U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 AUG -8  PM 3: 14

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DONNA BROWE, TYLER BURGESS, )
BONNIE JAMIESON, PHILIP JORDAN, )
LUCILLE LAUNDERVILLE, and )
THE ESTATE OF BEVERLY BURGESS, )
                                )
      Plaintiffs,              )
                                )
v.                               )   Case No. 2:15-cv-267
                                )
CTC CORPORATION and )
BRUCE LAUMEISTER, )
                                )
      Defendants.       )

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS
THE COMPLAINT**
(Doc. 28)

This matter is before the court on Defendants CTC Corporation and Bruce Laumeister's (collectively, "Defendants") May 23, 2016 motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). Defendants argue that the First Amended Complaint fails to state a claim for relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1191c, because the deferred compensation plan on which Plaintiffs base their claims is a "top hat" plan, which is not subject to ERISA's vesting, funding and fiduciary responsibility provisions. Defendants also contend that Plaintiffs lack standing to recover under ERISA, and that their claims are time-barred. Plaintiffs Donna Browe, Tyler Burgess, Bonnie Jamieson, Philip Jordan, Lucille Launderville, and the Estate of Beverly Burgess (collectively, "Plaintiffs") oppose the motion. On June 9, 2016, Defendants filed their reply memorandum, whereupon the court took this matter under advisement.[1]

---

[1] The court has previously addressed many of the issues set forth herein in a separate Opinion and Order granting Plaintiffs' motion for non-possessory writ of attachment dated August 2, 2016 (the "Attachment decision"). (Doc. 47.) Although duplicative, the court reiterates some of

Patrick J. Bernal, Esq. represents Plaintiffs, and A. Jay Kenlan, Esq. represents Defendants.

## I.    Allegations of the Complaint.

Defendant CTC Corp. ("CTC") operated a wholesale and retail photo-finishing facility and retail store in Bennington, Vermont from 1980 to 2014. CTC served both local and regional customers, as well as mail-order customers, and operated over twenty one-hour photo labs in Vermont, Connecticut, Massachusetts, and New York. On October 6, 2014, CTC dissolved. Plaintiffs allege that Defendant Bruce Laumeister was the CEO, President, sole shareholder, and director of CTC until its dissolution.

Plaintiffs Donna Browe, Philip Jordan, and Lucille Launderville are former employees of CTC. Ms. Browe is sixty-four years old, and was employed by CTC from 1980 until November 12, 2012. Mr. Jordan is sixty-three years old. He was employed by CTC from 1980 to October 1986, and again from October 1988 to January 4, 2008. Ms. Launderville is sixty-four years old, and was employed by CTC from 1980 until March 14, 2008.

Beverly Burgess was employed by CTC from 1980 until shortly before her death on November 29, 2004. Plaintiffs Bonnie Jamieson and Tyler Burgess are Ms. Burgess's children, and the beneficiaries of her estate. Ms. Jamieson is the administratrix of Ms. Burgess's estate. Plaintiffs allege that "soon after" Beverly Burgess's death Ms. Jamieson went to the CTC offices in Bennington and asked Ms. Launderville whether she, her brother, or the estate were entitled to benefits or payments in connection with Ms. Burgess's employment at CTC. (Doc. 1 at 11, ¶ 55.) Based on information allegedly provided by Defendants, Ms. Launderville replied that "no such benefits or payments were available[.]" *Id.* The Estate of Beverly Burgess was allegedly unaware of any entitlement to receive benefits until Ms. Launderville contacted Ms. Jamieson in 2015.

CTC offered a deferred compensation plan (the "Plan") to certain employees. In December 1990, CTC adopted the first written agreement governing the Plan (the "1990

---

the factual background and legal analysis contained in its Attachment decision rather than incorporating it herein by reference.

Agreement"). In 1997, CTC adopted a new deferred compensation plan (the "1997 Agreement"), which amended and superseded the 1990 Agreement.

The 1997 Agreement designates the Plan as "an employer paid fund[.]"[2] (Doc. 16-3 at 1, ¶ 2.) Participants were required to establish individual retirement accounts ("IRAs"), and deposit three percent of their annual salary therein. CTC agreed to contribute funds to the Plan, although it was not required to contribute a specific amount or set aside any monies in a segregated account for the benefit of participating employees.

