U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 AUG -1 PM 4: 24

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

DONNA BROWE, TYLER BURGESS, )
BONNIE JAMIESON, PHILIP JORDAN, )
LUCILLE LAUNDERVILLE, and )
THE ESTATE OF BEVERLY BURGESS, )
)
Plaintiffs, )
)
v. ) Case No. 2:15-cv-267
)
CTC CORPORATION and )
BRUCE LAUMEISTER, )
)
Defendants. )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Doc. 107)

Plaintiffs Donna Browe, Tyler Burgess, Bonnie Jamieson, Philip Jordan, Lucille Launderville, and the Estate of Beverly Burgess (collectively, "Plaintiffs") bring this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1191c, against Defendants CTC Corporation ("CTC") and Bruce Laumeister (collectively, "Defendants"). Plaintiffs allege that Defendants failed to adequately fund and wrongfully denied them pension benefits owed under CTC's deferred compensation plan (the "Plan") and that Defendants breached various fiduciary duties to them.

Although the parties agree that CTC's deferred compensation plan is covered by ERISA, in moving for partial summary judgment, Plaintiffs seek a ruling that the Plan is not a "top hat" plan[1] as a matter of law and is thus subject to ERISA's participation and vesting provisions, *id.* §§ 1051-1061, funding provisions, *id.* §§ 1081-1086, and fiduciary

---

[1] ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[.]" 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1).

responsibility provisions, *id.* §§ 1101-1114. Plaintiffs contend that because the Plan is not a "top hat" plan, the undisputed material facts establish that Defendants have violated ERISA entitling Plaintiffs to prevail on the issue of fiduciary liability for purposes of Counts III, IV, and V of their Second Amended Complaint, with damages for those claims to be decided in a subsequent proceeding. Defendants oppose the motion. On May 16, 2017, Plaintiffs filed their reply memorandum, whereupon the court took this matter under advisement.

Patrick J. Bernal, Esq. and John D. Stasny, Esq. represent Plaintiffs. A. Jay Kenlan, Esq. represents Defendants.

## I. The Undisputed Facts.

### A. CTC Corporation.

CTC was a photo-finishing and processing company, founded by Defendant Laumeister in 1979. Until its dissolution in October 2014, CTC owned and operated a retail photo-finishing facility and retail store in Bennington, Vermont, from which it serviced walk-in and mail-order customers. CTC also operated over twenty one-hour photo labs in Vermont, Connecticut, Massachusetts, New Hampshire, and New York. Throughout CTC's existence, Defendant Laumeister was the CEO and sole shareholder. Defendant Laumeister has a bachelor's degree in engineering and a master's degree in business administration.

Prior to founding CTC, Defendant Laumeister served for several years as an executive at General Electric, a position in which he oversaw about 400 employees. Defendant Laumeister was also CEO at other companies, including at least one with annual sales in excess of one hundred million dollars.

### B. The Plaintiffs.

Plaintiff Browe worked in CTC's accounting department from the time CTC first opened for business until November 12, 2012. She began work as a minimum-wage clerk and worked as a clerk until at least 1990. In 2000, she became a manager of the accounting department after the prior manager had a stroke. In 1986, she earned $15,850. In 2001, she earned her highest ever annual compensation of $37,692.

Plaintiff Jordan first worked for CTC from its inception until 1986, and then again from 1988 until January 4, 2008. Plaintiff Jordan initially worked as a salesman and eventually became a sales manager. His highest ever annual salary was $30,009.

Plaintiff Launderville was employed by CTC from its inception until March 14, 2008, when she resigned to take a job with another company. During a portion of her time at CTC, she was concurrently employed by and received additional compensation from another company owned by Defendant Laumeister. As a result, she received approximately $105,000 in total combined annual compensation. In 1991 or 1992, she became plant manager of CTC's Bennington facility and in 1996 was promoted to vice president and general manager. In 1996, Defendant Laumeister promoted her to president of CTC.

Beverly Burgess began working for CTC at its inception and worked at the Bennington facility. She died in 2004. During her employment at CTC, she earned between $10,811.61 and $29,039.32. Tyler Burgess and Bonnie Jamieson are her children.

