UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 JUN 22 PM 2: 39

CLERK
BY
DEPUTY CLERK

DONNA BROWE, TYLER BURGESS, )
BONNIE JAMIESON, PHILIP JORDAN, )
LUCILLE LAUNDERVILLE, and )
THE ESTATE OF BEVERLY BURGESS, )
)
Plaintiffs, )
)
v. ) Case No. 2:15-cv-267
)
CTC CORPORATION and )
BRUCE LAUMEISTER, )
)
Defendants. )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Donna Browe, Tyler Burgess, Bonnie Jamieson, Philip Jordan, Lucille Launderville, and the Estate of Beverly Burgess (collectively, "Plaintiffs") allege that Defendants CTC Corporation ("CTC") and Bruce Laumeister (collectively, "Defendants") violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1191c, by failing to adequately fund and by wrongfully denying them benefits under 1990 and 1997 deferred compensation plans (collectively, the "Plan"). They further allege that Defendants breached fiduciary duties and reporting and disclosure obligations owed to them under ERISA.

Defendants deny liability and assert that the Plan is a nonqualified "top hat" plan pursuant to which they have no further obligations. They further assert that the applicable statute of limitations bars Plaintiffs' claims. In the alternative, if they are found liable for Plaintiffs' claims, pursuant to the counterclaims they have asserted, they contend that Plaintiff Lucille Launderville should be held jointly and severally liable and indemnify them for any ERISA damages awarded against them.

From December 6-8, 2017 and March 5-6, 2018, the court conducted a bench trial. On March 26, 2018, the parties submitted supplemental briefing, at which time the court took the matter under advisement.

Patrick J. Bernal, Esq. and John D. Stasny, Esq. represent Plaintiffs. A. Jay Kenlan, Esq. represents Defendants.

## I.  Findings of Fact.

Based upon the preponderance of the evidence, the court makes the following findings of fact:

**Absence of Relevant Records.**

1. The court's ability to make findings of fact in this matter is severely hampered by the destruction of most of CTC's corporate records and by Plaintiffs' failure to retain copies of the documents that they rely on for their claims.[1]

2. In many instances, there is a lack of reliable evidence especially with regard to key issues such as the number of CTC employees; the number of employees to whom the Plan was offered; the number of Plan Participants; and the salary and wages of CTC employees including Plaintiffs.

**The Parties.**

3. Plaintiff Donna Browe was employed by CTC from its inception until on or about November 12, 2012. Ms. Browe began her work at the company as a "minimum-wage" clerk, and continued working as a "clerk" in CTC's accounting department. She became the manager of CTC's accounting department in approximately 2000. Ms. Browe voluntarily left the employ of CTC on or about November 12, 2012 for a position at Morris Repair Company in Bennington, Vermont.

4. Beverly Burgess was employed by CTC from the time of its formation in 1980 until approximately 2004. She passed away on November 29, 2004. Plaintiffs Tyler Burgess and Bonnie Jamieson are the children of Ms. Burgess and are the sole beneficiaries of their mother's estate.

5. Plaintiff Philip Jordan was employed by CTC from its inception until on or about October 1986 and again from on or about October 1988 until January 4, 2008. Mr. Jordan worked initially as a salesman and eventually became the sales manager for CTC in or around 1997.

---

[1] Each party appeared at trial with a binder of exhibits, however, they introduced into evidence only a small subset of those documents.

6.    Plaintiff Lucille Launderville began her employment with CTC at its inception. She was initially employed in customer service and was eventually promoted to, among other positions, President of CTC, Director, and general manager/Chief Operating Officer ("COO"). She resigned from CTC in 2008 for a position at Plasan Industries.

7.    Defendant Bruce Laumeister was CTC's sole shareholder, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors throughout its existence. He was CTC's President from 1979 until 2000 and from 2008 until its dissolution in 2014. He is an experienced business executive with a bachelor's degree in engineering and a master's degree in business administration, as well as an honorary Ph.D. from Southern Vermont College. Prior to forming CTC, he held executive positions in several major companies, supervised over three hundred employees, and managed a multi-million dollar company.

8.    Defendant CTC is a dissolved corporation that ceased doing business in 2014.

## CTC's History.

9.    In approximately 1979, Mr. Laumeister formed CTC, a photo-finishing and processing company, for the purpose of acquiring the assets of Cap Tan, a film developing and photo processing plant and photographic equipment retail store. In addition to acquiring Cap Tan's business assets, CTC hired several Cap Tan employees. When CTC purchased its assets, Cap Tan was generating approximately $800,000 in annual sales and had approximately thirty employees.

10.    From approximately 1979 until 2014, CTC operated a retail photo-finishing facility and retail store located on Benmont Avenue in Bennington, Vermont (the "Bennington facility") from which it serviced walk-in and mail-order customers under the tradename "Vermont Color Photo Lab."

11.    In addition to its headquarters in Bennington, CTC operated between twenty-three and twenty-six one-hour photo labs in Vermont, Connecticut, Massachusetts, New Hampshire, and New York (the "One-Hour Labs") which were engaged in developing, processing, and printing film as well as operating retail stores selling photographic equipment and supplies.

12.    The One-Hour Labs were incorporated in the states in which they conducted business, filed their own tax returns, and paid their employees through three corporations which held separate bank accounts controlled by CTC: VSL Corporation (New Hampshire) ("VSL"), LWB Corporation (Massachusetts) ("LWB"), and BRL Corporation (Vermont and New York) ("BRL").

13.    Although Mr. Laumeister testified that the One-Hour Labs were CTC's wholly owned subsidiaries and that the One-Hour Labs' employees should be considered employees of CTC, Defendants have proffered no evidence to support

this claim beyond Mr. Laumeister's testimony. LWB was not a wholly owned subsidiary but was instead owned by Mr. Laumeister and Christopher Belknap, a fact which Mr. Laumeister conceded when impeached.

14.     To avoid liability after a major accident with one of its route drivers, Mr. Laumeister formed a separate Vermont corporation, ES Services ("ESS") to employ the drivers who serviced the One-Hour Labs and the convenience stores, drugstores, and other customers that offered CTC photo processing. All of the route drivers were employed part-time although some drivers worked up to thirty hours per week. Mr. Laumeister created a chart that indicated that there were eight part-time route drivers. He, however, also testified that they had "at least 15 or 16" route drivers and "16 to 18[,]" all of whom worked part-time. (Doc. 209 at 134.) He and his wife owned ESS's stock.

15.     In 1990, CTC acquired an interest in Weybridge Partners, LP ("Weybridge Partners"), a Vermont limited partnership that owned and operated an apartment complex in Middlebury, Vermont. At the time CTC acquired its limited partnership interest in Weybridge Partners, Mr. Laumeister was Weybridge Partners' general partner. The residential housing property owned by Weybridge Partners was a federally subsidized property that generated significant tax losses. Approximately ninety-five percent of those losses were allocated to CTC, allowing CTC to shelter a significant amount of its income from state and federal taxation.

16.     Starson Services ("Starson") was a corporation formed prior to CTC and owned by Mr. Laumeister and his wife. Starson acted as the property manager for Weybridge Partners' apartment complex, providing services such as rent assessment and collection, property management and maintenance, and general, administrative, and accounting services. Weybridge Partners paid Starson fees for its property management services. Starson also owned the photo-finishing equipment and other equipment in the Bennington facility and leased it to CTC.

17.     The records of both Weybridge Partners and Starson appear to have been destroyed with the CTC records, although the parties did not address this issue directly.

18.     Ms. Launderville claims she was never employed by Starson, however, she admits she received a bonus check on at least one occasion from Starson. She testified that the amount in question was approximately $20,000. In contrast, Mr. Laumeister testified that both Mr. Massari and Ms. Launderville received substantial bonuses from Starson, that almost half of their compensation was paid by Starson in certain years, and that they received bonuses in some years of approximately $50,000.

19.     In 2009, Weybridge Partners sold its real property, paid its creditors, and dissolved.

20.     Between 1980 and around 2000, CTC grew significantly. At its peak operation, CTC's Bennington facility operated three and sometimes four shifts per day, depending on the seasonal volume of the film to be developed and printed. During peak times, CTC and One-Hour Labs employed additional employees, typically on a part-time basis.

**Credibility and Reliability of Mr. Laumeister's Testimony.**

21.     Although at times in his testimony Mr. Laumeister demonstrated an impressive recall of the relevant facts, the court did not find his testimony wholly reliable or credible because Mr. Laumeister issued a number of statements under the penalties of perjury which he now concedes are incorrect. For example:

A.     In his declaration dated May 23, 2016 (the "5/23/16 declaration") he averred that: "From 1997 until about 2000, I was the president and chief operating officer of CTC Corporation." (Doc. 195 at 11.) In cross-examination, Mr. Laumeister testified that the date should be "late 1995." *Id.* This date, however, conflicts with his testimony that he was president of CTC from 1979 until 1996. *Id.* at 7.

B.     In his 5/23/16 declaration, Mr. Laumeister stated that: "In 2000, when I retired to Tucson, Arizona, [Lucille Launderville] was promoted to president of CTC Corporation and made a member of the board of directors[.]" *Id.* at 12. In his testimony, he admitted that this was incorrect and averred that the correct year was 1996. *Id.* at 12-13. In his February 24, 2017 deposition he testified: "When she was made president and director, I think that was about 1990. Maybe later. Maybe as late as '95, but there's a record of that. I'm sure I have a copy somewhere." *Id.* at 16. Elsewhere he stated that he never actually retired.

C.     In his 5/23/16 declaration, he averred that Ms. Launderville was CEO of CTC in November 2004. In his testimony, he admitted that that was in error and was a "typo." (Doc. 195 at 26.)

D.     In his testimony, he testified that the Mission Management & Trust account was opened while Mr. Massari was still working at CTC. *Id.* at 53. When confronted with account documentation, he agreed his testimony was incorrect and the account in question was opened in 2003 after Mr. Massari's stroke. *Id.* at 54.

E.     Although he initially testified that both he and Ms. Launderville made the decision regarding how much Mr. Massari should receive in deferred compensation, in his deposition he testified that the decision "probably came down to me." *Id.* at 56.

F. Mr. Laumeister testified that Ms. Launderville advised Hope Leonard that CTC would cease paying her benefits. *Id.* at 57 ("Had to be Lucille. I didn't."). However, in a December 31, 2007 letter he authored to Ms. Leonard, he advised her that there would be no further deferred compensation payments.

G. Mr. Laumeister testified that ESS was a wholly owned subsidiary of CTC but acknowledged that in 1995, his wife, Elizabeth Small, owned all outstanding ESS stock. He also inconsistently testified that CTC and Ms. Small owned the shares in ESS.

H. Although Mr. Laumeister testified that in 1997 the gross receipts for CTC were approximately five million dollars, CTC's 1997 corporate income tax return shows gross receipts of $2.78 million. Mr. Laumeister explained that this discrepancy reflects his inclusion of the revenue from Weybridge Partners.

22. For the foregoing reasons and in the absence of corroboration by CTC's business records, the court concludes that Mr. Laumeister's testimony regarding the number of CTC employees and specific employees' compensation is not wholly reliable. Accordingly, all of the facts governing the number of CTC employees and their compensation remain an approximation.

23. In 1997, CTC employees Wayne Massari and Ms. Launderville each received a combined annual compensation with bonuses of approximately $105,000.

24. The hourly employees at CTC's Bennington facility were paid at or slightly above the federal minimum wage.

25. With the exception of the managers of the Keene, New Hampshire and Manchester, Vermont locations, managers of One-Hour Labs were full-time employees who were paid between $18,000 and $19,000 in annual compensation.

26. Because of the size of the stores and the volume of business, the managers of the Keene, New Hampshire and Manchester, Vermont One-Hour Labs were salaried employees who were paid approximately $24,000 per year between 1990 and approximately 2006.

27. The remaining One-Hour Labs employees were paid at or slightly above minimum wage and were generally employed part-time.

28. The federal minimum wage on September 1, 1997 was $5.15 for all covered, non-exempt workers.

**The Number of CTC Employees.**

29. Defendants assert that CTC employed 196 people at its peak. Mr. Laumeister testified that this number is based on his memory and his consideration

of the One-Hour Labs. He did not consult any records in determining this number. He further testified that by 1997 CTC and its affiliates employed "between 150 and 180" employees (Doc. 209 at 120), that, "total employment [was] about 150, including 23 retail stores, with 90 part-time and 20 part-time at CTC Bennington. That's all on the asterisk in 2005" (Doc. 195 at 73), and that total employment was "[s]omewhere around 175 to 185" but "during . . . the summer months we actually got up over 200." (Doc. 209 at 137.) In his interrogatory responses dated August 10, 2016, he averred: "To the best of my knowledge, CTC Corporation employed approximately 196 people each year during the years from about 1990 until about 2006 when . . . CTC Corporation's business began to decline significantly as a result of the digital photo revolution." (Doc. 195 at 100.) During his deposition, he estimated that "CTC Corporation, at its peak, employed approximately 185 employees." *Id.* at 101. Julia Case, a former CTC employee, testified that at its peak there were 186 employees but that this number includes VSL, LWB, BRL, and ESS employees.

30.     Based upon Mr. Laumeister's review of CTC's tax returns from 2004 to 2006, he opined that CTC's total payroll in 1997 was $623,502. (Doc. 196 at 12.) CTC's corporate income tax return for 1997 shows: $113,230 for compensation of officers; $262,845 for salaries and wages (less employment credits); $623,785 costs of labor; and $31,547 for employee benefit programs. CTC's total payroll in 1997 was therefore $999,860. Mr. Laumeister further testified that in 1997, other than Mr. Massari and Ms. Launderville, there were eleven Plan Participants with an average salary of $27,000, for a total of $297,000, and that each of the One-Hour Labs had a full-time manager who was paid no less than $18,000 per year ($18,000 x 23 = $414,000). *Id.* at 13. Using the $999,860 total payroll and subtracting the compensation of officers ($113,230), the One-Hour Lab managers ($414,000), and the Plan Participants ($297,000) leaves $175,630 to pay the remaining employees during a year in which he testified he did not "recall that that was ever a problem[] . . . [with] sufficient cash flow." *Id.*

31.     As a matter of arithmetic, Mr. Laumeister's estimate of the number of CTC employees is unsupported by CTC's 1997 tax return. The remaining payroll of $175,630 would only be sufficient to pay 17.05 additional full-time employees at minimum wage (2,000 hours x $5.15 = $10,300 per employee) or 34.10 part-time employees at minimum wage (1,000 hours x $5.15 = $5,150 per employee). Mr. Laumeister was presented with these calculations and had no explanation for the discrepancy between CTC's 1997 tax return and his estimate of the number of its employees.

32.     Ms. Launderville offered an estimate of sixty CTC employees in the late 1990s. Her testimony also reflects a lack of precision.[2]

---

[2] Ms. Launderville testified as follows:

33.    The court finds there is no reliable evidence of the number of CTC employees during much of the company's existence.  There is also no reliable record of how many employees worked full-time versus part-time.  The best evidence is that CTC had no more than sixty full-time employees in 1997.

**Roles and Identities of CTC's Corporate Officers and Directors.**

34.    Mr. Massari served as CTC's Treasurer, Chief Financial Officer ("CFO"), and a Director until he suffered a stroke in 1999, became disabled, and retired.  In his work for CTC, Mr. Massari was a meticulous, detail-oriented, honest, competent, and reliable employee.