Under the 1997 Agreement, payouts occurred as follows:

> In the event of normal, or postponed retirement, and in the event of disability, to the Participant so qualifying, payment for 120 consecutive months. During the 120 month period of payout, the growth of the account will continue at prevailing rates. A monthly payout amount will be computed, subject to periodic review and adjustment based on the rate of growth, to plan exhaustion of the Participant's fund at the final, 120th, payment.

*Id.* at 2, ¶ 6. The 1997 Agreement defined the term "retirement" as "withdrawal from full time active employment at or after age 65." *Id.* at 1, ¶ 3(c). The 1997 Agreement also provided that death benefits would "commence on the first day of the month following the Participant's death and be payable for 120 consecutive months, or [a] lump sum at the option of the beneficiary." *Id.* at 3, ¶ 6. Participants were permitted to designate one or more members of their immediate family as beneficiaries.

The 1997 Agreement states that:

> [Neither] [t]he Employer, nor the plan Administrators make any guarantee to the Participant, nor the [] Participant's beneficiary, as to the market value of the Participant's account upon retirement or in the event of disability payments or death benefit payments. The account balance is not targeted to any preconceived amount nor [is it] associated to a percentage of the Participant's salary. The balance of the account will be driven only by the

---

[2] Because the First Amended Complaint refers to and quotes from the 1997 Agreement, it is integral to the Complaint and may be considered on a Rule 12(b)(6) motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (noting that the court may consider a document outside the pleadings "where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.").

3

> economic market growth of the funds which the Employer has funded. The monthly payout amount will be reviewed and adjusted annually to reflect the growth of the account and to exhaust the fund balance over the remainder of the 120 month payout period.

*Id.* CTC was required to "advise the Participant[s] of the actual cash value of their account annually, and at the time of retirement." *Id.*

CTC administered the Plan, and its board of directors had authority to make "[a]ll decisions concerning withdrawal, payment, method of payment, [and] investments of funds[.]" *Id.* at 1, ¶ 4. Participants in the plan had the same rights as a "general creditor of the Employer [], and then solely to the extent of the net value of the Participant's deferred compensation account." *Id.* at 3, ¶ 7. The Plan, however, does not specifically state that it is a "top hat" plan.

The 1997 Agreement prohibited "funding" of the Plan as follows:

> 11.  PROHIBITION AGAINST FUNDING - If the Employer acquires a mutual fund, an annuity contract or life insurance policy, or any other asset in connection with its liabilities hereunder, neither a Participant nor any beneficiary of the Participant shall have any right with respect to, or claim against, such contract, policy or other asset and the Employer shall be named the owner and beneficiary of any such contract, policy or other asset. Such contract, policy, or other asset shall not be held under any trust for the benefit of a Participant or [beneficiaries] of a Participant or held in any way as collateral security for the performance of any obligation of the Employer under the Plan. Any such policy or other asset shall be, and remain, a general, unpledged, unrestricted asset of the Employer.

*Id.* at 4-5, ¶ 11.

Plaintiffs allege that Ms. Browe, Ms. Burgess, Mr. Jordan, and Ms. Launderville (collectively, the "Participants") were asked to complete application forms to participate in the Plan as defined in the 1997 Agreement, and that they "participated" in the Plan within the meaning of 29 U.S.C. § 1002(7).[3]

Defendants periodically provided the Participants with statements purporting to show the value of the Plan. Plaintiffs allege that one such statement dated March

---

[3] 29 U.S.C. § 1002(7) defines a "participant" under ERISA as "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit" from a deferred compensation plan.

18, 1997, projected total payouts to all Plan participants of $3,034,470, including $215,280 for Ms. Browe; $169,920 for Ms. Burgess; $269,280 for Mr. Jordan; and $592,470 to Lucille Launderville. Another statement, dated June 23, 2000 allegedly documented the Plan's value as $355,071.84, and showed that funds were not maintained in separate trust accounts for the benefit of each participant.