C.   **The Deferred Compensation Plans.**

1.   **The 1990 and 1997 Agreements.**

In December 1990, CTC adopted a written agreement governing its deferred compensation plan (the "1990 Agreement"). The 1990 Agreement was amended and superseded in 1997 when CTC adopted a new deferred compensation plan agreement (the "1997 Agreement") (collectively, "the Plan"). CTC did not offer any other retirement plan to its employees. Plaintiffs Browe, Burgess, Jordan, and Launderville participated in the Plan.[2]

---

[2] Defendants assert that "Plaintiffs have neither pled nor produced in response to Defendants' request for production of documents any documents or agreements establishing membership of Philip Jordan or Beverly Burgess as Plan participants." (Doc. 121 at 15, ¶ 9.) In Defendants' Answer, however, they responded "ADMITTED" to Plaintiffs' allegations in their initial Complaint (Doc. 1) that Plaintiffs Browe, Burgess, Jordan, and Launderville are Plan participants. *See* Doc. 11 at ¶¶ 4, 7, 18, 21. Defendants are bound by their judicial admissions. *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 491 (2d Cir. 2014) ("'Facts admitted in an answer, as in any pleading, are judicial admissions that bind the defendant

3

The 1997 Agreement provides that it is an "employer paid fund[,]" and that CTC "agrees to contribute funds which will accumulate and be payable in accordance with Section 6." Doc. 107-1 at 6-7, ¶ 13 (internal quotation marks omitted). Section 6 of the 1997 Agreement provides, in part:

> 6. BENEFITS UNDER PLAN - The Plan provides for alternative types of payment as follows:
>
> Deferred Compensation Payments, payable upon the happening of any of the following events:
>
> 1) Retirement of the Participant[.] ["Retirement" is defined as "withdrawal from full time active employment at or after age 65."]
>
> 2) Death Benefits, payable when a Participant dies before Deferred Compensation payments start.
>
>    a) death benefit equals mark value of a participant's account, less an insurance payment provided under 2b.
>
>    b) employer has also funded, group term life insurance equal to one time participant's annual salary, for which the participant has named a beneficiary. (This benefit is in addition to the one time salary provided with the participant's group insurance benefit package, and will be equal to one time the Participant's current annual salary.)
>
> . . .
>
> Subject to all provisions hereof, the Employer agrees to pay Deferred Compensation [Payments], as follows:
>
> In the event of normal, or postponed retirement, and in the event of disability, to the Participant so qualifying, payment for 120 consecutive months. . . . A monthly payout amount will be computed, subject to periodic review and adjustment based on the rate of growth, to plan exhaustion of the Participant's fund at the final, 120th, payment.

*Id.* at 5-6, ¶ 11 (quoting Doc. 16-3 at 2).

---

throughout th[e] litigation.'") (alteration in original) (quoting *Gibbs ex rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006)).

The 1997 Agreement further provides that "[a] Participant may designate one or more beneficiaries, but any [named] beneficiaries must be a member of his/her immediate family, that is spouse and[/]or children under the age of twenty-one, of Participant." *Id.* at 6, ¶ 12 (internal quotation marks omitted). In the event of death benefits, the 1997 Agreement provides that payments "will commence on the first day of the month following the Participant's death and be payable for 120 consecutive months, or lump sum at the option of the beneficiary." *Id.* at 6, ¶ 13 (internal quotation marks omitted).

The 1990 Agreement provides that CTC "'agree[d] to contribute an amount sufficient to provide a total retirement benefit, including social security, and the participant's personal IRA account, which will approximately equal each participant's salary at the date of this Plan.'" *Id.* at 7, ¶ 13 (quoting Doc. 16-2 at 2, ¶ 5). The 1997 Agreement provides that CTC "'will advise the Participant of the actual cash value of their account annually, and at the time of retirement.'" *Id.* (quoting Doc. 16-3 at 3, ¶ 6).

### 2. CTC Employees Eligible to Participate in the Plan.

CTC offered the Plan to eighteen employees, not all of whom elected to participate. *Id.* at 7, ¶ 15.[3] In establishing the Plan, Defendant Laumeister explained that he was "interested in creating what he understood to be a 'non-qualified plan,' meaning that he 'only wanted it to benefit the people that were making a difference in the business and that were critical to the business.'" *Id.* at 8, ¶ 15 (quoting Doc. 107-2 at 12, 33:9-11).