35.    The parties dispute Ms. Launderville's role in CTC.  Mr. Laumeister testified that Ms. Launderville was named a President and Director of CTC and that press releases regarding her assumption of the role of President were disseminated among stakeholders in their industry.  He further testified that her status as CTC's President was reflected in CTC's corporate filings with the Vermont Secretary of State.  He contends she participated in annual Board of Directors meetings.

36.    In contrast, Ms. Launderville testified that she was President "in name only" at CTC, was never a member of the Board of Directors, and never participated in Directors meetings.  (Doc. 196 at 247.)  The court does not find her testimony on this point credible.  Although CTC may not have formally designated its end of the year meetings as meetings of the Board of Directors, there is credible evidence that Ms. Launderville attended and participated in those meetings and played a role in CTC's business decisions.  Mr. Massari prepared and disseminated meeting minutes reflecting her attendance and participation and provided a copy of those minutes to Ms. Launderville.  Those minutes describe Ms. Launderville as a Director of CTC as of December 16, 1995.  In addition, the court found credible the testimony of Ms. Case that Ms. Launderville acted as President

---

Q. At the peak of its operations, how many employees did CTC itself ever employ?

A. CTC itself, probably in the peak, employed about 60 people.

Q. And when you say the peak, which year or years do you mean?

A. I'm going to say late '90s.

Q. Do you have an opinion about the number of employees that worked for CTC in 1990?

A. For CTC, I would say that might have been 60.  . . . No, there was probably less -- less than 1990.  I'm -- I'm -- you know, just shot.  Maybe 40, 45.

(Doc. 197 at 19-20.)

of CTC during her employment there from 1999 until Ms. Launderville's resignation.

37. Ms. Launderville has a high school education and was a competent and dedicated CTC employee and corporate officer.

**The Plan.**

38. In late 1989 to early 1990, CTC decided to offer certain employees a deferred compensation plan. It appears that some form of earlier plan, funded by life insurance purchased by CTC, may have been offered to a few employees, but no copy of this plan was introduced and no witness claims to have seen it. The 1990 and 1997 Plans are thus the only retirement or deferred compensation plans CTC offered to its employees. Plaintiffs concede this point in their Proposed Statement of Undisputed Facts for Trial. (Doc. 164 at 4, ¶ 10.)

39. Mr. Massari drafted the 1990 Plan. Although Mr. Laumeister contends that Mr. Massari did so with the assistance of Massachusetts Mutual Insurance Company ("Mass. Mutual"), he testified inconsistently on this point, claiming Mass. Mutual did not handle "nonqualified plans" which is the type of plan he believes Mr. Massari drafted. *Id.* at 82. In any event, no evidence was introduced of the type of assistance, if any, Mass. Mutual provided. Similarly, although Mr. Laumeister testified at one point that Peter Holden, Esq. reviewed both the 1990 and 1997 Plans, the court found this testimony uncorroborated and inconsistent with Mr. Laumeister's testimony that Mr. Massari drafted both Plans based on his "knowledge of the tax laws."

40. Mr. Laumeister intended the 1990 Plan to accomplish three objectives. First, to reward CTC's senior managers for the performance and growth of the company. Second, to incentivize CTC's senior managers to remain as employees of CTC until their retirement at age sixty-five or their death or disability while in CTC's employ. And third, to encourage CTC's senior managers to make annual contributions of a minimum of 3% of their salary to their own Individual Retirement Accounts.

41. Mr. Laumeister intended the 1990 Plan to be a nonqualified "top hat" plan that was offered to a select group of management level, highly compensated employees of CTC so that it would satisfy the requirements of ERISA. Defendants' expert witness James Herlihy credibly testified that he advises that such plans be offered only to "a small percentage of the total work force" and "they should be managerial or highly compensated people." (Doc. 196 at 203.) The 1990 Plan does not state that it is a "top hat" plan, does not state it is a "nonqualified plan," and does not refer to ERISA.

42. In relevant part, the 1990 Plan states: "The employer agrees to contribute an amount sufficient to provide a total retirement benefit, including social security, and the participant's personal IRA account, which will approximately equal each

participant's salary at the date of this Plan." (Doc. 29-1 at 2, ¶ 5.) The Plan states that CTC's Directors shall be the Plan Administrators. When CTC adopted the 1990 Plan, Mr. Laumeister and Mr. Massari were CTC's only Directors. After Mr. Massari's stroke, Ms. Launderville became a CTC Director.

43. According to Mr. Laumeister, Ms. Launderville and Mr. Massari proposed each of the Plan Participants. This testimony however, was at odds with his further testimony regarding to whom he decided to offer the Plan. Mr. Laumeister testified that in selecting Plan Participants, he examined employees' "job duties and their level of responsibility in accomplishing their job duties and their job descriptions and how that contributed to [CTC's] success in faster turnaround and higher quality." (Doc. 209 at 87.) They needed to be "employees that did not need to be managed or coddled all the time" and "knew what they were supposed to do and how they were going to do it." *Id.* at 91-92. He also considered "their employment history before [CTC]" and with CTC, "what was their personal life like[,]" where they lived and whether they had "nice homes" and "good families," and whether "their kids [got] in big trouble or themselves." *Id.* at 95.

44. Ms. Launderville testified that she had no voice and no role in Plan administration. The court did not find this testimony credible. As President, a Director, and the COO of CTC, she had the most knowledge of employee performance and proposed employees for Plan participation on this basis. She also participated in Plan administration and was identified as a Plan Administrator on a cover letter that was disseminated to Plan Participants. (Plaintiffs' Ex. 14.)

45. Mr. Massari's role in Plan administration appeared to be confined to managing the financial aspects of the Plan, attending Board of Directors meetings, and approving Plan Participants. After Mr. Massari left CTC's employ, there is no evidence that the remaining Plan Administrators, Mr. Laumeister and Ms. Launderville, complied with ERISA's reporting and disclosure requirements.

46. To fund the 1990 Plan, CTC established accounts with Mass. Mutual into which CTC deposited funds with which it intended to pay deferred compensation (the "Mass. Mutual accounts"). In addition, 1990 Plan Participants were required to establish and fund their own IRA accounts. No Plaintiff claims entitlement to deferred compensation under the 1990 Plan.

47. By 1997, Mr. Laumeister had become dissatisfied with the investment returns generated by investments in the Mass. Mutual accounts. As a result, CTC terminated its relationship with Mass. Mutual and adopted a new deferred compensation plan (the "1997 Plan") that, by its terms, superseded and replaced the 1990 Plan.

48. Mr. Massari drafted the 1997 Plan, which Mr. Laumeister again intended to be a "top hat" nonqualified plan. Mr. Laumeister intended that the 1997 Plan further the same objectives as the 1990 Plan. The 1997 Plan does not state it is a

"top hat" plan, does not indicate that it is "nonqualified," and contains no reference to ERISA.

49.     The 1997 Plan provides in relevant part that it is an "employer paid fund[,]" and that CTC "agrees to contribute funds which will accumulate and be payable in accordance with Section 6." (Defendants' Ex. B at 1, ¶¶ 2, 5.)

50.     Section 6 of the 1997 Plan states:

> 6.     BENEFITS UNDER PLAN - The Plan provides for alternative types of payment as follows:

Deferred Compensation Payments, payable upon the happening of any of the following events:
1)     Retirement of the Participant
2)     Death Benefits, payable when a Participant dies before Deferred Compensation payments start.
> a)     death benefit equals market value of a participant's account, less any insurance payment provided under 2b.
> b)     employer has also funded, group term life insurance equal to one time participant's annual salary, for which the participant has named a beneficiary. (This benefit is in addition to the one time salary provided with the participant's group insurance benefit package, and will be equal to one time the Participant's current annual salary.)

The Employer and each Participant will execute an agreement in writing, confirming their assumptions of the obligations set forth in this Plan and the method of Death Benefits payable.

Subject to all provisions hereof, the Employer agrees to pay Deferred Compensation Payments, as follows:

> In the event of normal, or postponed retirement, and in the event of disability, to the Participant so qualifying, payment for 120 consecutive months. . . . A monthly payout amount will be computed, subject to periodic review and adjustment based on the rate of growth, to [P]lan exhaustion of the Participant's fund at the final, 120th, payment.

*Id.* at 2, ¶ 6.

51.     The 1997 Plan defines the term "retirement" as "withdrawal from full time active employment at or after age 65." *Id.* at 1, ¶ 3(c). The parties dispute whether this provision requires the employee to retire from CTC. Other than Plaintiff Browe, no Plaintiff testified that they understood the 1997 Plan to offer

retirement benefits if they were no longer in CTC's employ when they retired. *See* Doc. 209 at 61, 65. The court does not find Plaintiff Browe's testimony credible as it is inconsistent with her proposal that Mr. Laumeister include her in his will because she would not receive deferred compensation under the Plan. It is also inconsistent with her own testimony. *See id.* at 65 (Browe testimony: "Q. Up until Ms. Launderville contacted you about this suit did you have any belief or basis for claiming deferred compensation under the plan? A. No.").

52.     The 1997 Plan provides that death benefits would "commence on the first day of the month following the Participant's death and be payable for 120 consecutive months, or lump sum at the option of the beneficiary." *Id.* at 3, ¶ 6. It provides that "[a] Participant may designate one or more beneficiaries, but any named beneficiaries must be a member of his/her immediate family, that is spouse and or children under the age of twenty-one, of Participant." *Id.*

53.     The 1997 Plan further states that:

> [Neither] [t]he Employer, nor the plan Administrators make any guarantee to the Participant, nor the . . . Participant's beneficiary, as to the market value of the Participant's account upon retirement or in the event of disability payments or death benefit payments. The account balance is not targeted to any preconceived amount nor [is it] associated to a percentage of the Participant's salary. The balance of the account will be driven only by the economic market growth of the funds which the Employer has funded. The monthly payout amount will be reviewed and adjusted annually to reflect the growth of the account and to exhaust the fund balance over the remainder of the 120 month payout period.

*Id.*

54.     Under the 1997 Plan, CTC's Board of Directors were Plan Administrators and were authorized to make "[a]ll decisions concerning withdrawal, payment, method of payment, [and] investments of funds[.]" *Id.* at 1, ¶ 4. Participants in the 1997 Plan have the same rights as a "general creditor of the Employer[,] . . . and then solely to the extent of the net value of the Participant's deferred compensation account." *Id.* at 3, ¶ 7.

55.     Pursuant to the 1997 Plan, Plan Administrators were required to "advise the Participant[s] of the actual cash value of their account annually, and at the time of retirement." *Id.* at 3, ¶ 6.

56.     The 1997 Plan prohibits "funding" as follows:

> 11.     PROHIBITION AGAINST FUNDING - If the Employer acquires a mutual fund, an annuity contract or life insurance policy, or any other asset in connection with its liabilities hereunder, neither

12

a Participant nor any beneficiary of the Participant shall have any right with respect to, or claim against, such contract, policy or other asset and the Employer shall be named the owner and beneficiary of any such contract, policy or other asset. Such contract, policy, or other asset shall not be held under any trust for the benefit of a Participant or [beneficiaries] of a Participant or held in any way as collateral security for the performance of any obligation of the Employer under the Plan. Any such policy or other asset shall be, and remain, a general, unpledged, unrestricted asset of the Employer.

*Id.* at 4-5, ¶ 11.

**Plan Application.**

57.     Each employee to whom the 1997 Plan was offered signed an "Application to Participate in the CTC Corporation Deferred Compensation Plan" that provided in relevant part:

To: Plan Administrators

Please be advised that I wish to participate in the Deferred Compensation Plan. I understand that the company funding of this Plan is contingent upon my annual contribution of a minimum of 3% of my base salary to my personal individual retirement account for each year I participate in the Plan.

I understand that the corporate funding of this Plan and some provisions have changed from the original Plan document. I further understand that this Plan supersedes any and all Deferred Compensation Plan documents provided by CTC Corporation.

I wish to designate the following beneficiary (or beneficiaries) in accordance with the articles of the Plan agreement:

* * *

I acknowledge receipt of a copy of the Deferred Compensation Plan agreement and confirm that I have reviewed and understand all of the terms and conditions thereof.

Signed
Home Address
Date

This document must be signed, dated and returned to the Employer in order to participate in this Plan. It is the responsibility of the Participant to notify the Employer of any intended change in the designated beneficiaries.

(Defendants' Ex. C) (the "Plan Application").

58.     Defendants introduced into evidence Exhibit D, which is a one-page document dated August 20, 1997, signed by Mr. Massari, and entitled "CTC Deferred Compensation Plan" which states as follows:

> The Assumption for rate of growth used to illustrate your fund balance is 10%. This is an assumption only, based on previous growth of this mutual fund. Your account will be adjusted periodically to reflect the actual growth rate and fund balance of your account.

> Please complete and sign the last page "Application" and return this to me. I will return a copy to you for your files.

> Please provide evidence of your current active "IRA" account as required by the Plan Document. This is not necessary if you are funding your IRA by payroll deduction.

> Contact me if you have any questions regarding this Plan.

(Defendants' Ex. D.)

## Plan Statements.

59.     Defendants periodically provided the Plan Participants with account statements showing the amounts held in the Plan, however, there is no evidence that those reports were provided with any regularity. Mr. Laumeister does not recall ever providing a statement, although he believes Mr. Massari and Ms. Browe may have done so.

60.     Neither Defendants nor Plaintiffs retained copies of Plan statements with the exception of one "worksheet" retained by Ms. Launderville and two documents retained by Mr. Laumeister.

61.     Ms. Launderville credibly testified that she was given the undated worksheet identified as Plaintiffs' Exhibit 3 by Mr. Massari. Plaintiffs' Exhibit 3 identifies fifteen "Retirees": Wayne Massari; Lucille Launderville; Donald Loseby; Don Hollner; Eileen Bliss; Donna Browe; Beverly Burgess; Ed Hojnowski; William Elliott; Sharon Fish; Phil Jordan; Robin Secord; Steve Brown; Garry Pleasant; and Hope Leonard. The spreadsheet purports to show an "Initial Investment" for each individual, "Additional Annual Funding," "Total CTC Funding," projected retirement years, projected payouts (annual and monthly), fund balance at the time of retirement, and fund balance after payout. It indicates that payouts will occur over 180 months/fifteen years at ten percent growth. (Plaintiffs' Ex. 3.)

62.     Plaintiffs' Exhibit 3 reflects the following "Assumptions:"

- Projections "assume" continued corporate funding of $20,325.00 15% current payroll per year through year 2000 (see notes below for additional funding explanation)

14

- Funding will continue as prescribed above, at a rate of 5% of participants earnings (adjustment for increased future earnings not reflected in worksheet)

- Growth rate of fund 10%

- Benefits paid out monthly for 15 years

- Benefits amount paid calculated to exhaust fund balance at the end of fifteen years

- Fund balance continues to grow as benefits are paid, until exhausted at end of 15 years

- Benefits subject to change relative to actual rate of fund growth and balance at retirement[.]

*Id.*

63.  Plaintiffs' Exhibit 3 contains notes specific to certain "Retirees," including the following: "Initial funding for these new entrants is a dollar amount determined by Bruce Laumeister, paid from the surrender proceeds of terminated participants.  The balance of the proceeds from terminated employees was allocated 55% to Lucille Launderville, and 45% to Wayne Massari, as instructed by Bruce Laumeister[.]"  *Id.*

64.  Plaintiffs' Exhibit 3 also contains the following general "Notes:"

- All accounts adjusted to actual mutual discovery balance at 03-18-97

- Account for Don Hollner closed at 03-18-97, balance of $4,582.9 transferred to the account of Donna Browe per instructions of Bruce Laumeister

- Don Hollner will be considered for plan participation in 1998, per Bruce Laumeister

- Account established for Garry Pleasant 6-97 per Bruce Laumeister[.]