On April 24, 2006, Mr. Laumeister allegedly admitted to Ms. Launderville that he had been using Plan assets to pay for CTC's business expenses, including paying its creditors. During the conversation, Mr. Laumeister further allegedly told Ms. Launderville that the Plan's value had fallen to $136,745 from $263,490.40. Mr. Laumeister told Ms. Launderville not to worry and allegedly promised that he would "make up the difference, strictly between you and me." (Doc. 15 at 9, ¶ 47) (internal quotation marks omitted). Plaintiffs allege that soon after that meeting, Mr. Laumeister announced during a company meeting, with multiple employees present, that he had been using Plan assets to cover CTC's business expenses. Mr. Laumeister stated that his actions were necessary in light of the difficult economic climate for print-film developers because of the development of digital photography.

On January 1, 2008, Mr. Laumeister allegedly wrote an email to Ms. Launderville stating:

> The potential pension amounts for you, Donna [Browe] and Phil [Jordan] will be part of my future plans. I will, shortly, set up an increased fund with Mission Management and Trust that will fund the pay out of all of your [pension over] the 10 years (as specified in the agreement) at your retirement or if your employment has to terminate earlier, with my agreement, at that time.

Id. at 10, ¶ 49 (internal quotation marks omitted). On February 24, 2008, Mr. Laumeister wrote another email to Ms. Launderville stating, "[m]y intention is exactly what I showed you before. I am putting in my will and trust and instructing Mission Trust to pay your [deferred compensation] when you are 65 or when I check out. Donna [Browe]'s will be in the same instruction." Id. at ¶ 50 (internal quotation marks omitted).

5

In October 2014, Ms. Launderville and Ms. Browe met with Mr. Laumeister at a restaurant in Bennington, where he allegedly represented that he would personally fund their deferred compensation, but would make payment contingent on his ability to sell or lease certain real estate. On April 5, 2015, Mr. Laumeister wrote a follow-up email to Ms. Launderville, in which he reiterated that he had "promise[d] to personally fulfill your deferred [compensation], though it was a CTC responsibility." *Id.* at 10-11, ¶ 53. In the same email, Mr. Laumeister allegedly repeated that any payment of benefits would be contingent on the lease or sale of certain real property.

Plaintiffs allege that Mr. Laumeister has taken no steps to fulfill his promises to personally fund deferred compensation payments for Ms. Browe and Ms. Launderville. Plaintiffs further allege that other Plan participants have received "significant" payments under the Plan. *Id.* at 12, ¶ 58.

## II. Conclusions of Law and Analysis.

### A. Whether Defendants' Motion is Untimely.

As a threshold issue, Plaintiffs contend that Defendants' motion to dismiss is untimely because it was filed after Defendants answered Plaintiffs' original Complaint. A motion to dismiss for failure to state a claim under Rule 12(b)(6) "must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Although Defendants answered the original Complaint, Plaintiffs subsequently amended it. "It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted). Consequently, a responsive pleading addressed to the original complaint is rendered moot upon the filing of an amended complaint. *See Thompson v. Pallito*, 949 F. Supp. 2d 558, 582 (D. Vt. 2013) (noting that "motions addressed to the original complaint are generally regarded as moot upon the filing of an amended complaint."). Because Defendants have not answered the First Amended Complaint, the pleadings are not closed and Defendants may file a motion to dismiss under Rule 12(b)(6). Even if the pleadings were closed, the Second Circuit has directed that untimely motions to dismiss "should be construed by the district court as a

motion for judgment on the pleadings under Rule 12(c)." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). Defendants' motion is therefore timely and properly before the court.

### B. Whether to Convert Defendants' Motion to a Motion for Summary Judgment.

Defendants' motion to dismiss relies upon evidence outside of the pleadings, specifically declarations by Mr. Laumeister and Timothy Voigt, an expert in deferred compensation plans. Defendants contend that Mr. Laumeister's declaration serves to establish "facts that Plaintiffs had omitted from the Complaint[,]" (Doc. 36 at 3), and that Mr. Voigt's declaration serves to assist the court and the parties in understanding the elements of a "top hat" plan under ERISA. Defendants have no objection to conversion of their motion into a motion for summary judgment under Rule 12(d). Plaintiffs object to conversion because they have not had adequate time for discovery.