In addition to Plaintiffs Browe, Launderville, and Burgess, CTC employees Sharon Fish, Hope Leonard, and Bill Elliot were offered to participate in the Plan. Defendant Laumeister testified that he is "quite sure" that none of the Plan participants had a four-year college degree. *Id.* at 9, ¶ 17 (quoting Doc. 107-2 at 25, 106:22).

Plaintiff Launderville and CTC employee Wayne Massari received a combined total of $113,230 of the compensation paid by CTC in 1997. CTC's payroll for all other

---

[3] Defendants dispute that the Plan was offered to eighteen CTC employees but cite no admissible evidence to the contrary. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record").

employees in 1997 was $262,845 and its cost of labor was $623,785. CTC's total payroll was $999,860.

### 3. Defendants' Roles as Plan Fiduciaries.

Under the 1997 Agreement, CTC and its board of directors administered the Plan. Defendant Laumeister, a director, made decisions concerning the funds contributed to the Plan, answered questions about the Plan, administered the Plan, and terminated a vendor who had helped administer the Plan.[4]

Defendant Laumeister offered to personally fulfill Plaintiff Launderville's deferred compensation. Defendant Laumeister informed Plaintiff Launderville that: "'My intention is exactly what I showed you before. I'm putting in my will and trust and instructing Mission Trust to pay your [deferred compensation] when you are 65 or when I check out. Donna's will be the same instruction.'" (Doc. 107-2 at 51, 204:3-7.)

The Plan money was a "general credit" of CTC. Defendant Laumeister testified that if Mr. Massari had a "legitimate bill" then "that money was available to keep the company going." *Id.* at 47-48, 190:6-7, 191:3-4. The 1997 Agreement provides that any funds held for the Plan "shall be, and remain, a general, unpledged, unrestricted asset of [CTC]." (Doc. 16-3 at 5, ¶ 11.)

### 4. Defendant Laumeister's Representations Concerning Payments to Plaintiffs.

CTC was dissolved in October 2014. In an April 5, 2015 e-mail from Defendant Laumeister to Plaintiff Launderville, he stated, "I did promise to personally fu[l]fill your deferred comp, though it was a CTC responsibility." (Doc. 16-6 at 1.) He further stated that: "As you should remember, however, the payment is contingent on [certain personal property] providing either a sale or leasing to provide the funds." *Id.* Defendant

---

[4] Defendant Laumeister disputes Plaintiffs' assertion that he "fired" a vendor who had helped provide the Plan. Plaintiffs' citation to the record evidence supports their assertion and Defendants offer no evidence to the contrary. *See* Doc. 107-1 at 16, ¶ 27 (citing Doc. 107-2 at 11, 24:1-6) ("There was the 1990 plan that was sold to Western Massachusetts Mutual and the '97 plan which *after I fired Mass Mutual for nonperformance*, with the help of Wayne Massari and some other people -- Wayne Massari was the treasurer and CFO -- we developed the '97 plan which was similar.") (emphasis supplied).

6

Laumeister concluded his e-mail by advising Plaintiffs Launderville and Browe that they should "keep working" rather than retire and stated: "This letter is strictly for your eyes. Please do not share it with anyone else. I've tried to be totally straight with you and only you." *Id.* at 1-2. Plaintiffs received no benefits under the Plan.

## II. Whether Defendants' Statement of Disputed Facts Should be Considered.

Defendants have not submitted a "separate, concise statement of disputed material facts" as required by Local Rule 56(b). Instead, they include within their opposition "Defendants' Response to Plaintiffs' Statement of Undisputed Facts" to which the "Third Certification of Bruce Laumeister" is attached.[5]

A district court has "broad discretion to determine whether to overlook a party's failure to comply with local court rules" and "even where one of the parties has failed to file [a statement of undisputed or disputed facts]" the court "may in its discretion opt to 'conduct an assiduous review of the record.'" *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (quoting *Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000)). Here, it would exalt form over substance to ignore Defendants' statement of disputed facts merely because it is not "separate" from Defendants' opposition.