*Id.*

65.  Plaintiffs' Exhibit 3 indicates "total CTC funding" of $261,368.14 and total CTC funding for Plaintiffs as follows: Lucille Launderville: $40,104.75; Donna Browe: $15,611.14; Beverly Burgess: $19,906.23; and Phil Jordan: $17,417.30. Assuming a ten percent rate of growth, "total payouts" of $3,034,470 were projected to be made, including $215,280 to Ms. Browe; $169,920 to Ms. Burgess; $269,280 to Mr. Jordan; and $592,470 to Ms. Launderville.  *Id.*

66.  The assumption of a fifteen year payout in Plaintiffs' Exhibit 3 conflicts with the 1997 Plan which reflects a ten year payout.  Although Plaintiffs' Exhibit 3 reflects an annual percent of payroll annual contribution by CTC, the

1997 Plan does not require this contribution. The amounts set forth in Plaintiffs' Exhibit 3 conflict with Mr. Laumeister's testimony that when the 1990 Plan was replaced by the 1997 Plan approximately $130,000 to $140,000 remained in the Mass. Mutual accounts. These funds were deposited in a CTC account with Mission Management & Trust Company and in an investment account referred to as the "Mutual Discovery Account."

67.     Plaintiffs' damages estimate offered by their expert witness, economist Richard Heaps, is based on the amounts set forth in Plaintiffs' Exhibit 3. Mr. Heaps opined that performing the same calculations as set forth in Plaintiffs' Exhibit 3, he was able to project account balances for each Plaintiff's deferred compensation account as of the time of trial.

68.     The court finds Plaintiffs' Exhibit 3 "worksheet" reliable for the following purposes. First, to establish that Mr. Laumeister was the primary decision-maker with regard to the 1997 Plan. Second, to reflect account balances adjusted to reflect "Actual Mutual Discovery Balance at 03-18-97." Third, to confirm that it was a document generated by Mr. Massari to project how the 1997 Plan might perform under certain assumptions, several of which are inconsistent with the 1997 Plan.

69.     In addition to Plaintiffs' Exhibit 3, the only other financial statements related to the Plan and introduced into evidence were two statements retained by Mr. Laumeister. A May 1998 statement introduced as Plaintiffs' Exhibit 14 provides a "revised projection" of Ms. Launderville's retirement account and shows "total payouts" to Ms. Launderville of $657,900 upon her retirement, assuming a ten percent growth rate. (Plaintiffs' Ex. 14 at 1-2.) Defendants' Exhibit A1 is a statement dated December 23, 2004 that indicates a balance of $279,803, above which Mr. Laumeister wrote "I met with Wayne [Massari] on this. He had data which agreed with this." (Defendants' Ex. A1 at 1.)

70.     Plaintiffs' Exhibit 14 is a statement sent from Mr. Laumeister to Ms. Launderville with the following cover letter:

> Dear Lucille [name handwritten]
>
> Attached is [a] revised projection of your retirement fund as a participant in the CTC Corporation Deferred Compensation Plan. A strong stock market has reflected a substantial growth in your fund balance. While the projection attached reflects a more conservative 10% market growth, this projection will be adjusted each year to reflect actual market conditions. Pursuant to the plan document you have received, CTC Corporation nor the plan Administrators guarantee the value of the value of your account upon your retirement or in the event of your death, payments to your beneficiaries. The fund balance will be driven only by the economic

market growth of the funds which have been invested. The fund is currently invested with the Franklin Mutual Series Class Z Fund.

Your participation in this fund continues to be contingent upon the terms and conditions expressed in the plan document which you have received. **If you have any questions about this plan, please direct them to me, Lucille or Wayne.**

Please note that you have been selected to receive benefits under this plan based on your service to CTC Corporation. This plan is entirely funded and owned by the employer and has not been open to all employees. **Therefore I ask that you discuss this matter only with the above mentioned plan Administrators.**

(Plaintiffs' Ex. 14 at 1) (emphasis supplied).

71.     The spreadsheet attached to Plaintiffs' Exhibit 14 reflects "total payouts [of] 180 months" and ten percent growth. *Id.* at 2. It depicts the same annual funding of $2,850 of Ms. Launderville's account reflected in Plaintiffs' Exhibit 3. It notes that the account balance for March was "Adjusted to Actual 3/18/98[,]" *id.*, one year after the notation in Plaintiffs' Exhibit 3 that "all accounts adjusted to Actual Mutual Discovery Balance at 03-18-97[.]" Plaintiffs' Ex. 3. The monthly balance in March 1998 is $46,550.06 in Plaintiffs' Exhibit 14 and $40,104.75 in March 1997. The court concludes that Plaintiffs' Exhibits 3 and 14 are both business records of CTC, despite their inconsistencies with the 1997 Plan.

72.     Ms. Launderville was provided with the 1997 Plan which states that CTC's Directors are the Plan Administrators. She is identified in Plaintiffs' Exhibit 14 as a person to whom questions about the Plan could be directed. She proposed participants to the Plan, discussed potential Plan Participants with Mr. Laumeister and Mr. Massari, and voted on certain decisions with regard to the 1997 Plan.

73.     Between 1990 and 2014, CTC paid deferred compensation to approximately four Plan Participants in accordance with the 1997 Plan: Don Loseby, Hope Leonard, Eileen Bliss, and Wayne Massari. In addition, the Plan Administrators determined that both Sharon Fish and William Elliott should be permitted to retire early and receive Plan benefits on that basis. In Ms. Fish's case, she was tired of the commute from Rutland to Bennington and was offered Plan participation even though she worked part-time. In Mr. Elliott's case, his family had a history of early mortality and he wanted to enjoy his remaining years through an early retirement.

74.     Between 1997 and about 2001, CTC continued to deposit funds in its Mission Management & Trust and Mutual Discovery accounts from which it intended to pay deferred compensation.

**CTC's Decline and Dissolution.**

75.     In approximately 2004, CTC experienced a significant decline in sales due to the advent of digital photography and internet photo-finishing services. In addition, a change of policy purportedly announced by the U.S. Postmaster regarding the speed with which first class U.S. mail would be delivered impaired CTC's ability to deliver expeditious service to its customers.

76.     From 2004 until its dissolution, CTC's cash flow from its annual sales became insufficient to support its operating expenses. As a result, all monies deposited in CTC's deferred compensation accounts were transferred to CTC's general business account and used to pay CTC's general business expenses, including payroll. In 2004, Mr. Laumeister told Ms. Launderville "that because of the deteriorating financial condition of CTC, the [P]lan was being terminated and the funds would be used to pay business operating expenses." (Doc. 195 at 69.) It does not appear that CTC, Mr. Laumeister, or Ms. Launderville otherwise announced the termination of the 1997 Plan.

77.     Ms. Launderville and Ms. Browe kept Mr. Laumeister apprised of CTC's operating shortfalls. Mr. Laumeister then directed withdrawals from CTC's deferred compensation accounts to cover them. When CTC's cash reserves were exhausted, Mr. Laumeister made a series of personal loans to CTC to fund operating expenses. Both Ms. Launderville and Ms. Browe were aware of both the use of the deferred compensation accounts and the personal loans from Mr. Laumeister.

78.     In approximately 2006, Mr. Laumeister convened a meeting attended by Ms. Launderville and others during which he explained that CTC was in financial distress. He proposed that employees accept a twenty percent pay-cut which was apparently accepted by those employees who chose to remain in CTC's employ.

79.     By February 2008, the only remaining employees of CTC who were 1997 Plan participants were Ms. Browe and Ms. Launderville. At the time, CTC's cash flow was insufficient to pay its general creditors or to fund its deferred compensation accounts. Both Ms. Browe and Ms. Launderville were aware of this fact.

80.     By 2014, Mr. Laumeister's outstanding unpaid loan balance to CTC was approximately $600,000. Because of the significant decline in CTC's sales, he realized that CTC could not repay those loans and decided he would no longer try to keep CTC operational.

81.     On October 6, 2014, at the direction of Mr. Laumeister, CTC ceased doing business and filed Articles of Dissolution with the Vermont Secretary of State.

82.     When CTC dissolved in 2014, Starson sold the film developing and photo processing equipment that it had leased to CTC at a loss of approximately $450,000.

83. At the time of its dissolution, CTC purportedly had no outstanding accounts payable, other than its obligations with regard to the loans from Mr. Laumeister.

84. With regard to the destruction of CTC's business records, Mr. Laumeister testified that in 2012:

> [W]e had a small business advisory service. We got monthly information from them, especially on taxes and so on. And I asked Donna [Browe] to contact them and ask them what was the requirement when you dissolved a corporation, what records had to be kept, and that was eight years back plus tax returns.

(Doc. 196 at 52-53.)

85. Ms. Browe credibly denied any involvement in the destruction of business records and denied giving Mr. Laumeister any advice or guidance on this point. The records were not destroyed until 2014 after Ms. Browe left CTC's employ. It appears that the true impetus for their destruction was Mr. Laumeister's desire not to leave them behind in the Bennington facility for which CTC had not paid its property taxes.

**Retention of Plan Documents.**

86. Defendants' expert witness, Mr. Herlihy, testified that Plan records should be maintained over the life of the Plan. He opined that even with a non-qualified "top hat" plan, although an employer can use the assets in the plan, it retains the obligation to pay plan participants the amounts it contributed to their accounts consistent with the terms of the plan:

> Q. [I]f the company goes completely out of money, spends all their money, does that bear on how much money they ultimately wind up paying the participant?
>
> A. Well, if they—yeah. If they don't have the money to pay them, then they can't pay it because they're paying it out of the assets of the company.
>
> Q. I'm sorry. I should rephrase that. In terms of how you would have your clients account for what they owe to that participant.
>
> A. They would still—then our bookkeeping entry would indicate that they still owed it.
>
>        *    *    *
>
> Q. The last questions that came up went to the obligations of the company that established the nonqualified plan to the plan participants, right? And you had indicated that if a company has a thousand dollars in a plan participant's name in its account, and spent 900 of those dollars on other company obligations, that the company would still owe that $900 to the plan participant; is that correct?

A. Yes.

Q. Okay. Under what circumstances would that $900 be owed to the plan participant?

A. It would be owed to the plan participant according to the provisions in the plan document where they were entitled to get the benefit that they had been promised by either the—by the formula in the document.

Q. Supposing the formula in the document said to participate in the benefits of a plan you have to be employed by the company until age 65, and the person whose account had the $900 in it left the employment of the company at age 45, would that person be entitled to payments under the plan?

A. No, they wouldn't.

(Doc. 196 at 208-10.)

## Employees Offered Participation in 1997 Plan.

87.    The parties dispute the number of CTC employees who were offered participation in the Plan. Mr. Laumeister testified that fifteen employees were offered the Plan and thirteen accepted but he also testified that eighteen employees were offered participation, all of whom were proposed by Ms. Launderville.[3] Plaintiffs contend eighteen CTC employees were offered Plan participation. Ms. Launderville further testified that all Plan Participants were chosen by Mr. Laumeister. The court finds that the best evidence is that the 1997 Plan was offered to eighteen CTC employees.

88.    Participation in the 1997 Plan was offered by CTC to all of the participants in the 1990 Plan and to additional employees selected by the Plan Administrators. Evidence regarding employees to whom the Plan was offered is limited and is for the most part uncorroborated by business records. Mr. Laumeister testified regarding the duties and responsibilities of each of the employees to whom the Plan was offered, often exaggerating their managerial responsibilities while Plaintiffs' witnesses denied certain Plan Participants had any management responsibility. The court found neither version of the facts wholly credible. On balance, it appears that there is insufficient evidence to support a conclusion that Hope Leonard, Pat DeCoff, William Elliott, Ed Hojnowski, Donald Loseby, and Sue Carman/Caraman were either highly compensated employees or had

---

[3]    Q. Now, CTC offered plan participation to at least 18 employees, correct?

A. I believe there were 18 that were nominated by Lucille Launderville, and I had no reason to object to any of 'em.

(Doc. 196 at 10.)

significant management responsibilities. The court briefly recites the limited facts introduced regarding individuals to whom the 1997 Plan was offered.[4]

**Wayne Massari.**

89.     Wayne Massari was CTC's Treasurer and CFO as well as a CTC Director and Plan Administrator until he experienced a stroke in 1999, became disabled, and retired. Mr. Laumeister and Ms. Launderville agreed that he was entitled to deferred compensation benefits under the 1997 Plan. Of the Plan Participants who received deferred compensation benefits, Mr. Massari received the most.

90.     Mr. Massari's maximum combined compensation was approximately $105,000, which reflected Starson bonuses.

**Lucille Launderville.**

91.     Lucille Launderville was born on November 18, 1951. She was employed by Cap Tan in customer service and paid approximately minimum wage as an hourly employee. CTC hired Ms. Launderville on the same terms in 1980 when it purchased the assets of Cap Tan. In addition, Ms. Launderville performed secretarial work for Mr. Laumeister.

92.     Ms. Launderville credibly testified that she had a poor recall for dates and could not recall when she received certain promotions and changes in her compensation at CTC. Mr. Laumeister's testimony regarding Ms. Launderville's employment also reflected inconsistencies.

93.     In 1982 or 1983, Ms. Launderville was promoted to assistant to the plant manager. She received a raise with her promotion and worked in that position for approximately three years. In 1989-92, Ms. Launderville was promoted to plant manager of the Bennington production facility and received compensation of approximately $22,000 per year. In 1994, she was promoted to Vice President and General Manager with a salary increase to approximately $44,000 per year. In 1995, she was promoted President of CTC and general manager/COO handling CTC's day-to-day operations and received an increase in compensation. As of December 16, 1995, she was a Director of CTC.

94.     During the period between 1990 and 2008, Ms. Launderville was a salaried employee of CTC with annual compensation for the years from 1985 until 1999 ranging between approximately $22,000 and $59,000, with bonuses during the years between 1990 and approximately 2004 ranging between approximately $12,000 and $50,000. As a result of the bonuses paid by Starson, Ms. Launderville's maximum combined total compensation was approximately $105,000.

---

[4] The court cannot identify the eighteenth employee who was offered participation in the Plan.

95.     In 2008, Ms. Launderville voluntarily left employment at CTC and accepted employment at Plasan Industries in Bennington, Vermont. At the time, Ms. Launderville was fifty-seven years old and was not disabled. She testified as follows with regard to her understanding of the 1997 Plan:

> Q. Now, doesn't section six of the plan tell you that because you were not 65 at the time you left the employ of CTC Corporation, that–you hadn't died, of course, and you were not disabled, that you were not entitled to any benefits under the plan? Isn't that what section six says?
>
> A. That's what it says.
>
> Q. And that's what you agreed to?
>
> A. At the time, but that's also why I contacted Bruce before I left the company regarding the deferred compensation plan, because of my concern.

(Doc. 197 at 45.) She also agreed that under the terms of the 1997 Plan, her rights in CTC's deferred compensation accounts were no greater than that of a general creditor.