Under Rule 12(d), where "matters outside the pleadings are presented to and not excluded by the court," a motion to dismiss "must be treated as one for summary judgment under Rule 56[,]" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "As indicated by the word 'shall,' the conversion of a Rule 12(b)(6) motion into one for summary judgment under Rule 56 when the court considers matters outside the pleadings is 'strictly enforce[d]' and 'mandatory.'" *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (quoting *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir. 1999)). The court, however, retains discretion to "exclude the additional material and decide the motion on the complaint alone[,]" *Friedl v. City of New York*, 210 F.3d 79, 83 (2nd Cir. 2000) (internal quotation marks omitted), or "convert the motion to one for summary judgment under [Rule 56] and afford all parties the opportunity to present supporting material." *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988).

Because this case is in its early stages and neither party has had the benefit of discovery, the court exercises its discretion to decline "to consider extrinsic evidence"

7

and will instead "limit itself to the pleadings as it would on a motion to dismiss[.]" *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 70 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (noting a Rule 56 motion should be decided "after adequate time for discovery"). To the extent that Defendants request that the court treat their pending motion to dismiss as one for summary judgment, that request is DENIED.

### C.   Whether Dismissal Is Warranted.

Defendants assert that the First Amended Complaint fails to state a claim because Plaintiffs lack standing, and because the Plan is a non-qualified "top hat" plan under 29 U.S.C. §§ 1051(1), 1081(a)(3), 1101(a)(l), which is not subject to the vesting, funding and fiduciary responsibility provisions of ERISA that serve as the basis for Plaintiffs' claims. Defendants further contend that claims brought by the Estate of Beverly Burgess are barred by the statute of limitations.

On a motion to dismiss under Rule 12(b)(6), the court is "guided by '[t]wo working principles[.]'" *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). First, "a court must accept as true all of the [factual] allegations contained in a complaint[,]" a "tenet" that is, however, "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Second, only a complaint that . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face' . . . survives a motion to dismiss." *Id.* at 678-79 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*,

489 F.3d 499, 509 (2d Cir. 2007). "In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under 12(b)(6). Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Id.*

### 1. Whether Plaintiffs have Standing.

Defendants claim that Ms. Browe, Mr. Jordan, and Ms. Launderville lack standing to recover under the Plan because they left employment with CTC prior to the age of sixty-five, the vesting date expressly provided in the 1997 Agreement. Defendants also claim that the Estate of Beverly Burgess, Mr. Burgess, and Ms. Jamison lack "standing" because Ms. Burgess was not employed by CTC at the time of her death.

At the pleading stage, "standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003). Thus, "general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Although the 1997 Agreement states that accrued benefits are not payable until an employee retires from CTC at or after the age of sixty-five, or dies while employed by CTC, "[c]ourts must [] interpret plans to adhere to ERISA requirements." *Fenwick v. Merrill Lynch & Co.*, 2009 WL 426464, at *1 (D. Conn. Feb. 20, 2009) (citing *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 742 (2004)). Under ERISA's vesting provisions, one-hundred percent of an employee's accrued benefit derived from employer contributions in an individual account plan is "nonforfeitable" after six years of service with the employer. 29 U.S.C. § 1053(a)(2)(B)(iii). "[T]he statutory definition of 'nonforfeitable' assures that an employee's claim to the protected benefit is legally enforceable[.]" *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512 (1981). Because CTC allegedly employed Ms. Burgess, Ms. Browe, Mr. Jordan, and Ms. Launderville each for a period of more than six years, their accrued benefits may be nonforfeitable and their claims for benefits may be legally enforceable. *See* 29 U.S.C. § 1132(a)(1)(B) (permitting individuals who may be eligible to receive benefits to bring a lawsuit in

federal court "to enforce his [or her] rights under the terms of the plan[.]"). Accordingly, the court cannot rule as a matter of law that certain Plaintiffs lack standing, and Defendants' motion to dismiss on this basis is therefore DENIED.

### 2. Whether the Plan is a "Top Hat" Plan.

Defendants next claim that the Plan is exempt from ERISA's fiduciary protections. ERISA "is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). ERISA governs "employee benefit plan[s] . . . established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce[.]" 29 U.S.C. § 1003(a)(1). "Employee welfare benefit plans" include plans, funds, or programs established or maintained by the employer "for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment[.]" *Id.* at § 1002(1). When an ERISA plan suffers a loss because of a breach by a plan fiduciary's duties, the fiduciary is personally liable to "make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary[.]" *Id.* at § 1109(a).