Substantially more serious is Defendants' failure to comply with Fed. R. Civ. P. 56(c)'s requirement of citation to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" A court should not be required to comb the record for admissible evidence to support a counselled defendant's statement of disputed facts. Accordingly, to the extent the record does not readily yield support for

---

[5] The Third Certification does not state that it is based on personal knowledge nor is it made under oath. It is therefore inadmissible. *See* Fed. R. Civ. P. 56(c)(4) (requiring that an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge"); *Lexington Ins. Co. v. Rounds*, 349 F. Supp. 2d 861, 869 (D. Vt. 2004) ("It is well settled that a district court should disregard an unsworn letter in ruling on a summary judgment motion").

7

Defendants' statement of disputed facts, the court will proceed no further and will deem any unsupported statement admitted.

### III.  Disputed Facts.

The parties dispute the total number of CTC employees in 1997. Plaintiffs contend that the eighteen employees to whom CTC offered participation in the Plan account for $495,871 of CTC's total payroll of $999,860, with the remaining $503,989 constituting the payroll for employees not offered to participate. Plaintiffs conclude that the remaining $503,989 could only have allowed CTC to employ "no more than 42 individuals in addition to Plan offerees." (Doc. 107-1 at 13, ¶ 22.) Plaintiffs reach this conclusion based on the following assumptions. CTC operated twenty-three retail stores and each of the twenty-three retail store managers earned $18,000 per year, the minimum testified to by Defendant Laumeister. The remaining CTC employees each worked no more than twenty hours per week for fifty weeks out of the year (1,000 hours per year) and received the federal minimum wage of $4.75 per hour for the first eight months of 1997 and then received $5.15 per hour for the last four months. From this, Plaintiffs conclude that "CTC necessarily had *at most* 60 employees in 1997[,]" twenty-three retail-store managers and nineteen minimum-wage earners, and that "[t]he Plan, therefore, was offered to *more than* 30% (18/60) of CTC's workforce." *Id.* at 15, ¶ 22.

Defendants dispute Plaintiffs' calculation, arguing that the number of employees Plaintiffs proffer could not reasonably have staffed twenty-three stores and Plaintiffs' estimate further fails to take into account the part-time nature of the employment of a number of the CTC Corporation employees. Defendants point out that Defendant Laumeister testified that CTC employed approximately 196 people and at minimum employed 185 people in 1997. Both parties concede that because the relevant records have long since been destroyed, the court must rely on collateral facts and circumstances to make this determination. Defendants contend that this is a matter requiring expert testimony; Plaintiffs argue it is a matter of mere arithmetic.

Defendants further dispute that Defendant Laumeister testified that *each* retail store manager earned between $18,000 and $24,000, and assert that he "testified that the

8

managers of *two* of the retail stores may have been paid as much as $18,000-$24,000 per year but did not testify as to the compensation paid to the managers of *all* retail stores." (Doc. 121 at 18, ¶ 20) (emphasis supplied). Both the question and the answer at issue are imprecise and are not directed to a particular time period:

> Q. How much did the store managers at the different one-hour photo labs make in a year?
>
> A. The maximum was probably about 24,000. That was the Keene . . . one probably, and maybe the New Hampshire one.
>
> The least was probably about 18. 18 to 19.

(Doc. 107-2 at 44, 154:16-21.)

Finally, Defendants dispute whether the Plan was offered to employees based on their value to CTC or based on their "high level" status. Although Plaintiffs cite Defendant Laumeister's testimony that CTC offered the Plan to essential employees regardless of their managerial or supervisory status, Defendants counter that a comparison of relative compensation levels establishes that only highly compensated employees within CTC were offered Plan participation.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A genuine dispute exists when the evidence is such that, if the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." *S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings,

9

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [Rather], the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations, emphasis, footnote, and internal quotation marks omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

### B. Whether Plaintiffs Are Entitled to Summary Judgment in Their Favor Because the Plan Is Not a "Top Hat" Plan under ERISA.

"ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and 1101, state that ERISA shall apply to any employee benefit plan, other than listed exceptions." *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000). One such exception is a "top hat" plan which is "excluded from ERISA's vesting, funding, and fiduciary responsibility requirements because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." *Gallione v. Flaherty*, 70 F.3d 724, 727 (2d Cir. 1995). To decide whether the Plan is a "top hat" plan, the court must determine whether it was "(1) unfunded, and (2) maintained primarily for a select group of management or highly compensated employees." *Demery*, 216 F.3d at 287. Plaintiffs seek partial summary judgment,

10

contending Defendants will be unable to establish that the Plan satisfies these requirements.

Although Defendants contend that "by its terms, [the 1997 Agreement] establishes that it is a top hat Plan[,]" the 1997 Agreement is bereft of any reference to a "top hat" plan or to the ERISA provisions that authorize such plans. (Doc. 121 at 16.) The 1997 Agreement nonetheless expressly states that "[t]he rights of the Participant created by the Plan shall be that of a general creditor of the Employer only[.]" (Doc. 16-3 at 3, ¶ 7.) Pursuant to Second Circuit precedent, this renders the Plan unfunded as a matter of law. *See Demery*, 216 F.3d at 286 ("[T]he question a court must ask in determining whether a plan is unfunded is: 'can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?'").

In evaluating whether a plan is maintained primarily for a "select group," the Second Circuit "require[s] the district court to conduct a fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction." *Id.* at 288. Quantitatively, "the plan must cover relatively few employees." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996). Qualitatively, "the plan must cover only high level employees." *Id.*

Plaintiffs assert that because the Plan was not offered to relatively few employees, not all of whom occupied supervisory positions, it was not maintained for a "select group" of "high level employees." Defendants respond that the relevant facts are in dispute, and the required factual inquiry is more nuanced that a mere analysis of the number of employees and their salaries and job responsibilities.

1. **Whether the Plan Covers "Relatively Few Employees."**

According to Plaintiffs, the Plan was offered to at least eighteen CTC employees and CTC had no more than sixty employees in 1997. From this, Plaintiffs conclude that CTC offered the Plan to approximately 30% of CTC's workforce, which Plaintiffs assert is above the 15.34% which the Second Circuit has stated "is probably at or near the upper limit of the acceptable size for a 'select group[.]'" *Demery*, 216 F.3d at 289.

11

Although Defendants failed to identify a disputed issue of fact regarding the number of employees offered the Plan, drawing all inferences in their favor, they have established the total number of CTC employees in 1997 is in dispute. Defendants ask the court to draw a reasonable inference that the number of employees Plaintiffs proffer could not reasonably have staffed twenty-three stores. They further point out that Defendant Laumeister testified that CTC employed approximately 196 people and at minimum employed 185 people in 1997, which means that the Plan was offered to only thirteen employees, with eleven participating. Defendants therefore conclude that the Plan was offered to 6.6% of CTC Corporation's employees and participated in by 5.6% of employees. They contend these percentages satisfy the Second Circuit's requirement that the Plan be offered to a "select group."

The court cannot decide this issue as a matter of law because it requires a determination of the credibility of Defendant Laumeister's recollection weighed against Plaintiffs' "simple arithmetic." Summary judgment on this issue is therefore unavailable. *See Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016), *as amended* (Feb. 24, 2016) ("In deciding a summary judgment motion, a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact.") (internal quotation marks omitted).

### 2. Whether the Plan Covers Only "High Level Employees."

Plaintiffs argue that participation in the Plan was not based on managerial status or compensation level and therefore the Plan cannot be a "top hat" plan as a matter of law. They further point out that Defendants proffer no evidence that Plan participants were capable of negotiating to protect their pension expectations, or that they enjoyed a level playing field with Defendant Laumeister who is highly educated and who was experienced in business and financial matters.