96.     Before accepting employment at Plasan Industries, Ms. Launderville emailed Mr. Laumeister on February 24, 2008 and stated in relevant part: "I have been offered a position. I think it is a good move for me, but before I accept, I wonder what this will mean regarding my Deferred Compensation." (Plaintiffs' Ex. 10 at 2.) Mr. Laumeister responded to her inquiry in pertinent part as follows: "My intention is exactly what I showed you before. I am putting in my will and trust and instructing Mission Trust to pay your d.c. when you are 65 or when I check out. Donna[ Browe]'s will be in the same instruction." *Id.* at 1.

97.     While employed at Plasan Industries in Human Resources, Ms. Launderville determined that ERISA might apply to the 1997 Plan and contacted counsel on that basis. In 2015, she also contacted each of the other Plaintiffs in this lawsuit and encouraged them to join her in a lawsuit against Defendants.

**Donna Browe.**

98.     In 1986, Donna Browe earned $15,850 from CTC. In approximately 2000, she became the manager of CTC's accounting department. From 1990 until 2013, Ms. Browe was a salaried employee of CTC with a salary ranging between approximately $28,000 and $37,000, with bonuses during the years between 1990 and approximately 2001 ranging between approximately $2,000 and $4,000. Her highest annual compensation at CTC was in 2001 and was $37,692.

99.     At the time Ms. Browe left the employ of CTC on November 12, 2012, she was sixty-one years old and not disabled. She did not request any information about the 1997 Plan or make any claim or request that 1997 Plan funds be transferred to her or to her new employer. No claim was made by Ms. Browe

against CTC for deferred compensation until after she was contacted by Ms. Launderville in 2015 and encouraged to participate in this litigation.

**Philip Jordan.**

100.    As CTC's sales manager, Philip Jordan was responsible for managing and overseeing the sales and distribution of CTC's photo processing, photo printing, and photo equipment retail businesses, CTC's One-Hour Labs, the retail stores, and the convenience stores and drug stores with which CTC had agreements to provide film developing and printing services for their customers.

101.    During the period between 1990 and the termination of his employment at CTC in 2008, Mr. Jordan was a salaried employee with a salary ranging between approximately $22,000 and $28,000, with bonuses during the years between 1990 and approximately 2001 ranging between approximately $2,000 and $4,000. Mr. Jordan's highest annual salary with CTC was $30,009.

102.    Mr. Jordan did not deposit a minimum of 3% of his CTC salary into an IRA during the years that he was employed by CTC and was a participant in the Plan. When he voluntarily left the employ of CTC in October 1988 for a position with another company, Mr. Jordan had not reached the age of sixty-five and was not disabled. At the time he left CTC, he did not request any information about the Plan, or make any claim or request that the Plan funds be transferred to him or to his new employer. No claim was made by Mr. Jordan against CTC for deferred compensation until after he was contacted by Ms. Launderville in 2015 and encouraged to participate in this litigation.

**Beverly Burgess.**

103.    In 1990, CTC offered the Plan to Beverly Burgess, who at that time served as manager of the CTC retail store at the Bennington facility. She was also responsible for management of retail inventory and sales activities at the One-Hour Labs operated by CTC. In 1997, her job responsibilities were essentially unchanged.

104.    During the period between 1990 and 2004, Ms. Burgess was a salaried employee and earned between $10,811.61 and $29,039.32.

105.    Mr. Burgess and Ms. Jamieson do not have a copy of their mother's Plan Application and she apparently did not retain a copy of the 1997 Plan or any Plan statements. According to Mr. Laumeister, he was unable to find any evidence of a Plan Application by Ms. Burgess although she is mentioned as a "Retiree" in Plaintiffs' Exhibit 3.

106.    Ms. Launderville advised Ms. Jamieson shortly after Ms. Burgess's death on November 29, 2004 that there was nothing available to her under the Plan other than her mother's own IRA. Mr. Laumeister testified that he believed Ms. Burgess had applied for long-term disability based on her representation that she

was no longer employed by CTC. Ms. Jamieson recalled her mother receiving short-term disability payments prior to her death. There is no other evidence regarding Beverly Burgess's status as a CTC employee at the time of her death. Ms. Jamieson testified that her mother's death was sudden, while Mr. Laumeister testified that it was preceded by a lengthy period of hospitalizations and absences from work.

107. Following Ms. Launderville's denial of benefits based on Ms. Burgess's participation in the 1997 Plan, neither Ms. Jamieson nor Mr. Burgess spoke with Mr. Laumeister about any possible claim that they may have had against CTC for deferred compensation payable as death benefits. Neither Ms. Jamieson nor Mr. Burgess made any other claim against the Plan until after they were contacted by Ms. Launderville in 2015 and encouraged to join in this lawsuit. Ms. Launderville told Ms. Jamieson that she "thought it was unfair, that people were not getting their benefits that they deserved." (Doc. 196 at 98.)

**Sharon Fish.**

108. Sharon Fish was the administrative manager of Wilson Photo when CTC absorbed that company in 1988. Thereafter, she became employed by CTC and assisted with the transition. Her job responsibilities included transporting and logging in product from Rutland to the Bennington facility. She was allowed to work part-time because she lived in Rutland and commuted to Bennington. In 1992, she requested approval to retire early from employment at CTC before she reached age sixty-five. Her retirement was approved, and, as a Plan Participant, she received deferred compensation payments.

109. During the period between 1990 and her retirement from CTC in 1992, Ms. Fish was a salaried employee of CTC with an annual compensation of approximately $23,000, with bonuses during the years between 1990 and approximately 1992 ranging between approximately $2,000 and $4,000. The most she earned at CTC was between $28,000 and $32,000.

**Hope Leonard.**

110. Hope Leonard was employed by Cap Tan in its production and inspection department prior to CTC's purchase of Cap Tan's assets. She was employed by CTC from the time of its formation in 1980 until her retirement. She credibly testified that she was a print operator who never managed employees throughout her employment at CTC. The court finds Mr. Laumeister's testimony that Ms. Leonard managed part-time seasonal employees not credible.

111. In 1990, CTC offered the Plan to Ms. Leonard who accepted participation. She was offered participation because she was a reliable and competent employee. In 1997, her job responsibilities remained essentially unchanged and she accepted participation in the 1997 Plan. She retired from employment at CTC in 2002,

when she reached age sixty-five and was paid deferred compensation under the 1997 Plan.

112. Ms. Leonard credibly testified that she was never a salaried employee.

113. After her retirement, Ms. Leonard received a December 31, 2007 letter from Mr. Laumeister stating that he had overpaid her deferred compensation benefits and would cease doing so. She was angered by the letter because she believes he underpaid her.

**William Elliott.**

114. In 1980, prior to becoming employed by CTC, William Elliott was plant engineer/parts manager at Cap Tan. Mr. Elliott was employed in this same capacity at CTC until his retirement at age sixty-five in 2000. Mr. Elliott was responsible for maintaining the film developing and photo processing equipment at the Bennington facility, including retrofitting or fabricating parts to keep the outdated equipment operating. Mr. Elliott was available on-call to address equipment breakdowns. He also trained other CTC employees in maintenance and repair.

115. In 1990, CTC offered the Plan to Mr. Elliott who accepted participation in it. In 1997, his core duties remained the same but were on a greater scale in light of CTC's growth.

116. During the period between 1990 and his retirement in 2000, Mr. Elliott was a salaried employee of CTC with a salary ranging between approximately $18,000 to $24,000, with bonuses during the years between 1990 and his retirement ranging between approximately $2,000 and $4,000.

117. The Plan Administrators approved the decision to allow Mr. Elliott to retire at age sixty because of his family history of early mortality.

**Don Hollner.**

118. In 1998, Don Hollner was employed at CTC as the director of marketing, a position that Mr. Laumeister previously held. Mr. Hollner was employed by CTC until 2008. Although he participated in the 1997 Plan, due to his departure from CTC before reaching age sixty-five he received no deferred compensation. There is no evidence that he claimed any benefits under the 1997 Plan after he left CTC's employ.

119. During the period between 1990 and his termination of employment with CTC in around 2008, Mr. Hollner was a salaried employee with annual compensation of approximately $41,000.

**Eileen Bliss.**

120. Eileen Bliss was employed as an hourly production worker by Cap Tan. In 1980, CTC employed her in this same capacity. During her employment with

CTC, she was promoted in 1990 to production manager for CTC's Bennington facility's film developing and photo processing operations. In this position, she scheduled plant production, evaluated job applications, hired new employees, appointed workers to shifts, and started and tested developing and photo processing machinery. She worked independently and made production decisions without direct supervision from senior management.

121. During the period between 1990 and her retirement in around 2005, Ms. Bliss was a salaried employee of CTC with annual compensation between approximately $20,000 and $28,000, with bonuses during the years between 1990 and 2001 between approximately $2,000 and 4,000.

**Ed Hojnowski.**

122. In 1990, Ed Hojnowski was employed by CTC. According to Mr. Laumeister, he managed one of CTC's film developing and photo processing shifts at its Bennington facility and supervised six to ten employees. Ms. Leonard credibly testified that he fixed machines, was not a "boss[]," and never gave any orders. (Doc. 196 at 147.) Plaintiff Browe echoed this testimony. Mr. Hojnowski chose to leave the employ of CTC in 1998. At the time, he was neither sixty-five nor disabled. There is no evidence that he made a claim for deferred compensation benefits thereafter.

123. During his employment at CTC, Mr. Hojnowski was a salaried employee with annual compensation of approximately $20,000, with bonuses between approximately $2,000 and $4,000. He never made more than $25,000 working for CTC.

**Robin Secord.**

124. In 1997, at the recommendation of Ms. Launderville, Robin Secord was hired as customer service manager. CTC's policy was to require that all telephone inquiries from customers to be answered by a "live" CTC employee. Ms. Secord trained night shift personnel to respond to customer calls and to refer more complicated inquires to her. The 1997 Plan may have been offered to Ms. Secord, however, no documents confirm her participation. Mr. Laumeister testified that the proposal to add her as a Plan participant was conditioned upon her continued employment at CTC.

125. During the period between 1990 and her termination of employment in 2001, Ms. Secord was a salaried employee with annual compensation of approximately $25,000, with bonuses between approximately $1,000 and $2,000. When Ms. Secord left CTC's employment she was neither sixty-five nor disabled. There is no evidence that she made a claim for deferred compensation benefits thereafter.

**Steven Brown.**

126.   In approximately 1990, Steven Brown was hired by CTC to be its fleet manager for the vehicles used for delivery of supplies, equipment, and inventory to the One-Hour Labs and retail stores; delivery of supplies and customer envelopes to the drug stores, convenience stores, and other retail locations that offered CTC film processing; pick-ups from the Bennington facility; and similar services. After CTC moved the Wilson Photo operations to Bennington, Mr. Brown managed the Wilson Photo plant in Castleton, Vermont, and CTC's Vermont Color warehouse and retail property in Rutland, Vermont. In 2008, Mr. Brown left employment at CTC to become a service manager for a Rutland, Vermont automobile dealer. He was neither sixty-five nor disabled at the time.

127.   During his employment at CTC, Mr. Brown was a salaried employee with annual compensation between approximately $20,000 and $25,000, with bonuses during the years between 1990 and approximately 2001 between approximately $2,000 and $4,000.

128.   When he left CTC's employ, Mr. Brown made no claim for benefits under the 1997 Plan.

**Garry Pleasant.**

129.   In 1990, Garry Pleasant was hired by CTC as a shift manager at the Bennington facility. Due to a personal matter, he left the employ of CTC. He was neither sixty-five nor disabled at the time. It is not clear whether he was offered participation in the 1997 Plan. The only documentation of his Plan participation is Plaintiffs' Ex. 3. He did not receive any deferred compensation benefits from CTC. There is no evidence that he ever made a claim for such benefits after he ceased employment at CTC.

130.   During his employment at CTC, Mr. Pleasant was a salaried employee with annual compensation between $23,000 and $25,000, with annual bonuses of approximately $2,000.

**Donald Loseby.**

131.   From 1990 until his retirement, Donald Loseby fixed CTC's machines and was a salaried employee of CTC. His salary ranged between approximately $22,000 and $27,500, with bonuses during the years between 1990 and his retirement between approximately $3,000 and $5,000. Upon his retirement at age sixty-five, Mr. Loseby was paid deferred compensation pursuant to the 1997 Plan. Ms. Leonard credibly testified that Mr. Loseby did not manage any employees.

**Sue Carman or Caraman.**

132.   According to Mr. Laumeister, Ms. Carman or Caraman was a friend of Ms. Launderville who worked at CTC and whom Ms. Launderville proposed for participation in the 1997 Plan. It is unclear whether she accepted participation.

**Pat DeCoff.**

133.   Pat DeCoff worked at CTC's Bennington plant.  In a declaration, Mr. Laumeister averred that she was offered an opportunity to participate in the Plan in 1990 and 1997 but declined to participate.  She was a non-salaried print operator who had no management responsibilities.

**Percentage of CTC Employees Offered Plan Participation.**

134.   It appears that the 1997 Plan was offered only to CTC's Vermont employees and primarily those at the Bennington facility.

135.   Because there is no evidence that any employee of One-Hour Lab or any employee of ESS was offered participation in the Plan, the percentage of CTC's total workforce for purposes of Plan participation appears to be 18 / 60 = 30%.  If all CTC-related entities are considered, 18 / 186 = 9.6% of the workforce was offered Plan participation.  These percentages likely include part-time employees in both the numerator and denominator although the parties agree that, other than Ms. Fish, part-time employees were ineligible for Plan participation.

**Mr. Laumeister's Promises.**

136.   At some point prior to April 4, 2015, Mr. Laumeister, Ms. Launderville, and Ms. Browe met at Jensen's Restaurant in Bennington, Vermont.  At that meeting, Mr. Laumeister agreed to include a $90,000 bequest for Ms. Launderville and a $35,000 bequest for Ms. Browe in his will.  Mr. Laumeister executed a Last Will and Testament dated June 17, 2010 which stated in relevant part:

> I direct that my stock in CTC Corp be sold or liquidated as soon as possible after my death, together with the land and buildings known as 252 Benmont Avenue, Bennington, Vermont.  I give, devise and bequeath the sum of $90,000.00 from the proceeds of that sale to Lucille Launderville of Shaftsbury, Vermont if she survives me. . . .
> I give, devise and bequeath the sum of $35,000.00 to Donna Browe, of Bennington, Vermont if she survives me.

(Defendants' Ex. A8 at 3) (emphasis omitted).

137.   By email dated April 4, 2015, Ms. Launderville wrote to Mr. Laumeister that her employer, Plasan, was moving and it "looks like I will be pushed into retirement about a year or so sooner than anticipated." (Defendants' Ex. A7 at 2.) In this email, she inquired about the Plan as follows:

> I am wondering about the deferred compensation which I had counted on in retirement.  We can't make any firm plans until I have a complete understanding of where this issue stands.  I understand that you have bankrupted CTC, but hope that you can find it in your heart to take care of the commitment which was made so many years ago.  I gave my heart and

soul to the business and hope that you feel that I impacted the business and you in a very dedicated and positive way.