> Top hat plans, however, are excluded from ERISA's fiduciary protections:
>
> ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and 1101, state that ERISA shall apply to any employee benefit plan, other than listed exceptions. One of these exceptions, known as a top hat plan, is defined as: "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Top hat plans are exempt from the participation and vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C. §§ 1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§ 1131-1145.

*Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286-87 (2d Cir. 2000). The rationale of the top hat exception is that "Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." *Gallione v. Flaherty*, 70 F. 3d 724, 727 (2d Cir. 1995). In order to qualify as a top hat plan, a deferred compensation plan must be "(1) unfunded, and (2) maintained primarily for a select group of management or highly compensated employees." *Demery*, 216 F.3d at 287. Defendants bear the burden of proving that the Plan is a top hat plan. *Daft v. Advest, Inc.*, 658 F. 3d 583, 596-97 (6th Cir. 2011) (observing that "the defendant-employer typically advocates for the top-hat status of an ERISA plan in order to avoid statutory liability, and therefore the defendant-employer typically bears the burden of proof on this issue in the district court.").[4]

A deferred compensation plan is unfunded where "benefits thereunder will be paid . . . solely from the general assets of the employer." *Gallione*, 70 F.3d at 725. "[T]he question a court must ask in determining whether a plan is unfunded is: 'can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?'" *Demery*, 216 F.3d at 287. Because the 1997 Agreement expressly states that "[t]he rights of the Participant created by the Plan shall be that of a general creditor of the Employer only[,]" (Doc. 16-3 at 5, ¶ 11), the Plan was unfunded as a matter of law.

---

[4] Defendants cite *Pane v. RCA Corp.*, 868 F.2d 631 (3d Cir. 1989), for the proposition that the plaintiff bears the burden of pleading that a plan is not a top hat plan. *See Pane*, 868 F.2d at 637 (rejecting the view that the top hat exception is an affirmative defense). The more recent trend, however, is to impose that burden on a defendant. *See, e.g., MacDonald v. Summit Orthopedics, Ltd.*, 681 F. Supp. 2d 1019, 1023 (D. Minn. 2010) (concluding that "Defendants bear the burden of showing that the Plan is a top hat plan"); *Deal v. Kegler Brown Hill & Ritter Co. L.P.A.*, 551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) (observing that "[t]he burden is on Defendant to show that the . . . Plan is a top hat plan."); *Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 142 (D. Mass. 2006), *aff'd*, 513 F.3d 37 (1st Cir. 2008) (noting that defendant "has the burden of proving that [deferred compensation plans] were each top hat plans."); *Virta v. DeSantis Enters., Inc.*, 1996 WL 663970, at *3 (N.D.N.Y. Nov. 7, 1996) ("Defendants have failed to controvert plaintiffs' evidence that this Plan was not administered as a Top Hat plan, and they bear the burden of proof on this affirmative defense").

11

In addition to being unfunded, in order to qualify as a top hat plan, "the plan must cover relatively few employees . . . [and] the plan must cover only high level employees." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996). As the top hat exception was intended for individuals who are capable of protecting their own pension expectations, the "[a]bility to negotiate is [also] an important component of top hat plans[.]" *Demery*, 216 F.3d at 289. "To determine whether the participants of an employee benefit plan are 'a select group of management or highly compensated employees,' [the Second Circuit] require[s] the district court to conduct a *fact-specific inquiry*, analyzing quantitative and qualitative factors in conjunction." *Id.* at 287 (emphasis supplied). For this reason, a court may decline to rule on the top hat defense at the motion to dismiss stage. *See, e.g., Godina v. Resinall Int'l Inc.*, 2009 WL 4545213, at *4 (D. Conn. Dec. 1, 2009) (declining to dismiss on the basis that ERISA plan was purportedly a top hat plan because "[p]roper consideration of the[] [relevant] factors requires evidentiary proof and cannot be done at the motion to dismiss stage on the pleadings before the [c]ourt in this case."). Because the First Amended Complaint does not allege that the Plan covered "relatively few" or "high level" employees, *In re New Valley Corp.*, 89 F.3d at 148, or that Plaintiffs had the ability to negotiate plan terms, Defendants have failed to establish that the Plan is a top hat plan under 29 U.S.C. § 1051(2). Their motion to dismiss on that basis is therefore DENIED.