In *Demery*, the Second Circuit held that a deferred compensation plan which included "assistant vice presidents and branch managers, and therefore swept more broadly than a narrow range of top executives" was "nonetheless limited to highly valued managerial employees." 216 F.3d at 290. The Circuit explained that if a plan is established "as a means to retain valuable employees," this factor "must weigh in favor of

classifying the [p]lan as a top hat plan." *Id.* at 287 (internal quotation marks omitted). It is also "significant that the statute defines a top hat plan as 'primarily' designed to provide deferred compensation for certain individuals who are management or highly compensated" because "[i]t suggests that if a plan were principally intended for management and highly compensated employees, it would not be disqualified from top hat status simply because a very small number of the participants did not meet that criteria, or met one of the criteria but not the other." *Id.* at 289.

The parties dispute the nature of the job duties for several Plan participants, including Plaintiff Burgess, Mr. Elliot, Ms. Fish, and Ms. Leonard. Plaintiffs' descriptions of their job duties, if credited, would establish that these employees were not upper management or otherwise highly valued. Defendants point to portions of the record evidence in which Defendant Laumeister testified that these employees were sufficiently critical to the day-to-day functioning of CTC such that he considered them to be invaluable.

For example, Defendant Laumeister testified that Ms. Fish, who earned approximately $22,000 per year, was "in charge" of incorporating material from another business Defendant Laumeister had purchased into CTC's business and that "for the first several years [Ms. Fish] was critical" and that by 1997 her duties increased. (Doc. 107-2 at 33-34, 133:24-134:6.) Although Ms. Leonard, who earned approximately $18,000 per year, worked as a printer and operator for CTC, Defendant Laumeister explained that by 1997 she was "supervising what came in from the dealers as well as with the route drivers." *Id.* at 29, 144:6-8. Mr. Elliot, who earned approximately $20,000 per year, worked in maintenance for CTC, but Defendant Laumeister explained that he "was absolutely invaluable and critical," and that as the parts and repair shop manager he was in charge of parts, ordering parts, machinery repair, and even making parts for older machines. *Id.* at 33, 133:6-8. Defendants point out that the courts do not merely examine salaries and titles but also analyze whether the plan was "viewed as a means to retain valuable employees." *Demery*, 216 F.3d at 288.

With respect to Plan participants' ability to negotiate, Plaintiffs assert that it "strains credibility" to suggest that the maintenance and retail employees could negotiate the terms of the Plan with Defendants. (Doc. 107 at 14.) While the "[a]bility to negotiate is an important component of top hat plans," *Demery*, 216 F.3d at 289, this requirement is derived not from ERISA, but from a Department of Labor ("DOL") opinion letter which courts have not found controlling. *See, e.g., Alexander v. Brigham & Women's Physicians Org.*, 513 F.3d 37, 47 (1st Cir. 2008) (rejecting "a hard-and-fast requirement that individual top-hat plan beneficiaries must have bargaining power" because courts that have so held have "all ultimately derive[d] that requirement from the DOL opinion letter" and declining "to depart from the plain language of the statute and jerry-build onto it a requirement individual bargaining power."). In any event, neither party has proffered admissible evidence regarding the Plan participants' ability to negotiate the terms of the Plan or whether any participant ever attempted to do so. *See Demery*, 216 F.3d at 289-90 (observing that a plan may retain "top hat" status where the record is "silent as to plaintiffs' ability to negotiate the terms of the Plan, and there is no evidence that they attempted to do so" and devoid of "either direct or circumstantial evidence suggesting an absence of bargaining power").

Plaintiffs appear to have a strong argument that Defendants will be unable to establish the requirements of a "top hat" plan at trial. However, they fall short of establishing that outcome as a matter of law. Affording all reasonable inferences in Defendants' favor, in light of the disputed issues of material fact, Plaintiffs' motion for partial summary judgment on the issue of whether the Plan is a "top hat" plan must be denied. Partial summary judgment with regard to Counts III, IV, and V of Plaintiffs' Second Amended Complaint is therefore also DENIED.

### C. Whether Plaintiffs Are Entitled to Judgment on Defendants' Affirmative Defenses of Standing and Statute of Limitations.

#### 1. Whether Plaintiffs Have Standing.

Plaintiffs seek judgment as a matter of law on Defendants' affirmative defense that Plaintiffs lack standing to recover under the 1997 Plan. In opposing summary judgment,

Defendants have not challenged Plaintiffs' standing and thus they have abandoned this defense. *See Jackson v. Fed. Express*, 766 F.3d 189, 194-95 (2d Cir. 2014) (explaining that although "Rule 56 does not allow district courts to automatically grant summary judgment on a claim simply because the summary judgment motion, or relevant part, is unopposed[,]" a "partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims"). Even in the absence of abandonment, Plaintiffs have established their entitlement to summary judgment on this affirmative defense.