*Id.*

138.  Mr. Laumeister responded in an email that was intended only for Ms. Launderville. *Id.* ("P.S. This letter is strictly for your eyes. Please do not share it with anyone else. I've tried to be totally straight with you and only you."). In relevant part, he responded to her request as follows:

> I did not bankrupt CTC. Digital and stupid Kodak torpedoed the industry. I did fight for more years than I should have to try to save CTC and it cost me more than $600,000, the loans from me to CTC which will never be repaid.
>
> I did promise to personally fulfill your deferred comp, though it was a CTC responsibility. As you should remember, however, the payment is contingent on 252 Benmont, the store, warehouse and garage on about an acre, providing either a sale or leasing to provide the funds. That is my personal property, but I was and still am willing to use it to provide the $$ for you and Donna.
>
> The problem is timing, which does not appear to be soon. The Benmont bridge reconstruction has killed interest in retail for now, after I spent over $10,000 to renovate the bldg., plus annual taxes of over $6000 and insurance of almost $2000/yr. Hoisington believes it is a good buy at my $190,000 listing or $220,000 with the back bldg.s and land. I have even said I'd lease it to a good tenant, starting at $1000/month, triple net to get a long term tenant who could bring the rent up to $2000/month where it should be in a few years. NO TAKERS SO FAR.
>
> I know that you probably feel that I could afford to pay you out of my own funds, but sadly, I'm in tough shape now.
>
> &ast; &ast; &ast;
>
> I'm sorry if all these problems upset your retirement plans. As one who has worked from age 13 to 80, and can't slow down now, I would advise you both to keep working, do not tap soc. sec. until 65 as you'll lose thousands over the next 20 years[.] Both of you have the ability to find compensation [employment] in Bennington County, and I believe that 252 B will eventually sell.

*Id.* at 1.

139.  Thereafter, Mr. Laumeister agreed to increase the bequest in his will to Ms. Browe. His revised Last Will and Testament dated April 25, 2014 remained the same for Ms. Launderville, but provided the following increase for Ms. Browe:

I direct that the land and buildings known as 252 Benmont Avenue, Bennington, Vermont, be sold as soon as possible after my death. From the net sales proceeds, I direct that the sum of $90,000 be paid to Lucille Launderville of Shaftsbury, Vermont, if she survives me. If she does not survive me, I direct that the sum of 90,000 to be paid to her surviving husband or, if he does not survive her, then to her son. I further direct that $60,000 from the net proceeds of said sale shall be paid to Donna Browe of Bennington, Vermont, if she survives me. If she does not survive me, then I direct that said sum be paid to her husband, Tom, if he survives me. In the event that the sale of 252 Benmont, Bennington, Vermont does not generate net proceeds to satisfy these bequests, I direct that such parties' share be reduced proportionately based on the amount that the net sale proceeds are less than 150,000.

(Doc. 196 at 65-66.)

140. Mr. Laumeister provided Ms. Launderville and Ms. Browe with copies of the page in his will where their bequests are mentioned. They raised no objection in 2010 or 2014.

141. Mr. Laumeister credibly testified that the amount of the bequests were proposed by Ms. Launderville and Ms. Browe based upon what they believed was in their deferred compensation accounts and that he thought the amounts were "reasonable." *Id.* at 60. He further contends that as any obligation belonged to CTC, he had no personal obligations to them and he considered his bequests a "gift[.]" *Id.*

142. Mr. Laumeister considers this lawsuit a rejection of the offers he made to Ms. Launderville and Ms. Browe. Neither Ms. Launderville nor Ms. Browe offered any evidence to the contrary.

**Piercing the Corporate Veil.**

143. Plaintiffs cite the following evidence in support of their claim that Defendants engaged in self-dealing and in support of their request that CTC's corporate veil be pierced to hold Mr. Laumeister personally responsible for CTC's obligations:

A. At Mr. Laumeister's request, Ms. Launderville arranged for Cody Laumeister to receive health care benefits from CTC although he provided no services to CTC.

B. On a couple of occasions, Ms. Launderville and other CTC employees worked at the concession stand for a function at the Bennington Center for the Arts for which they did not receive additional compensation.

C. Ms. Launderville claims that Eric and Jeff Crawford were builders on CTC's payroll who performed work on the Bennington Center for the

30

Arts. Mr. Laumeister testified that he personally reimbursed CTC for their work. No records were introduced to support either claim.

D.      Ms. Launderville performed services for Mr. Laumeister's residential rental property and that of his wife including soliciting tenants and collecting and depositing rent checks. On one occasion, she and Ms. Browe cleaned an apartment and purchased items such as dishes and linens so that it could be rented as furnished.

E.      While Mr. Laumeister was in Arizona, on occasion, Ms. Launderville would stop by his house in Vermont and pick up his mail. She and other CTC employees also helped out on one occasion to clean up after frozen pipes burst at Mr. Laumeister's home while he was in Arizona. They did not receive additional compensation for these services.

F.      CTC's payroll was used to pay for maintenance on Mr. Laumeister's home on Monument Avenue in Bennington and at the Bennington Center for the Arts which he founded. Mr. Laumeister testified that these amounts were fully reimbursed but has no records to support that claim.

G.      Mr. Laumeister used his personal credit cards for corporate purchases so that he would obtain the reward points for his personal use.

H.      A "note" from Mission Management & Trust states: "There are two accounts: 1) Agent for Bruce's personal account: 2) agent for his corporation in VT. They are combined for investment management purposes." (Plaintiffs' Ex. 27 at MM0116.)

## II.    Conclusions of Law and Analysis.

Plaintiffs assert six claims against Defendants under ERISA. Four of Plaintiffs' claims allege that Defendants breached their fiduciary duties: Count I: Wrongful denial of benefits under the Plan; Count III: Inadequate funding of the Plan and withholding of Plan assets; Count IV: Failing to ensure that the Plan complies with ERISA; and Count V: Self-dealing. Count VI alleges that Defendants violated ERISA's reporting and disclosure requirements.

Plaintiffs seek to hold Defendants jointly and severally liable for all unpaid Plan benefits and further request that Defendants disgorge all profits made through the use of Plan assets. In addition, Plaintiffs seek to pierce the corporate veil and hold Mr. Laumeister personally and individually liable for all amounts owed to Plaintiffs under the Plan. Based on Defendants' alleged failure to comply with ERISA's reporting and disclosure requirements, Plaintiffs assert that Defendants are personally liable, jointly and

severally, for an amount up to $100 per day to each Plaintiff, from the date of each violation. Finally, based on Mr. Laumeister's disavowal of any obligations to provide Plan benefits, Plaintiffs request that the court enjoin Defendants from further violating ERISA, remove Defendants as Administrators of the Plan, appoint an administrator in their place, and compel them to remit all monies and reports due to Plaintiffs.

Defendants deny liability and assert that the Plan is a top hat plan pursuant to which they have no further obligations. In the event they are found liable for Plaintiffs' claims, they have counterclaimed against Plaintiff Launderville, contending that she should be held jointly and severally liable and indemnify them for any ERISA damages awarded against them.

### A.    Standard of Review.

As the Plaintiffs make no claim under the 1990 Plan, the court confines its analysis to the 1997 Plan.[5] The court reviews Defendants' denial of benefits *de novo* because the 1997 Plan does not grant the plan administrators discretion to make final benefit determinations. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) ("[A] denial of benefits challenged under [an ERISA claim] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."). The *de novo* standard "applies to all aspects of the denial of an ERISA claim, including fact issues, in the absence of a clear reservation of discretion to the plan administrator." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999).

"[T]he *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." *Firestone Tire & Rubber Co.*,

---

[5] The 1997 Plan was accompanied by an application signed by each participant acknowledging that it superseded prior plans. *See* Defendants' Ex. C at 1 (stating the 1997 Plan "supersedes any and all deferred compensation plan documents provided by CTC Corporation.") (capitalization omitted).

489 U.S. at 115. It requires "the district court [to not only] find the facts specially and state separately its conclusions of law thereon," the court must also "judge the credibility of witnesses[.]" *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001) (internal quotation marks omitted).

## B.     Whether the 1997 Plan is a Top Hat Plan under ERISA.

The parties agree that the 1997 Plan is generally subject to ERISA which applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce[.]" 29 U.S.C. § 1003(a)(1). ERISA defines an "employee pension benefit plan" to include:

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program[] . . . results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A)(ii).

"ERISA's coverage provisions, 29 U.S.C. §§ 1003, 1051, 1081, and 1101, state that ERISA shall apply to any employee benefit plan, other than listed exceptions." *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000). At issue in this case is whether the top hat exception applies. A top hat plan is defined as:

> "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Top hat plans are exempt from the participation and vesting provisions of ERISA, 29 U.S.C. §§ 1051-1061, its funding provisions, 29 U.S.C. §§ 1081-1086, and its fiduciary responsibility provisions, 29 U.S.C. §§ 1101-1114, though not from its reporting and disclosure provisions, 29 U.S.C. §§ 1021-1031, or its administration and enforcement provisions, 29 U.S.C. §§ 1131-1145.

*Demery*, 216 F.3d at 286-87.

Congress created the top hat exception because "Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations." *Gallione v. Flaherty*, 70 F.3d 724, 727 (2d Cir. 1995). A 1990

Department of Labor ("DOL") opinion letter reflects this same interpretation of legislative intent:

> It is the view of the Department that in providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

U.S. Dep't of Labor, Pension & Welfare Benefit Programs, Opinion Letter 90-14A, 1990 WL 123933, at *1 (May 8, 1990).[6]

## 1.  Requirements of a Top Hat Plan.

In the Second Circuit, in order to establish a top hat exception, it must be established that the 1997 Plan was: "(1) unfunded, and (2) maintained primarily for a select group of management or highly compensated employees." *Demery*, 216 F.3d at 287. The Second Circuit joins the Sixth and Ninth Circuits in finding that there is a third consideration as well because an "[a]bility to negotiate is an important component of top hat plans[.]" *Demery*, 216 F.3d at 289; *see also Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678-79 (6th Cir. 2007) (observing that "the 'select group' test is whether the members of the group have positions with the employer of such influence that they can protect their retirement and deferred compensation expectations by direct negotiations with the employer'") (internal quotation marks omitted); *Duggan v. Hobbs*, 99 F.3d 307, 312-13 (9th Cir. 1996) (citing the DOL opinion letter and concluding that "the top-hat exception was intended to apply to employees who 'by virtue of their position or compensation

---

[6] The DOL opinion letter "explain[s] Congress's intent for creating top-hat plans[]" and "is therefore entitled to persuasive deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161, 89 L.Ed. 124 (1944)." *Sikora v. UPMC*, 876 F.3d 110, 116 (3d Cir. 2017); *see also Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 47 (1st Cir. 2008) ("We have no quarrel with the letter's persuasiveness as a gloss on Congress's intentions in enacting the top-hat provision.").

level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan[.]'").[7]

## 2. The Burden of Proof.

This court has previously held that Defendants bear the burden of proving that the Plan is a top hat plan. *See* Doc. 47 at 9. The court recognizes that there is a split of authority on this issue,[8] with the Third Circuit holding that an employee or other beneficiary must prove his or her employer did not establish a top hat plan. The Second

---

[7] Not all Circuits agree that a court should consider an employee's ability to negotiate. As the Third Circuit recently observed, it finds the approach of the First Circuit more persuasive:

> The First Circuit has expressed a different view, one which is in tension with the positions taken by the Second, Sixth, and Ninth Circuits. In *Alexander v. Brigham & Women's Physicians Org., Inc.*, that court declined 'the appellant's invitation to depart from the plain language of the statute and jerry-build onto it a requirement of individual bargaining power.' *Alexander v. Brigham & Women's Physicians Org., Inc.*, 513 F.3d 37, 47 (1st Cir. 2008). . . . We agree with the First Circuit's approach.

*Sikora*, 876 F.3d at 115. However, even the First Circuit has observed: "The origins of the top-hat provision lie in Congress's insight that high-echelon employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interests." *Alexander*, 513 F.3d at 43.

[8] *Compare Daft v. Advest, Inc.*, 658 F.3d 583, 596-97 (6th Cir. 2011) (observing that "the defendant-employer typically advocates for the top-hat status of an ERISA plan in order to avoid statutory liability, and therefore the defendant-employer typically bears the burden of proof on this issue in the district court."); *MacDonald v. Summit Orthopedics, Ltd.*, 681 F. Supp. 2d 1019, 1023 (D. Minn. 2010) (concluding that "Defendants bear the burden of showing that the Plan is a top hat plan"); *Deal v. Kegler Brown Hill & Ritter Co. L.P.A.*, 551 F. Supp. 2d 694, 700 (S.D. Ohio 2008) (observing that "[t]he burden is on Defendant to show that the . . . Plan is a top hat plan."); *Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 142 (D. Mass. 2006), *aff'd*, 513 F.3d 37 (1st Cir. 2008) (noting that defendant "has the burden of proving that [deferred compensation plans] were each top hat plans."); *Virta v. DeSantis Enters., Inc.*, 1996 WL 663970, at *3 (N.D.N.Y. Nov. 7, 1996) ("Defendants have failed to controvert plaintiffs' evidence that this Plan was not administered as a Top Hat plan, and they bear the burden of proof on this affirmative defense"), *with Sikora*, 876 F.3d at 113 ("[Plaintiff] has the burden of showing that the Plan is not a top-hat plan to obtain relief under ERISA") (citing *Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989) (rejecting contention that a plan's status as a top-hat plan is an affirmative defense and concluding that § 1101(a) "does not provide for an exemption from liability under section 502(a)" but instead "merely provides the legal standard by which [a defendant's] section 502(a) liability is to be determined.")).

Circuit has not squarely addressed the issue. For the following reasons, the court disagrees with the Third Circuit's approach and adopts the majority approach.

In general, it is the employer who chooses to offer an employee benefit plan and on what terms; drafts the plan or causes it to be drafted; determines whether it will seek a top hat exception from ERISA's more onerous requirements; and selects the employees who will be allowed to participate therein. It therefore follows that the employer should bear the burden of establishing that it has accomplished its intended objectives.[9]

Placing the burden of proof on the employer also furthers ERISA's remedial and protective purposes. As the Supreme Court has explained:

> Congress enacted ERISA to "protect . . . the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans and to "provid[e] for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans.

*Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (alterations in original).

ERISA was also intended to address concerns about "the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds." *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989); *see also Firestone Tire & Rubber Co.*, 489 U.S. at 108 ("ERISA provides a panoply of remedial devices for participants and beneficiaries of benefit plans.") (internal quotation marks omitted); *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 454 (1st Cir. 1995) (holding ERISA's substantive provisions are designed "to safeguard the financial integrity of employee benefit funds, to permit employee monitoring of earmarked assets, and to ensure that employers' promises are kept."). For these reasons, "[t]he elements of [the statutory] definition make the top hat category a narrow one" and "top hat plans form a rare sub-species of ERISA plans[.]" *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir.

---

[9] The Third Circuit has described a top hat plan as "having three elements: (1) 'the plan [must] be unfunded'; (2) it must 'exhibit the required purpose'; and (3) 'it must also cover a 'select group' of employees." *Sikora*, 876 F.3d at 113 (internal quotation marks omitted). Each of these factors is exclusively within the employer's control.

1996).[10] If the purpose of ERISA is to protect employees and employee benefit plans, that purpose would be thwarted if an employee was required to bear the burden of establishing whether an exception to it applies, especially when that exception limits ERISA's protections.

Only an employer has both the motive and the means of ensuring compliance with ERISA's top hat exception. Requiring the employer to shoulder the burden of proof thus furthers congressional intent, places the burden of proof on the party most likely to have the evidence relevant to establish the exception, and allocates the burden of proof to the party that controls if, when, and how a top hat plan is offered.