### 3. Whether the Estate of Beverly Burgess, Tyler Burgess, and Bonnie Jamieson's Denial of Benefits Claims are Time-Barred.

Finally, Defendants assert that the Estate of Beverly Burgess, Tyler Burgess, and Bonnie Jamieson's denial of benefits claims are barred by the statute of limitations because Ms. Jamieson filed her claims twelve years after being advised by Ms. Launderville that no benefits were due to the Estate of Beverly Burgess in 2004. Plaintiffs respond that the statute of limitations should be equitably tolled because Ms. Jamieson did not have sufficient information to ascertain whether the Estate of Beverly Burgess was wrongfully denied benefits until just before the lawsuit was filed.

"The statute of limitations is . . . an affirmative defense . . . on which the defendant has the burden of proof[.]" *Bano v. Union Carbide Corp.*, 361 F.3d 696, 710 (2d Cir. 2004) (internal citation omitted). Defendants may only prevail on a statute of limitations defense if the "complaint clearly shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999). "Statutes of limitations are generally subject to equitable tolling where necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004). "Where defendant is responsible for concealing the existence of plaintiff's cause of action, [the Second Circuit] has held equitable tolling appropriate." *Id.* "The relevant question is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Id.* "Additionally, the burden of proving that tolling is appropriate rests on the plaintiff." *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 512 (2d Cir. 2002).

With respect to ERISA claims for denial of benefits[5] pursuant to 29 U.S.C. § 1132, "the controlling limitations period is that specified in the most nearly analogous state limitations statute." *Miles v. N.Y. State Teamsters Conference Pension & Ret. Fund Employee Pension Ben. Plan*, 698 F.2d 593, 598 (2d Cir. 1983). This court has previously applied "Vermont's six year statute of limitations to actions under ERISA asserting denial of benefits."[6] *Borowski v. Int'l Bus. Machs. Corp.*, 928 F. Supp. 424, 427 (D. Vt. 1996) (footnote supplied).

"A plaintiff's ERISA cause of action accrues, and the six-year limitations period begins to run, when there has been a repudiation by the fiduciary which is clear and made

---

[5] Plaintiffs' denial of benefits claims are pled in the alternative. If Defendants are liable to the Plan for breaches of fiduciary duty, individual Plaintiffs would then obtain benefits from the Plan itself, not Defendants. *See Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985) (noting that fiduciary claims under ERISA are "brought in a representative capacity on behalf of the plan.")

[6] Vermont's general statute of limitations, 12 V.S.A. § 511, states "A civil action, . . . shall be commenced within six years after the cause of action accrues and not thereafter." 12 V.S.A. § 511.

13

known to the beneficiaries." *Miles*, 698 F.2d at 598 (internal quotation marks omitted). A claim for denial of benefits accrues "regardless of whether the plaintiff has filed a formal application for benefits." *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 49 (2d Cir.1999). The limitations period is "triggered by either actual knowledge or constructive knowledge of a clear repudiation." *Id.* at 48 n.4.

According to the allegations of First Amended Complaint, the Estate of Beverly Burgess, Tyler Burgess, and Bonnie Jamieson were not aware of any entitlement to receive benefits under the Plan until Ms. Launderville contacted them in 2015. Based on the facts alleged, it is therefore at least plausible that Ms. Jamieson would not have been "aware of the existence of a cause of action." *Veltri*, 393 F.3d at 323. Indeed, the First Amended Complaint alleges that the denial of benefits was communicated only verbally.[7] *See id.* at 324 (tolling statute of limitations where defendant "fail[ed] to comply with the regulatory obligation to disclose the existence of a cause of action"). Defendants have thus failed to sustain their burden of proof to show that the Estate of Beverly Burgess, Tyler Burgess, and Bonnie Jamieson's claims are untimely.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint (Doc. 28) is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 8th day of August, 2016.

Christina Reiss, Chief Judge
United States District Court

---

[7] ERISA requires deferred compensation plans to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied[.]" 29 U.S.C. § 1133(1).