Under ERISA's minimum vesting provisions, one hundred percent of an employee's accrued benefit derived from employer contributions in an individual account plan is "nonforfeitable" after six years of service with the employer. 29 U.S.C. § 1053(a)(2)(B)(iii). "[T]he statutory definition of 'nonforfeitable' assures that an employee's claim to the protected benefit is legally enforceable[.]" *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512 (1981).

In this case, the undisputed facts reveal that CTC employed Plaintiff Burgess, Plaintiff Browe, Plaintiff Jordan, and Plaintiff Launderville for a period of more than six years. As a result, their accrued benefits may be nonforfeitable and their claims for benefits may be legally enforceable. *See* 29 U.S.C. § 1132(a)(1)(B) (permitting individuals who may be eligible to receive benefits to bring a lawsuit in federal court "to enforce his [or her] rights under the terms of the plan[.]"). The court therefore GRANTS Plaintiffs' motion for partial summary judgment with regard to Defendants' affirmative defense of lack of standing.

### 2. Whether the Plaintiffs' Claims are Time-Barred.

Plaintiffs contend they are also entitled to judgment as a matter of law with regard to Defendants' statute of limitations affirmative defense. A claim for a breach of a fiduciary duty under ERISA must be brought before "the earlier of—

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three

years after the earliest date on which the plaintiff had actual knowledge of the breach or violation[.]

29 U.S.C. § 1113.

Although Plaintiffs cite no specific dates for the triggers set forth in § 1113, they argue that there is no evidence that they had specific knowledge of the actual breaches of fiduciary duty upon which they brought this action prior to the expiration of the limitations period. Plaintiffs further contend that Defendants cannot establish that the claims of the Estate of Beverly Burgess, Plaintiff Burgess, and Plaintiff Jamieson are time-barred because there was no clear repudiation of benefits. Even if there was a clear repudiation of benefits (although Plaintiffs fail to identify the date on which it presumably occurred), they assert "that would not mean that Plaintiff Burgess or Plaintiff Jamieson were ever put on notice that *they* (as Plan beneficiaries) had any knowledge of their actionable right to benefits in the first instance." (Doc. 107 at 20.) Finally, Plaintiffs assert they are entitled to equitable tolling.

Defendants counter that the claims of the Estate of Beverly Burgess, Plaintiff Burgess, and Plaintiff Jamieson are time-barred because Plaintiff Jamieson testified at deposition that she was informed in 2004 by Plaintiff Launderville that no benefits were owed to her mother's estate. In support of this contention, Defendants have not submitted Plaintiff Jamieson's deposition testimony, nor have they proffered any other evidence regarding what, if anything, Plaintiff Launderville told Plaintiff Jamieson in 2004.

A "statute of limitations argument is an affirmative defense for which [the defendant] bears the burden of proof." *United States v. Livecchi*, 711 F.3d 345, 352 (2d Cir. 2013). However, "[t]he party seeking equitable tolling bears the burden of proving he is entitled to it." *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Watson v. United States*, 2017 WL 3221270, at *5 (2d Cir. July 31, 2017) (internal quotation marks omitted).

In this case, neither party has proffered admissible evidence to establish entitlement to judgment as a matter of law on the statute of limitations issue. At best, they make arguments regarding how the facts may be interpreted without establishing those underlying facts as required by Fed. R. Civ. P. 56. Summary judgment must therefore be DENIED in Plaintiffs' favor on Defendants' statute of limitations affirmative defense.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment on Counts III, IV, and V is DENIED. Summary judgment is GRANTED in favor of Plaintiffs on Defendants' affirmative defense of lack of standing and DENIED with regard to Defendants' statute of limitations defense. Plaintiffs' request for attorneys' fees is DENIED as premature.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 1st day of August, 2017.

Christina Reiss, Chief Judge
United States District Court