### 3. The 1997 Plan's Stated Purpose.

In this case, the 1997 Plan does not indicate it is a top hat plan, does not state it is a nonqualified plan, contains no reference to ERISA, and expresses no intent to be exempt from certain ERISA requirements.[11] Although not dispositive, this is evidence of CTC's intent. *See Guiragoss v. Khoury*, 444 F. Supp. 2d 649, 659 (E.D. Va. 2006) ("[I]t is clear that merely inserting the ERISA definition of a top hat plan into a document is insufficient if the actual plan does not satisfy the top hat requirements, although a plan's language is indicative of the employer's intent when establishing the plan and may influence the court's determination") (collecting cases); *see also Alexander*, 513 F.3d at 45 (noting "a plan's specific language can aid a court in determining whether that plan qualifies as a top-hat plan.") (citation omitted).

The 1997 Plan identifies its purpose as follows: "The primary purpose of the Plan is to provide designated employees with an employer paid fund, which will provide a

---

[10] *See also Alexander*, 513 F.3d at 43 ("The top-hat provision cuts a swath through [ERISA's] regulatory thicket, relieving employers of many of ERISA's more onerous burdens if—and only if—certain circumstances exist."); *Carrabba v. Randalls Food Mkts., Inc.*, 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999), *aff'd*, 252 F.3d 721 (5th Cir. 2001) ("'ERISA is a remedial statute to be liberally construed in favor of employee benefit fund participants,' and . . . exemptions from the ERISA coverage should be confined to their narrow purpose.") (quoting *Kross v. W. Elec. Co.*, 701 F.2d 1238, 1242 (7th Cir. 1983)).

[11] Indeed, the Plan states that it "shall be construed under the laws of the state of Vermont." (Defendants' Ex. B at 5.)

survivor benefit to the employee's immediate family as well as a supplemental retirement income." (Defendants' Ex. B at 1.) The term "Employees" is defined as "all d[e]signated eligible employees of this Plan" while "Participant" is defined as "an Employee who participates in this Plan." *Id.*

The Plan imposes no qualifications for participation in the Plan other than the employee's minimum 3% IRA contribution. *See Khoury*, 444 F. Supp. 2d at 663 (declining to find a top hat exemption where employer "cannot even rely on the Plan documents to support their top hat argument because the documents contain no reference to selective member requirements"). It delegates decisions regarding Plan participation to the Plan Administrators without guidance regarding how that task is to be performed:

> ADMINISTRATION- This Plan shall be administered by the Employer. The Board of Directors of the Employer shall have full power and authority to adopt rules and regulations for the administration of the Plan, and to interpret, alter, amend, and revoke any rules and regulations so adopted. The Board of Directors of the Employer shall administer the Plan. All decisions concerning withdrawal, payment, method of payment, investment of funds, etc, shall be determined by a majority of the Board of Directors. Employee Board of Director members shall not be entitled to make any decision of any kind with respect to their own participation.

(Defendants' Ex. B at 1.)

There is thus nothing in the 1997 Plan itself that suggests it was intended to fall within ERISA's top hat exception.

### 4. Whether the Plan is Unfunded.

Defendants argue that the Plan is unfunded. Plaintiffs counter that there is "strong evidence that the Plan's actual inception was 1987" and "Defendants presented no Plan documents from 1987 showing that the Plan was then 'unfunded' so as to meet the threshold requirement for a top hat plan." (Doc. 213 at 2.) The court disagrees that there is "strong evidence" of a 1987 plan. No witness claimed to have seen such a plan or participated therein. The issuance of a life insurance policy in Ms. Launderville's name and a reference in Board of Directors minutes to a 1987 plan do not create a plan where one does not otherwise exist. Plaintiffs effectively concede this point by proposing that

38

the court find that "[t]he Plan (including the versions under the 1990 and 1997 Agreements) was the only retirement plan CTC ever offered to its employees." (Doc. 164 at 4, ¶ 10.) The only question is therefore whether the 1997 Plan was unfunded.

> [T]he question a court must ask in determining whether a plan is unfunded is: "can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?"

*Demery*, 216 F.3d at 287. Put differently, a deferred compensation plan is unfunded where "benefits thereunder will be paid . . . solely from the general assets of the employer." *Id.* (citing *Gallione*, 70 F.3d at 725) (internal quotation marks omitted).

In *Demery*, the plan's "express terms" made it clear that the amounts payable would not be held "in trust or as a segregated fund for the Employee[,]" would be "payable solely from the general assets of the Employer," and the "Employer's obligation under the Plan shall be that of an unfunded and unsecured promise of Employer to pay money in the future." *Id.*

The 1997 Plan, in contrast, is less clear:

> 7. RIGHTS OF THE PARTICIPANT - The rights of the Participant created by the Plan shall be that of a general creditor of the Employer only, and then solely to the extent of the net value of the Participant's deferred compensation account. Prior to the date on which an obligation to pay Deferred Compensation Payments or Death Benefits commences, the Participant has no other rights under the Plan or in the salary deferred under the terms of the Deferred Compensation Payments or to a Death Benefit, are set forth in Article 6 and Article 8 through 10 hereof [8. Leave of Absence. 9. Amendment or Termination of Plan. 10. Non-Assignability Clause]. It is also understood that the Plan in no way affects the Employer's or the Employee's rights to terminate employment at any time, with or without cause.

* * *

> 11. PROHIBITION AGAINST FUNDING - If the Employer acquires a mutual fund, an annuity contract or life insurance policy, or any other asset in connection with its liabilities hereunder, neither a Participant nor any beneficiary of the Participant shall have any right with respect to, or claim against, such contract, policy or other asset, and the Employer shall be named the owner and beneficiary of any such contract, policy or other

39

asset. Such contract, policy, or other asset shall not be held under any trust for the benefit of a Participant or [beneficiaries] of a Participant or held in any way as collateral security for the performance of any obligation of the Employer under the Plan. Any such policy or other asset shall be, and remain, a general, unpledged, unrestricted asset of the Employer.

(Defendants' Ex. B at 3-5.)

Because the 1997 Plan states that the Participants' rights will be that of a general creditor and that they will have no rights to, or claims against, any specific Plan assets, under *Demery*, this supports a claim that the 1997 Plan is unfunded. It is, moreover, undisputed that CTC treated its deferred compensation accounts as assets it could use to pay its operating expenses. Plaintiffs Launderville and Browe were aware that CTC was using its deferred compensation accounts for this purpose. They not only failed to protest this use; they facilitated it.

However, certain other provisions of the 1997 Plan suggest that it will be "funded."[12] In addition, CTC placed its deferred compensation contributions in accounts initially held separately from its general assets. *See Khoury*, 444 F. Supp. 2d at 659-60 ("The first step in the top hat inquiry is determining whether the plan is unfunded. The analysis is straightforward and depends on whether the plan has a funding source apart from the general assets of the company. . . . If there is no separately maintained account distinct from the company's general assets, then the plan is unfunded."); *see also Reliable Home Health Care, Inc. v. Union Cent. Ins. Co.*, 295 F.3d 505, 514 (5th Cir. 2002) ("[I]n determining whether a plan is 'funded' or 'unfunded' under ERISA, . . . a court should

---

[12] *See, e.g.*, Defendants' Ex. B at 1 ("The primary purpose of the Plan is to provide designated employees with an employer paid fund"); *id.* at 2 ("In the event that a Participant fails to continue funding the IRA, pursuant to this agreement, the Employer will terminate funding the plan on behalf of the Participant and all benefits accrued will be forfeited to the Employer."); *id.* ("Deferred Compensation Payments[] . . . employer has also funded, group term life insurance equal to one time participant's annual salary, for which the participant has named a beneficiary."); *id.* at 3 ("The balance of the account will be driven only by the economic market growth of the funds which the Employer has funded. The monthly payout amount will be reviewed and adjusted annually to reflect the growth of the account and to exhaust the fund balance over the remainder of the 120 month payout period. The Participant should be aware that the payout from this fund is taxable and should plan accordingly.").

identify whether a policy is funded by a res separate from the general assets of the company.").

On balance, because the 1997 Plan clearly states that it vests in Plan Participants no rights in CTC's deferred compensation accounts and no greater status than that of a general creditor, and because CTC treated the deferred compensation accounts as its general assets, Defendants have satisfied their burden to establish the 1997 Plan was unfunded.

### 5. Whether the Plan was Offered to a "Select Group."

"To determine whether the participants of an employee benefit plan are 'a select group of management or highly compensated employees,' [the Second Circuit] require[s] the district court to conduct a fact-specific inquiry, analyzing quantitative and qualitative factors in conjunction." *Demery*, 216 F.3d at 288 (citation omitted). Quantitatively, "the plan must cover relatively few employees." *In re New Valley Corp.*, 89 F.3d at 148. Qualitatively, "the plan must cover only high level employees." *Id.* As the Ninth Circuit has observed, the "select group" requirement includes "more than a mere statistical analysis." *Duggan*, 99 F.3d at 312. While the First Circuit has observed that "[i]t is an open question whether the statutory phrase 'select group' modifies only the term 'management' or also modifies the term 'highly compensated employees[,]'" the court need not decide whether "both categories of employees are subject to the 'select group' requirement" because regardless of whether the "select group" modifies both categories, Defendants cannot sustain their burden of proof. *Alexander*, 513 F.3d at 43 n.7.

### a. Quantitative Analysis.

In analyzing whether the 1997 Plan was maintained for relatively few employees, the court must first determine the number of employees offered participation in the Plan (the numerator) in comparison to the size of CTC's workforce (the denominator). The courts have provided ample guidance regarding how to identify the numerator, however, there is scant guidance on how to select the denominator.[13] If all employees are at least

---

[13] *See, e.g.*, *Demery*, 216 F.3d at 288 (comparing the number of employees offered participation in the plan to the size "of an employer's workforce"); *Sikora v. UPMC*, 876 F.3d 110, 113 (3d

"eligible for consideration[,]" "the plan . . . is not[] . . . a top-hat plan which would be exempt from any ERISA provisions." *Hollingshead v. Burford Equip. Co.*, 747 F. Supp. 1421, 1430 (M.D. Ala. 1990).

In this case, for the numerator, Plaintiffs assert that the 1997 Plan was offered to at least eighteen CTC employees. Defendants appear to concede that the court may rely on this number. *See* Doc. 214 at 12 ("assuming that the Plan was offered to a maximum of 18 CTC Corporation employees"). With regard to the denominator, however, the parties are poles apart.

Plaintiffs argue that CTC's total workforce was approximately sixty employees at the time of the 1997 Plan based upon Ms. Launderville's testimony and Defendants' inability to corroborate their estimates of total CTC employment with CTC's 1997 tax return. They point out that there is no evidence that the employees of the One-Hour Labs or ESS had any ability to participate in the 1997 Plan.

Defendants, in contrast, cite the Internal Revenue Code, 26 U.S.C. § 1563, which defines "controlled group of corporations" and "parent-subsidiary controlled groups," in support of their contention that the employees of CTC, ESS, VSL, BRL and LWB must be considered in deciding whether Plan participation was quantitatively select. They argue that with the exception of LWB, CTC was the sole shareholder of these corporations and, with regard to LWB, it owned 60% of the shares. The court disagrees with Defendants' approach for several reasons.

First, Defendants introduced no evidence beyond Mr. Laumeister's testimony that the shares of these corporations were owned in the manner stated by CTC. In several material respects, Mr. Laumeister testified inconsistently regarding these corporations. For example, he initially testified that LWB was wholly owned by CTC but when impeached, he admitted that he owned the shares of LWB with Christopher Belknap. Similarly, Defendants erroneously characterized ESS as wholly owned by CTC when it appears that it was owned by Mr. Laumeister and his wife. Accordingly, the court does

Cir. 2017) (estimating that "0.1% of the entire [employer's] workforce was a participant in the Plan.").

42

not find Mr. Laumeister's testimony regarding CTC's ownership status with regard to other related entities wholly reliable.

Second, even if Mr. Laumeister's testimony were fully credited, no court has relied on 26 U.S.C. § 1563 to determine the size of an employer's workforce eligibility for participation in a top hat plan. Although ERISA cross-references this Internal Revenue Code provision, *see* 29 U.S.C. § 1060(c), it does so only in the context of a "plan maintained by more than one employer[]" which neither party contends is at issue here. 29 U.S.C. § 1060(a). ERISA's top hat provisions do not rely on 26 U.S.C. § 1563 for a definition of "employer" but instead rely on ERISA's definition that an "employer" is "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan[.]" 29 U.S.C. § 1002(5). CTC did not act as an employer in relation to an employee benefit plan for any entity or any employee of an entity other than CTC. It chose to separately incorporate ESS and the One-Hour Labs for its business purposes and to refrain from offering employees of those entities any deferred compensation plans. It therefore should not be permitted to artificially inflate the size of its total workforce by including those employees in the denominator so as to render the numerator more quantitatively select.

Because Defendants have destroyed their business records, the best evidence before the court is that in 1997 there were approximately sixty CTC full-time employees. Any inaccuracies in this number must be borne by Defendants. *See Khoury*, 444 F. Supp. 2d at 662 (declining to find a top hat exemption where, among other things, "[t]here is no clear evidence indicating who was offered enrollment in the Plan").[14] A deferred compensation plan offered to eighteen out of sixty employees is offered to 30% of the

_____

[14] The *Carrabba* court was faced with a similar lack of proof. *See Carrabba*, 38 F. Supp. 2d at 475 ("The record does not reflect, on an annual basis or otherwise, the number of employees of the [parent corporation] who were eligible to participate in the [plan] under the criteria for participation as they existed from time to time. However, there is indication in the record that there probably were a significant number of persons eligible to participate who did not actually participate"). This underscores the appropriateness of allocating to the employer the burden of proof as the employer is in the best position to provide the required evidence.

workforce. No court has found this percentage sufficiently quantitatively "select." In *Demery*, the Second Circuit observed that 15.34% of the workforce "is probably at or near the upper limit of the acceptable size for a 'select group[.]'" *Demery*, 216 F.3d at 289; *see also Khoury*, 444 F. Supp. 2d at 660 ("A review of the published cases reflects that there is no existing authority that affirms top hat status for a plan representing more than 16% of the total workforce."). The court thus concludes that, regardless of who is allocated the burden of proof, the 1997 Plan was not offered to a quantitatively "select group."

### b. Qualitative Analysis.

Defendants fare no better with establishing that the 1997 Plan was offered to a qualitatively select group. In *Demery*, the Second Circuit concluded that a deferred compensation plan which included "assistant vice presidents and branch managers, and therefore swept more broadly than a narrow range of top executives," was "nonetheless limited to highly valued managerial employees." *Demery*, 216 F.3d at 289. The *Demery* court opined that a "'select group of management' could include senior management and high-level executives[,]" and could include "certain key officers[.]" *Id.* at 288 (internal citations and quotation marks omitted).

The *Demery* court further found it "significant that the statute defines a top hat plan as 'primarily' designed to provide deferred compensation for certain individuals who are management or highly compensated" because "[i]t suggests that if a plan were principally intended for management and highly compensated employees, it would not be disqualified from top hat status simply because a very small number of the participants did not meet that criteria, or met one of the criteria but not the other." *Demery*, 216 F.3d at 289 (citing *Belka v. Rowe Furniture Corp.*, 571 F. Supp. 1249, 1252 (D. Md. 1983)) (finding participants in valid top hat plan included "salesman and a diverse group of executives, including vice presidents, sale managers, [and] supervisors")). In so ruling, the court observed that if a plan is established "as a means to retain valuable employees," this factor "must weigh in favor of classifying the [p]lan as a top hat plan." *Id.* at 287 (internal quotation marks omitted). Other courts have declined to find an employee's

status as "valuable" sufficient. *See, e.g., Carrabba v. Randalls Food Mkts., Inc.*, 38 F. Supp. 2d 468, 477 (N.D. Tex. 1999) ("The mere fact that the employer intends the plan to be a reward to 'key' employees does not satisfy the degree of selectivity contemplated by the statutes.") (citing *Hollingshead*, 747 F. Supp. at 1429 (holding "select group" requirement cannot be based on a "'key'" person status determined by "time of service, contribution to the company, loyalty"); *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1015 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 108 (2d Cir. 1996) (holding ERISA contemplates that a top hat plan will be for the benefit of "high-ranking employees[]").

In this case, Defendants have established that the 1997 Plan was "a means to retain valuable employees[.]" *Demery*, 216 F.3d at 287 (internal quotation marks omitted). However, they provided little evidence that the 1997 Plan was otherwise qualitatively select. Citing Mr. Laumeister's testimony, Defendants contend that "there is no dispute that all of the employees who were offered participation in the Plan were employees whose compensation ranged from two times to more than five times the [compensation of] employees at large of CTC Corporation and the subsidiary corporations that it controlled[.]" (Doc. 214 at 11.) However, there is no reliable evidence to support this assertion which is uncorroborated by CTC's business records. Plaintiffs, in contrast, have proffered evidence that at least some of the CTC employees to whom the 1997 Plan was offered were neither highly compensated nor managerial. *See Khoury*, 444 F. Supp. 2d at 664 (observing that employer "cannot seriously assert that its Plan, which enrolled salesclerks whose salaries were roughly in the middle of the pay scale, was primarily for the benefit of highly compensated employees"). "To come within the compass of the top-hat provision, the employer must be able to show a substantial disparity between the compensation paid to members of the top-hat group and the compensation paid to all other workers." *Alexander*, 513 F.3d at 46. Here, Defendants fail to make that showing.

Of equal importance is the ample evidence that Defendants generally offered 1997 Plan participation as Mr. Laumeister saw fit, employing an array of criteria including whether an employee contributed to CTC's success, did not need to be "coddled," knew his or her job, had a nice home, and had a good reputation in the community. No reliable

45

evidence of any guidelines for Plan participation was introduced. *See Khoury*, 444 F. Supp. 2d at 661 (observing that a top hat plan exemption requires "some well established basis for designating eligible Plan members as 'high level' employees."). Defendants have thus failed to establish the 1997 Plan was qualitatively select.

### 6. Whether Plan Participants Had the Ability to Negotiate Plan Terms.

Defendants also proffer no evidence that the 1997 Plan was offered on anything more than a "take it or leave it" basis. Defendants do not identify a single CTC employee who negotiated any aspect of his or her Plan participation, nor do they cite any evidence that CTC employees collectively had the bargaining power to negotiate the terms of the 1997 Plan.

For the foregoing reasons, the court concludes that Defendants have failed to establish the 1997 Plan was "maintained by [CTC] primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees[.]" 29 U.S.C. § 1051(2). The 1997 Plan is thus not a "top hat" plan and is not exempt from ERISA's requirements. *See Alexander*, 513 F.3d at 43 (noting that when top hat "preconditions are satisfied, the plan is exempted from several of ERISA's stringencies, including rules governing plan participation, vesting, funding, and fiduciary duty").

### C. Whether Plaintiffs Are Entitled to Benefits under the Plan.

Having determined that the 1997 Plan is not a top hat plan, the court turns to whether Plaintiffs are entitled to deferred compensation thereunder. ERISA provides that "[a] civil action may be brought-- (1) by a participant or beneficiary-- . . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). "[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co.*, 489 U.S. at 115. Nothing in ERISA confers on Plaintiffs the right to alter the terms of an ERISA plan, or to waive conditions to vesting that exist thereunder. *See*

*Hollingshead*, 747 F. Supp. at 1427 ("ERISA assures plan participants that they will obtain the benefits to which they are entitled and that they will not lose those benefits as a result of unduly restrictive provisions or lack of sufficient funds").

Under the 1997 Plan, a participant is eligible for deferred compensation payments upon his or her retirement, death, or in the event of disability. The 1997 Plan defines "retirement" as "withdrawal from full time active employment at or after age 65." (Defendants' Ex. B at 1, ¶ 3(c).) Although the 1997 Plan does not state that "full time active employment" must be at CTC, only Plaintiff Browe testified that she interpreted the 1997 Plan to cover employment other than CTC. She admitted that she did not leave CTC's employment with this understanding. Plaintiff Launderville, in contrast, conceded that the 1997 Plan required retirement to occur while in CTC's employ. Plaintiffs do not argue to the contrary in their post-trial memorandum of law.

The 1997 Plan further requires a Plan participant to deposit "a minimum of 3% of their salary" into an Individual Retirement Account ("IRA") and requires such contributions to continue for each year of Plan participation. *Id.* at 2, ¶ 5. "In the event that a Participant fails to continue funding the IRA, pursuant to this agreement, the Employer will terminate funding the plan on behalf of the Participant and all benefits accrued will be forfeited to the Employer." *Id.* The Plan requires the Employer to "notify the Participant in writing thirty days prior to termination." *Id.* No Plaintiff proffered evidence of compliance with the 1997 Plan's IRA funding requirement. Defendants proffered no evidence of compliance with the Plan's termination requirement.

The 1997 Plan states that "[t]he Employer may at any time terminate this Plan. Upon such termination, the Participants in the Plan will be deemed to have withdrawn from the Plan as of the date of such termination." *Id.* at 4, ¶ 9. The Third Circuit has concluded that such a provision is unenforceable if an employee fully performs by "continuing in the company's employment until retirement." *In re New Valley Corp.*, 89 F.3d at 150.

> Under unilateral contract principles, once the employee performs, the offer becomes irrevocable, the contract is completed, and the employer is

47

required to comply with its side of the bargain. In response to [an employer's] argument that the contract did not restrict its right to terminate the plan, we observed[:]

> even when a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles (unless an explicit right to terminate or amend after the participants performance is reserved). Any other interpretation . . . would make the Plan's several specific and mandatory provisions ineffective, rendering the promises embodied therein completely illusory.

> In our view, the company's claim to an unfettered right to terminate in the face of specific grants of benefits had no basis in contract law and was more than minimally unfair.

*Id.* at 150-51 (internal citations, quotation marks, and alteration omitted).

Against this backdrop, the issue before the court is whether Plaintiffs have established their entitlement to deferred compensation under the 1997 Plan regardless of whether the Plan has been terminated. It is beyond cavil that the 1997 Plan is not a model of clarity. Any ambiguities in it should therefore be construed against CTC as its drafter. *See Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 431 (7th Cir. 1994) (stating that, under the federal common law of contract, courts "construe ambiguities in ERISA plans against the drafter.") (internal quotation marks omitted); *see also Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) (finding that "[i]f there are ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer[,]" because the federal common law of contract should not "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted[.]") (internal quotation marks omitted).

At trial, the court permitted the parties to introduce extrinsic evidence of their understanding of the 1997 Plan requirements. As the Third Circuit explained:

> Applying the federal common law of contract, . . . in construing the plan documents[,] [a] court cannot interpret words in a vacuum, but rather must carefully consider the parties' context and the other provisions in the plan. Moreover, extrinsic evidence should have been considered to determine whether an ambiguity existed, especially in the absence of an integration clause in the plan.

Whether a document is ambiguous presents a question of law properly resolved by this court. . . . To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning. And once a contract provision is found to be ambiguous, extrinsic evidence must be considered to clarify its meaning.

*In re New Valley Corp.*, 89 F.3d at 149-50 (internal citations, quotation marks, and footnotes omitted).

Defendants proffered evidence that they intended the 1997 Plan to reward valued and valuable employees and to encourage them to continue to contribute to CTC's success. From Defendants' perspective, an employee who left CTC's employment prior to age sixty-five, unless through death or disability, was disqualified from deferred compensation under the Plan unless the Plan Administrators decided to make an exception as they did in the case of Sharon Fish and Bill Elliott. There is no evidence that Defendants ever paid deferred compensation to any Plan Participant who left CTC's employment prior to sixty-five and retired from employment elsewhere.

Plaintiffs Browe, Launderville, and Jordan all acknowledge that they voluntarily left CTC's employ prior to age sixty-five, made no claim to deferred compensation at the time, and made no inquiries that suggested they believed deferred compensation would be paid to them under the 1997 Plan upon their retirement from an employer other than CTC. They did not retain Plan documentation or assert any claim until Plaintiff Launderville encouraged them to participate in this lawsuit. Other Plan Participants who left CTC's employment prior to reaching sixty-five also made no claims for benefits.

In addition, Plaintiffs Browe and Launderville negotiated to be included in Mr. Laumeister's Last Will and Testament with the apparent understanding that deferred

compensation under the 1997 Plan was otherwise unavailable. Plaintiff Launderville raised the issue of her deferred compensation in debating whether she should accept Plasan Industries' offer of employment, thereby evidencing that she knew her deferred compensation was at risk if she did not retire in CTC's employ.

The context of the 1997 Plan and the parties' course of conduct were such that all parties appeared to clearly understand that the Plan's reference to "retirement" meant retirement at CTC. Construing the 1997 Plan against its drafter does not mandate a different result. Any other interpretation would reward employees who left CTC's employ on the same basis as employees who stayed and contributed to CTC's success. There would thus be little point from the employer's perspective to offer a plan to reward performance and incentivize employment longevity. *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006) (noting that "absurd results should be avoided[]" when interpreting a contract).

Considering the totality of the circumstances, the only reasonable interpretation of the 1997 Plan consistent with the parties' understanding and conduct is that absent death or disability, the Plan required an employee to reach the age of sixty-five while employed by CTC in order for deferred compensation to be paid. *See In re New Valley Corp.*, 89 F.3d at 154 ("Due to the abundance of ERISA plan[s] and the differing benefits these plans provide, each case must be considered fact specific and the court must make its determination of the benefits provided based on the language of the particular plan it has been called upon to review."). Pursuant to this interpretation, Plaintiffs Browe, Launderville, and Jordan have not established their entitlement to deferred compensation under the 1997 Plan because none of these Plaintiffs have satisfied the conditions precedent to payments thereunder. They have not retired at sixty-five, died, or become disabled while in CTC's employment and they have not proffered evidence that they complied with the 1997 Plan's 3% contribution requirement to an IRA.

Plaintiffs Tyler Burgess's and Bonnie Jamieson's claim to benefits under the 1997 Plan depends on their mother's status at the time of her death both in terms of whether she was a Plan participant and whether she was employed by CTC at the time of her

50

death. They proffer no evidence of their mother's application to participate in the 1997 Plan, no evidence that their mother retained any Plan documents, and no evidence that she entered into an agreement with CTC regarding how death benefits would be paid. *See* Defendants' Ex. B at 2, ¶ 6 ("The Employer and each Participant will execute an agreement in writing, confirming their assumptions of the obligations set forth in this Plan and the method of Death Benefits payable."). They have not challenged the credibility of Ms. Launderville's statement in 2004 that Beverly Burgess was not entitled to anything beyond her own IRA at the time of her death.

Although a closer question, based on the totality of the circumstances, Plaintiffs Burgess and Jamieson have not established that they have been wrongfully denied benefits on their mother's behalf under the 1997 Plan. *See Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005) ("[The plaintiff] bears the burden of proving his entitlement to contract benefits [under ERISA]."); *see also Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) ("As concluded by other circuit courts which have addressed the question, when the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant.").

For the foregoing reasons, the court enters judgment in Defendants' favor on Count I of Plaintiffs' Second Amended Complaint.

**D.     Whether Plaintiffs have Established a Breach of Fiduciary Duties.**

When an ERISA plan suffers a loss because of a breach of fiduciary duties, ERISA states that a plan fiduciary is personally liable:

> to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a); *see also id.* § 1132(a)(2) (providing that a "civil action may be brought[] . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109").[15]

"[A] person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) and (iii). A plan administrator "engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents." *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996).

"ERISA requires a 'fiduciary' to 'discharge his duties with respect to the plan solely in the interests of the participants and beneficiaries.'" *Id.* at 506. "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'" *Id.* "As other courts have held, '[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA[.]'" *Id.*

In *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985), the Supreme Court held that claims for a fiduciary duty breach under §§ 1109 and 1132(a)(2) must be "brought in a representative capacity on behalf of the plan as a whole." In *Varity v. Howe*, however, the Court held that individual relief for a fiduciary breach may be available pursuant to § 1132(a)(3) if brought by former employees who, "because they were no longer members of the . . . plan[,] . . . had no benefits due [them] under the terms

---

[15] The Supreme Court has held that, "although [29 U.S.C. § 1132(a)(2)] does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008).

of [the] plan" and would otherwise "have no remedy at all." *Howe*, 516 U.S. at 515 (internal quotation marks omitted).

In this case, Plaintiffs make no claims in a representative capacity on behalf of the 1997 Plan. Instead, they make individual claims and seek to reach Mr. Laumeister's personal assets by piercing CTC's corporate veil. There is no doubt that Mr. Laumeister is a fiduciary with regard to the 1997 Plan. He determined eligibility for Plan participation, controlled the investment and disposition of Plan assets, made determinations with regard to the denial and approval of claims for benefits, administered the Plan, and managed Plan assets. Plaintiffs claim that Mr. Laumeister violated his fiduciary duties as Plan Administrator by: wrongfully denying benefits under the Plan; inadequately funding the Plan; withholding Plan assets; and engaging in self-dealing.

Defendants counter that each of the acts Plaintiffs rely on for their breach of fiduciary duty claim is beyond the applicable statute of limitations and that Mr. Laumeister made no representations to Plan Participants inconsistent with the 1997 Plan. To the extent Beverly Burgess was entitled to benefits under the Plan, Defendants contend it was Ms. Launderville who made any misrepresentations to Plaintiff Jamieson. *See id.* at 512 ("ERISA specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims, . . . one that runs directly to the injured beneficiary"). Moreover, once Ms. Launderville became a Director of CTC, Defendants contend that she participated in any act or omission involving Plan administration and the denial of benefits. They therefore counterclaim against her for contribution and indemnification.

Faced with an array of issues with regard to Plaintiffs' breach of fiduciary duty claims, the court addresses them seriatim with the understanding that Plaintiffs have not clearly articulated any remedy they seek beyond payment of deferred compensation to which they are not entitled under the terms of the 1997 Plan.

### 1. Ms. Launderville's Status as a Plan Fiduciary.

As a threshold issue, the court agrees with Defendants that Ms. Launderville is a Plan fiduciary. The court did not find credible her claim that she did not know she was a

Plan Administrator. Although she claims she also did not know she was a Director of CTC, which gave rise to her status as a Plan Administrator, the evidence is to the contrary.

In her capacity as a Plan Administrator, Ms. Launderville determined eligibility for Plan participation, determined whether Mr. Massari should receive deferred compensation, participated in the decision to allow Ms. Fish and Mr. Elliott to retire early, and determined the denial of benefits for Beverly Burgess which she then communicated to Ms. Jamieson. She also facilitated the use of Plan assets to pay CTC's operating expenses.

Although some courts have held that "ERISA does not create a right of contribution" against another fiduciary, *Travelers Cas. & Sur. Co. of Am. v. IADA Servs., Inc.*, 497 F.3d 862, 867 (8th Cir. 2007), the Second Circuit has "conclude[d] that incorporating traditional trust law's doctrine of contribution and indemnity into the law of ERISA is appropriate." *Chemung Canal Tr. Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 18 (2d Cir. 1991). Defendants therefore have a right to seek contribution and indemnification from Ms. Launderville as a co-fiduciary of the 1997 Plan.

### 2. Only Injuries to the 1997 Plan as a Whole are Alleged.

In the absence of evidence that Ms. Launderville erred in her handling of Ms. Jamieson's request for deferred compensation on Beverly Burgess's behalf or any evidence that any of the other Plaintiffs were wrongfully denied benefits under the 1997 Plan, it is not clear what injury, if any, Plaintiffs suffered or what equitable remedy they should be allowed to invoke as a result of Mr. Laumeister's and Ms. Launderville's fiduciary breaches. The failure to keep separate accounts for the 1997 Plan, to adhere to the Plan terms in the Fish and Elliott early retirement decisions, and the use of Plan assets for CTC's general operating expenses all caused injuries to the Plan as a whole which did not flow to the individual beneficiaries in the absence of entitlement to benefits. No Plaintiff was denied deferred compensation as a result of these acts and there is no evidence that they suffered any other individualized harm because of them. While it is true that "Congress intended to make fiduciaries culpable for certain ERISA violations

54

even in the absence of actual injury to a plan or participant[,]" *Ziegler v. Conn. Gen. Life Ins. Co.*, 916 F.2d 548, 551 (9th Cir. 1990), if Mr. Laumeister and Ms. Launderville are required to "make good" to the 1997 Plan any losses sustained by the Plan as a result of their fiduciary breaches, Plaintiffs will not thereby be entitled to any deferred compensation. Instead, the Plan assets will be restored but no CTC employee will be in a position to claim them.

### 3. The Availability of Corporate Veil Piercing.

Although corporate veil piercing is available under ERISA,[16] it requires a far greater showing than has been made here. "ERISA does not render corporate officers personally liable for a company's unpaid benefit-fund contributions unless the officers and the company are 'alter egos' under traditional common law principles." *Leddy v. Standard Drywall, Inc.*, 875 F.2d 383, 387 (2d Cir. 1989). "The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws through a sham transaction or technical change in operations." *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) (internal quotation marks omitted). Thus, "[t]o protect employee benefits, courts observe 'a general federal policy of piercing the corporate veil when necessary.'" *Id.* (quoting *N.Y. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 647 (2d Cir. 2005)); *see also Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) ("In determining whether to disregard the corporate form, we must consider the importance of the use of that form in the federal statutory scheme, an inquiry that generally gives less deference to the corporate form than does the strict *alter ego* doctrine of state law.") (citation omitted).

---

[16] *See Peacock v. Thomas*, 516 U.S. 349, 354 (1996) ("Piercing the corporate veil is not itself an independent ERISA cause of action, but rather is a means of imposing liability on an underlying cause of action.") (internal quotation marks omitted); *see also Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*, 629 F.3d 282, 288 (2d Cir. 2010) ("Although developed in the context of the National Labor Relations Act, the alter ego doctrine has relevance in the ERISA context as well.").

The Second Circuit has recognized that the corporate veil may be disregarded in "special circumstances[.]" *See Sasso v. Cervoni*, 985 F.2d 49, 50 (2d Cir. 1993) ("[W]e have recognized that special circumstances, beyond an individual's officer status or corporate duties, might warrant the imposition of personal liability for a corporation's ERISA obligations."). "The test of alter ego status is flexible, allowing courts to weigh the circumstances of the individual case[.]" *UNITE HERE*, 629 F.3d at 288 (internal alteration and quotation marks omitted).

In this case, all Plan assets were used to pay CTC's corporate obligations including its payroll obligations. Although Mr. Laumeister on occasion used CTC resources for his personal benefit, these instances were isolated and relatively trivial, or if more serious, were unsupported by any evidence that they were not reimbursed. Plaintiffs assert that "Mr. Laumeister combined his personal investment account at Mission Management & Trust in Tucson, Arizona, with CTC's corporate account there for 'investment management purposes[,]'" (Doc. 164 at 9, ¶ 29), however, the only record they rely on for this assertion is a "note" from Mission Management & Trust that states: "There are two accounts: 1) Agent for Bruce's personal account: 2) agent for his corporation in VT. They are combined for investment management purposes." (Plaintiffs' Ex. 27 at MM0116.) This cryptic reference of unknown provenance and reliability is not a smoking gun.

In *Lowen v. Tower Asset Management, Inc.*, the Second Circuit described the type of conduct that will give rise to alter ego/veil piercing in the context of ERISA:

> A failure to disregard the corporate form in the circumstances of the present case would fatally undermine ERISA. The record demonstrates beyond dispute extensive intermixing of assets among the corporations, and among the corporations and individual defendants, without observing the appropriate formalities, simultaneous sharing of employees and office space by the corporate and individual defendants, and wholly inadequate capitalization of the corporations in light of the nature of the businesses in which they were engaged. The individual defendants were in no way passive investors in the corporate defendants. They personally and actively controlled and dominated those firms. The individual defendants caused Tower Asset to invest in companies in which they, their close relatives,

56

> Tower Capital, or Tower Securities had an equity interest. The individual
> defendants also arranged that Tower Capital and Tower Securities would be
> compensated by particular companies for Tower Asset's investing the
> Plans' assets in those companies. The individual defendants then took
> these proceeds themselves in the form of salaries, bonuses and
> unsubstantiated travel and expense reimbursements, and left the corporate
> defendants with virtually no net worth.

*Lowen*, 829 F.2d at 1221.

The circumstances in the instant case fall far short of *Lowen*. Moreover, any use
of CTC assets by Mr. Laumeister must be considered in conjunction with the $600,000 in
personal loans he made to the CTC with little hope of repayment. Plaintiffs have not
established that they are entitled to pierce CTC's corporate veil because of Mr.
Laumeister's mishandling of or self-dealing with regard to Plan assets, abuse or disregard
of corporate formalities, personal profit at the expense of CTC, or wholly inadequate
capitalization. In addition, as Mr. Laumeister is personally liable as a Plan fiduciary, it is
not clear what additional objective corporate veil piercing would accomplish.

For the foregoing reasons, the court enters judgment in Defendants' favor with
regard to Plaintiffs' request for a corporate veil piercing remedy.

### 4.      Statute of Limitations Defense.

A claim for a breach of a fiduciary duty under ERISA must be brought before "the
earlier of":

> (1) six years after (A) the date of the last action which constituted a part of
> the breach or violation, or (B) in the case of an omission the latest date on
> which the fiduciary could have cured the breach or violation, or (2) three
> years after the earliest date on which the plaintiff had actual knowledge of
> the breach or violation[.]

29 U.S.C. § 1113.

A "statute of limitations argument is an affirmative defense for which [the
defendant] bears the burden of proof." *United States v. Livecchi*, 711 F.3d 345, 352
(2d Cir. 2013). However, "[t]he party seeking equitable tolling bears the burden of
proving he is entitled to it." *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010).
"Generally, a litigant seeking equitable tolling bears the burden of establishing two

elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Mottahedeh v. United States*, 794 F.3d 347, 352 (2d Cir. 2015) (internal quotation marks omitted).

"The statute of limitations itself indicates a two-step analysis of accrual of an ERISA action: first, when did the alleged 'breach or violation' occur; and second, when did [the plaintiff] have 'actual knowledge' of the breach or violation?" *Ziegler*, 916 F.2d at 550. "This inquiry into plaintiffs' actual knowledge is entirely factual, requiring examination of the record." *Id.* at 552. "[A]n ERISA plaintiff's cause of action cannot accrue and the statute of limitations cannot begin to run until the plaintiff has actual knowledge of the breach, regardless of when the breach actually occurred." *Id.*

In this case, the only evidence Defendants proffer is that Plaintiffs had some knowledge that a breach of fiduciary duty may have occurred when they were contacted by Ms. Launderville in 2015 regarding participation in this lawsuit. They do not establish that this contact with Ms. Launderville occurred outside the statute of limitations. They also do not establish the precise date on which Ms. Launderville determined that the 1997 Plan might be covered by ERISA. There is thus a failure of proof with regard to Defendants' statute of limitations defense. The court therefore enters judgment in Plaintiffs' favor on Defendants' statute of limitations defense.

Although Mr. Laumeister and Ms. Launderville breached their fiduciary duties with regard to certain aspects of Plan administration, Plaintiffs failed to identify these breaches with any specificity in their presentation of evidence or explain how they may be asserted by Plaintiffs as individuals as opposed to in a representative capacity on the 1997 Plan's behalf. Correspondingly, Plaintiffs fail to articulate what remedy or remedies they seek other than an award of deferred compensation benefits to which they are not entitled. *See King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 747 (9th Cir. 2017) (noting that "it is unclear whether [the plaintiff] seeks relief under [ERISA] section [1132](a)(1)(B), [1132](a)(3), or both[]" and that therefore, on remand, the plaintiff must first "specif[y] whether he still seeks relief under ERISA section [1132](a)(1)(B), what

58

type of equitable remedy he seeks under section [1132](a)(3), and why," before "the district court . . . determine[s] the appropriate remedy.").

Because the court cannot and will not speculate as to the appropriate relief in the absence of guidance from Plaintiffs, the court grants judgment in Plaintiffs' favor on Counts III-V, finding that Mr. Laumeister and Ms. Launderville breached their fiduciary duties to the 1997 Plan and to the Plan Participants and beneficiaries, and in Defendants' favor for their counterclaim for contribution and indemnification. The court declines to award any specific relief at this time. Plaintiffs shall have thirty (30) days from the date of this Order to specify their requested relief. Defendants will be entitled to oppose that relief and propose their own requested relief by filing an opposition within thirty (30) days of the date of Plaintiffs' request.

### E. Whether Defendants Breached their Reporting and Disclosure Requirements.

Plaintiffs allege that Defendants failed to comply with ERISA's reporting and disclosure provisions under 29 U.S.C. § 1025. ERISA requires the provision of pension benefit statements as follows:

> The administrator of an individual account plan . . . shall furnish a pension benefit statement--
>
> > (i) at least once each calendar quarter to a participant or beneficiary who has the right to direct the investment of assets in his or her account under the plan,
> >
> > (ii) at least once each calendar year to a participant or beneficiary who has his or her own account under the plan but does not have the right to direct the investment of assets in that account, and
> >
> > (iii) upon written request to a plan beneficiary not described in clause (i) or (ii).

29 U.S.C. § 1025(a)(1)(A)(i)-(iii). Under ERISA, a pension benefit statement:

> (i) shall indicate, on the basis of the latest available information--
>
> > (I) the total benefits accrued, and
> >
> > (II) the nonforfeitable pension benefits, if any, which have accrued, or the earliest date on which benefits will become nonforfeitable,

(ii) shall include an explanation of any permitted disparity under section 401(l) of Title 26 or any floor-offset arrangement that may be applied in determining any accrued benefits described in clause (i),

(iii) shall be written in a manner calculated to be understood by the average plan participant, and

(iv) may be delivered in written, electronic, or other appropriate form to the extent such form is reasonably accessible to the participant or beneficiary.

*Id.* § 1025(a)(2)(A)(i)-(iv).[17]

ERISA's disclosure requirements provide in pertinent part:

The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary [of Labor] may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C. § 1024(b)(4) (internal footnote omitted).

---

[17] For individual account plans, ERISA states that "any pension benefit statement under clause (i) or (ii) of paragraph (1)(A) shall include":

(i) the value of each investment to which assets in the individual account have been allocated, determined as of the most recent valuation date under the plan, including the value of any assets held in the form of employer securities, without regard to whether such securities were contributed by the plan sponsor or acquired at the direction of the plan or of the participant or beneficiary, and

(ii) in the case of a pension benefit statement under paragraph (1)(A)(i)--

(I) an explanation of any limitations or restrictions on any right of the participant or beneficiary under the plan to direct an investment,

(II) an explanation, written in a manner calculated to be understood by the average plan participant, of the importance, for the long-term retirement security of participants and beneficiaries, of a well-balanced and diversified investment portfolio, including a statement of the risk that holding more than 20 percent of a portfolio in the security of one entity (such as employer securities) may not be adequately diversified, and

(III) a notice directing the participant or beneficiary to the Internet website of the Department of Labor for sources of information on individual investing and diversification.

29 U.S.C. § 1025(a)(2)(B)(i)-(ii).

ERISA provides that:

[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day[.]

29 U.S.C. § 1132(c)(1)(B). The statute defines the term "participant" as follows:

The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).

The Supreme Court has held that "the term 'participant' is naturally read to mean either 'employees in, or reasonably expected to be in, currently covered employment, or former employees who 'have . . . a reasonable expectation of returning to covered employment' or who have a 'colorable claim' to vested benefits[.]" *Firestone Tire & Rubber Co.*, 489 U.S. at 117 (citation omitted). "In order to establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id.* at 117-18. "A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits, however, simply does not fit within the [phrase] 'may become eligible.'" *Id.* at 118.

There is no evidence that any of the Plaintiffs requested Plan information and were denied it. There is also no evidence to support the claim that they are former employees with either a reasonable expectation of returning to CTC or who have a colorable claim to vested benefits. In such circumstances, they cannot prevail on a claim that Defendants have violated their disclosure and reporting requirements for purposes of $100 per day liquidated damages.

On the other hand, the evidence easily establishes that Mr. Laumeister and Ms. Launderville failed to adhere to ERISA in reporting and disclosing Plan information.

Plaintiffs have not articulated any measure of damages other than liquidated damages to which they are not entitled. Judgment is thus entered in Plaintiffs' favor against Defendants and Ms. Launderville for violating ERISA's reporting and disclosure requirements (Count VI).

Plaintiffs shall have thirty (30) days from the date of this Order to specify their requested relief. Defendants will be entitled to oppose that request and propose their own requested relief by filing an opposition within thirty (30) days of the date of Plaintiffs' request.

## CONCLUSION

For the foregoing reasons, the court enters judgment as follows: GRANTS judgment in Defendants' favor on Count I for the wrongful denial of benefits under the Plan; DENIES Plaintiffs' request for a declaratory judgment and injunctive relief in Count II; GRANTS judgment in Plaintiffs' favor on Counts III through V, finding that Mr. Laumeister and Ms. Launderville breached their fiduciary duties to the 1997 Plan and to Plan Participants and beneficiaries; GRANTS judgment in Plaintiffs' favor on Count VI, finding that Mr. Laumeister and Ms. Launderville violated ERISA's reporting and disclosure requirements; GRANTS judgment in Defendants' favor with regard to their counterclaim seeking a right of contribution and indemnification from Ms. Launderville. The court declines to award attorney's fees to either party at this time.

Because the court grants judgment in Plaintiffs' favor as to Counts III through VI and in Defendants' favor as to their counterclaim, but declines to award any specific relief at this time, Plaintiffs shall have thirty (30) days from the date of this Order to specify their requested relief. Defendants will be entitled to oppose that relief and specify the contribution and indemnification they seek from Ms. Launderville by filing an opposition within thirty (30) days of Plaintiffs' request.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of June, 2018.

Christina Reiss, District Judge
United States District Court