UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 DEC 16 PM 3: 42

CLERK
ᏞᎪᎳ
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| DONNA BROWE, TYLER BURGESS, BONNIE JAMIESON, PHILIP JORDAN, LUCILLE LAUNDERVILLE, and THE ESTATE OF BEVERLY BURGESS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 2:15-cv-267 |
| CTC CORPORATION and BRUCE LAUMEISTER, | ) ) ) | |
| Defendants. | ) ) | |

**SUPPLEMENTAL FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND REMEDIAL ORDER**

On June 22, 2018, the court issued Findings of Fact (the "2018 Findings") which it

incorporates herein. (Doc. 216.) After evidentiary hearings on June 3, 2022, August 31,

2022, and October 14, 2022, the court issues the following Supplemental Findings of

Fact, Conclusions of Law, and Remedial Order.

**FINDINGS OF FACT**

**A.    Mandate on Remand.**

1.  On remand from the appeal to the Court of Appeals for the Second Circuit (the

"Second Circuit"), this court was mandated:

> to craft a remedial scheme that takes into account the vested rights of
> participants after conducting, to the extent necessary, any additional fact-
> finding. That remedial scheme should include a mechanism enabling Plan
> participants not parties to this suit to receive any benefits to which they
> may be entitled, similar to that adopted by the district court in the first
> instance. The district court should also provide for an appropriate
> disposition of excess funds, if any, remaining after claims have been paid
> out.

> *Browe v. CTC Corp.*, 15 F.4th 175, 206-07 (2d Cir. 2021).

2. The Second Circuit observed that it "disagree[d] with Plaintiffs on the underlying question of Launderville's liability," affirmed the court's conclusion that Plaintiff "Launderville is liable for contribution as a co-fiduciary," remanded for the court to assess "the extent of Launderville's liability to Laumeister[,]" and held that "Plaintiffs are entitled to seek full satisfaction of the judgment from Laumeister, subject to Laumeister's right to seek contribution from Launderville[.]" *Id.* at 199-200. The Second Circuit concluded that Plaintiff Launderville engaged in "classic self dealing," and should not "escape liability entirely." *Id.* at 201.

3. The Second Circuit held that Plaintiff Launderville's and Plaintiff Browe's breach of fiduciary duty claims were time-barred. The court has entered judgment in Defendants' favor on these claims.

### B.   Notice to Potential Plan Participants.

4. The parties compiled a list of potential Plan Participants who are not parties to this case and obtained their addresses from known and publicly available information. Adequate notice reasonably calculated to reach all Plan Participants was provided by First Class and Certified Mail and by publication in *The Bennington Banner*, a newspaper in general circulation where CTC Corporation operated and where Plan Participants were employed. The parties were further permitted to send a court-approved questionnaire to Plan Participants regarding Plan participation, requests for benefits, withdrawals of benefits, and facts relevant to Defendants' statute of limitations defense.

5. Plan Participant Donald E. Loseby could not be served as he passed away on December 20, 2020. No Plan benefits are due to him.

6. The remaining Plan Participants were either personally served or acknowledged receipt of notice of these proceedings as set forth in Defendants' Report & Certificate of Service Re: Service upon the Plan Participants. (Doc. 295.)

7. The court finds that all potential Plan Participants have been identified.

**C.      Stipulation to Preliminary Fund Balance with Withdrawals.**

8.  The parties stipulated to a fund balance as of August 28, 2022, minus withdrawals as set forth in Plaintiffs' Exhibit 45. In so stipulating, Defendants waived their challenge to Plaintiffs' earnings calculation. The court accepts the parties' stipulation to Exhibit 45 as a reasonable approximation of account balances had the Plan been administered in accordance with ERISA. It therefore adopts the following Preliminary Fund Balance:

### Summary Table 4 - With Withdrawals
### Fund Balance as of Today
### (Prepared 08/28/22)

|  | Employee Percentage | Total Withdrawals | End of Year Balance in Fund |
|---|---|---|---|
| **Eileen Bliss** | 11.43% | -$4,343 | $126,021 |
| **Donna Browe** | 7.99% | $0 | $94,461 |
| **Steve Brown** | 4.21% | $0 | $49,773 |
| **Bev Burgess** | 7.96% | $0 | $94,107 |
| **Bill Elliot** | 5.32% | -$17,394 | $7,174 |
| **Sharon Fish** | 2.83% | $0 | $33,458 |
| **Ed Hojonowski** | 5.20% | $0 | $61,477 |
| **Pat DeCoff** | 1.10% | $0 | $13,005 |
| **Phil Jordan** | 7.05% | $0 | $83,348 |
| **Lucille Launderville** | 16.03% | $0 | $189,514 |
| **Hope Leonard** | 5.60% | -$17,945 | $16,829 |
| **Don Loseby** | 5.39% | -$22,167 | * |
| **Wayne Massari** | 13.77% | -$46,967 | $22,437 |
| **Garry Pleasant** | 2.02% | $0 | $23,881 |
| **Robin Secord** | 2.94% | $0 | $34,758 |
| **Marvin Smith** | 1.16% | $0 | $13,714 |
| ========== | ========== | ========== | ========== |
| **Totals =** | 100.00% | -$108,816 | $863,956 |

* Don Loseby has been compensated by withdrawals in 1997 through 2003

## D.    Additional Withdrawals.

9.  Plan Participants Wayne Massari, Eileen Bliss, and Hope Leonard provided additional information regarding their withdrawals of Plan benefits.

10. Plan Participant Wayne Massari authored a letter stating that he waived any benefits under the Plan. As Mr. Massari did not indicate that he knew the amount of benefits he was waiving, the court denied his letter as insufficient and advised the parties that a declaration under oath would suffice provided Mr. Massari acknowledged the amount of benefits he appeared to be due. No declaration under oath was forthcoming.

11. Plan Participant Eileen Bliss testified under oath that she had received Plan benefits in the amount of $217.15 per month for the period from May 2006 until December 2013. She agrees her Plan account should be credited with those withdrawals. She contends she is still owed Plan benefits from January 1, 2014 through April 2016 to complete 120 months of benefits under the Plan.

12. The parties dispute how the Bliss withdrawals should be reflected. Plaintiffs propose a deduction of the additional withdrawals from the ending Bliss account balance. Defendants correctly point out that this is inconsistent with the methodology used by Plaintiffs' expert witness who calculated earnings based on an annual account balance for each Plan Participant minus withdrawals in the year they were taken. The court agrees that Defendants' proposed treatment of the Bliss withdrawals in the year in which they were taken is most consistent with the methodology Plaintiffs' expert used to create Exhibit 45. Although Defendants' calculation relies on a Department of Labor ("DOL") Online Calculator,[1] this constitutes the best evidence of the impact of the Bliss withdrawals on the Bliss account balance. Rather than advance a more precise calculation performed by

---

[1] DOL's Online Calculator is part of the Employee Benefits Security Administration's Voluntary Fiduciary Correction Program intended to encourage voluntary restoration of Plan benefits. It is described at length in Doc. 274-1 at 4-7.

4

Plaintiffs' expert witness, after notice and an opportunity to do so, Plaintiffs chose to merely dispute Defendants' methodology and computation.[2]

13. The value of Ms. Bliss's account as of December 31, 2004 was $40,074 and Ms. Bliss's account balance as of August 28, 2022, reflecting additional withdrawals, is $69,219. (Doc. 331.)

14. Plan Participant Hope Leonard stated that she received "300 + I'm not sure" in retirement benefits from the Plan. Plaintiffs' Exhibit 45. This statement is insufficient to require recalculation of the benefits she previously received.

### E.    The Restoration Award.

15. Based upon the additional Bliss withdrawals, the Plan Balance is $807,155 as of August 28, 2022 (the "Restoration Award").

16. The Restoration Award includes all Plan Participants identified in the court's and the parties' notice procedures. The court thus finds that after the Restoration Award is paid, there shall be no Plan funds remaining.

17. The court addresses whether further reductions to the Restoration Award should be made based on Defendants' defenses.

### F.    Statute of Limitations and Laches Defenses.

18. Defendants have timely raised a statute of limitations defense. They seek to add a laches defense as of August 31, 2022 as an informal amendment to their Answers filed in this case.

19. Defendants ask the court to find that a wrongful denial of benefits claim is barred by the applicable statute of limitations for all Plan Participants and that, in addition to Plaintiffs Launderville and Browe, Plan Participants Wayne Massari, Eileen Bliss, and Marvin Smith are barred by the applicable statute of limitations from asserting a breach of fiduciary duty claim.

---

[2] This approach is needlessly oppositional and inconsistent with the parties' stipulation to the treatment of withdrawals in Exhibit 45. It would result in an unjustified windfall to Ms. Bliss and would potentially impair the prompt payment in full of the Restoration Award to the remaining Plan Participants. *See* Fed. R. Civ. P. 1. It is also directly adverse to the interests of Plaintiff Launderville who is also Plaintiffs' counsel's client.

20. Defendants seek to assert a laches defense with regard to the claims of the Estate of Beverly Burgess and its heirs, Tyler Burgess and Bonnie Jamieson; Don Loseby; Wayne Massari; Eileen Bliss; Hope Leonard; William Elliot; and Marvin Smith.

21. Plaintiffs ask the court to deny Defendants' laches defense as untimely and inapplicable where ERISA sets forth an express statute of limitations. They further request the court to deny Defendants' statute of limitations defenses against Plaintiffs' breach of fiduciary duty claims.[3]

22. Defendants, Plaintiff Launderville, and the Plan failed to comply with ERISA's requirements for a denial of Plan benefits. No written notice of any kind was provided to any Plan Participant much less one identifying the specific reasons for the denial of benefits and the appeal procedures for challenging that determination.

23. In general, Plan Participants were led to believe that enrollment in the Plan and distributions thereunder were entirely at the discretion of Defendant Laumeister. Plan Participant Garry Pleasant's statement, admitted as Plaintiffs' Exhibit 44, is illustrative:

> I was hired by Lucille Launderville in the spring of 1993 as an assistant Tech manager and a hourly employee. In late 1996 or early 1997 [I] was offered the position of Tech Manager. As part of the incentive to get me to switch to what would be a [s]alaried position, I was offered a pay increase, larger yearly bonuses and enrollment in the deferred compensation plan. I accepted the offer and continued employment as a manager at CTC until the fall of 2004 shortly after returning from a few months of short term disability due to surgery and cancer treatments. My understanding (among others) after years of watching Mr. Laumeister changing the entitlements as he saw fit, (he had complete control of all retirement funds) was that it wasn't worth pursuing after I voluntarily left employment.

> At this time I am on complete disability due to adult onset Muscular Dystrophy and have been since approx[imately] 2012.

---

[3] Although the Second Circuit suggested the court dismiss Plaintiffs Browe's and Launderville's breach of fiduciary duty claims, *see Browe v. CTC Corp.*, 15 F.4th 175, 192 n.8 (2d Cir. 2021), because the Second Circuit held they were barred by the applicable statute of limitations, Plaintiffs opposed that dismissal which the court granted over their objection.

24. Defendants and Plaintiff Launderville provided Plan Participants with either limited or no information regarding account balances or Plan requirements.

25. With regard to Plaintiffs Estate of Beverly Burgess, Tyler Burgess, and Bonnie Jamieson, Defendants and Plaintiff Launderville never advised Beverly Burgess's heirs that their mother's benefits were vested. The heirs received no written notice of the denial of their claim and no notice of appeal procedures. They were not provided with Plan documents or an account balance. Plaintiff Launderville affirmatively misled Tyler Burgess and Bonnie Jamieson as to the availability of benefits from their deceased mother's participation in the Plan. She did so even when she knew other Plan Participants (Wayne Massari, Hope Leonard, William Elliot, and Eileen Bliss) were receiving benefits at the time.

26. Philip Jordan was also not advised of any claim he might assert, much less a denial of that claim, and the appeal procedure. There is no evidence that he was provided Plan documents and account balances.

27. With regard to Plan Participant Wayne Massari, although Mr. Massari was the drafter of the Plan and part of CTC's executive team, he has brought no claim against Defendants.

28. Plan Participant Marvin Smith has also brought no claim against Defendants. In his response to Defendants' Questionnaire, Mr. Smith stated that he "believe[d]" he heard of or learned that CTC's management was using CTC retirement benefits to pay operating expenses between 2004 and 2008 but he did not know who informed him. (Defendants' Exhibit K at 5.) Defendants did not depose Mr. Smith or call him as a witness at the court's evidentiary hearings. Without more, there is insufficient evidence to establish that Mr. Smith was aware that CTC had breached its fiduciary obligations.

29. With regard to Plaintiff Launderville, the court previously found that on February 24, 2008, she advised Defendant Laumeister that she was considering accepting a new job and stated: "before I accept, I wonder what this will mean regarding my Deferred Compensation." (Doc. 216 at 22, ¶ 96) (quoting Plaintiffs' Exhibit 10 at

2). Defendant Laumeister responded in relevant part as follows: "My intention is exactly what I showed you before. I am putting in my will and trust and instructing Mission Trust to pay your [deferred compensation] when you are 65 or when I check out. Donna [Browe's] will be in the same instruction." *Id.* (quoting Plaintiffs' Exhibit 10 at 1).

30. On June 17, 2010, Defendant Laumeister executed a Last Will and Testament that included the following provisions:

> **TENTH:** I direct that my stock in CTC Corp be sold or liquidated as soon as possible after my death, together with the land and buildings known as 252 Benmont Avenue, Bennington, Vermont. I give, devise and bequeath the sum of $90,000.00 from the proceeds of that sale to Lucille Launderville of Shaftsbury, Vermont if she survives me.

> **ELEVENTH:** I give, devise and bequeath the sum of $35,000.00 to Donna Browe, of Bennington, Vermont if she survives me.

> Defendants' Exhibit A8 at 3/D0194.

31. On April 4, 2015, Plaintiff Launderville emailed Defendant Laumeister and requested her CTC retirement funds, stating in relevant part:

> It looks like I will be pushed into retirement about a year or so sooner than anticipated. . . . I am wondering about the deferred compensation which I had counted on in retirement. We can't make any firm plans until I have a complete understanding of where this issue stands. I understand that you have bankrupted CTC, but hope that you can find it in your heart to take care of the commitment which was made so many years ago.

> Defendants' Exhibit A7 at 2/D0191.

32. On April 5, 2015, Defendant Laumeister emailed Plaintiff Launderville and confirmed that Defendant Laumeister planned to personally fund Plaintiffs Launderville's and Browe's deferred compensation, stating in relevant part:

> I did promise to personally fulfill your deferred comp, though it was a CTC responsibility. As you should remember, however, the payment is contingent on 252 Benmont, the store, warehouse and garage on about an acre, providing either a sale or leasing to provide funds. That is my personal property, but I was and still am willing to use it to provide the $$ for you and Donna. The problem is timing, which does not appear to be soon. . . . I'm sorry if all these problems upset your retirement plans. As one who has worked from age 13 to 80, and can't slow down now, I would

advise you both to keep working, do not tap soc. sec. until 65 as you'll lose thousands over the next 20 years[.] Both of you have the ability to find compensation in Bennington County, and I believe that 252 B will eventually sell.

*Id.* at 1/D0190.

33. Based on this evidence, Defendants have established that Plaintiff Launderville knew of Defendants' breaches of their duties under the Plan and their failure to pay benefits due under the Plan no later than February of 2008.

34. Although Plaintiff Browe was not a Plan fiduciary, she was aware that Plaintiff Launderville and Defendants had failed to pay Plan benefits. She, too, attempted to arrange a side deal with Defendant Laumeister whereby she would receive her Plan benefits from him personally. In February of 2008, Plaintiff Browe was aware that she had a claim against CTC for non-payment of her Plan benefits which she decided to forego by seeking those benefits directly from Defendant Laumeister.

**G.    Indemnification and Contribution.**

35. Defendant Laumeister used both the Plan assets as well as his own funds to keep CTC operational and to provide continuing employment to CTC employees including Plan Participants. There was little, if any, personal benefit to him to continue to operate CTC at a deficit.

36. In contrast, Plaintiff Launderville was aware of and facilitated the use of Plan assets to fund CTC's operating expenses at no cost to herself and for her continuing benefit through the receipt of a substantial salary. Thereafter, she sought to secure payment of her and Plaintiff Browe's Plan benefits while either hindering or failing to inform other Plan Participants of her and Defendants' breach of their duties under the Plan and wrongful denial of benefits.

37. It was not until Plaintiff Launderville determined that Defendant Laumeister had reneged on his promise to pay her Plan benefits that she contacted other Plan Participants to file this lawsuit December 28, 2015.

9

## CONCLUSIONS OF LAW

### A.   Whether Defendants Have Waived Plan Requirements.

As the court previously found, Defendants administered the Plan with little regard for "top hat" requirements and the Plan's own terms. Some, but not all, Plan Participants were allowed to receive Plan benefits before they retired. In the case of Plan Participant Bliss, she received Plan benefits while still employed by CTC. Plan Participants were not required to provided evidence of their own Plan contributions. As the Second Circuit observed, under ERISA, vested benefits are non-forfeitable:

> If Plaintiffs had vested benefits which, as discussed below, appears to be the case, they are entitled to those benefits upon their retirement irrespective of their employer at that time. . . . ERISA provides that a participant's benefits under a covered plan vest upon the earlier of her attainment of normal retirement age (as defined in 29 U.S.C. § 1002(24)) or her completion of a specified number of years of service. Once benefits vest, they are nonforfeitable, even if their receipt must await the occurrence of future events such as retirement or death. That is so even if the employee has "consent[ed] to plan provisions that would otherwise require forfeiture.

*Browe*, 15 F.4th at 203 (citations and internal quotation marks omitted).

ERISA requires plans to establish a claim procedure and provides procedural requirements that must be followed. 29 U.S.C. § 1133. It further requires a plan to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant[.]" *Id.* at § 1133(1). Thereafter, plans must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." *Id.* at § 1133(2). The regulations require that an initial notice of a claim denial contain certain information, including the reason for the denial and a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.]" 29 C.F.R. § 2560.503-1(g)(1)(iii).

10

"When making a claim determination under ERISA, an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court." *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 440 (9th Cir. 2020). Allowing Defendants to assert non-compliance with Plan requirements to deny benefits would allow Defendants a second opportunity to deny claims that they failed to deny in accordance with ERISA. In light of their non-compliance and their own disregard of the Plan requirements, Defendants have waived the right to insist on strict compliance with any Plan requirements that purport to serve as conditions precedent to the receipt of Plan benefits. *See id.* at 441 (observing that "Blue Cross' silence and payment [of benefits without plan compliance] was so inconsistent with an intent to enforce the anti-assignment clause as to induce a reasonable belief that [the right to enforce the clause] ha[d] been relinquished") (second and third alterations in original) (internal quotation marks omitted); *Brand Tarzana Surgical Inst., Inc. v. Aetna Life Ins. Co.*, 541 F. Supp. 3d 1031, 1039 (C.D. Cal. 2021) ("Yet, a plan administrator can waive the right to enforce [a plan] provision.") (internal quotation marks omitted).

For the reasons stated above, to the extent Defendants request a finding that Plan Participants have failed to satisfy the conditions for a receipt of Plan benefits, the court DENIES that request.

## B.   Defendants' Statute of Limitations and Laches Defenses.

Defendants ask the court to find that a wrongful denial of benefits claim is barred by the applicable statute of limitations for all Plan Participants and that, in addition to Plaintiffs Launderville and Browe, Plan Participants Wayne Massari, Eileen Bliss, and Marvin Smith are barred by the applicable statute of limitations from bringing a breach of fiduciary duty claim.

Defendants seek to assert a laches defense against the Estate of Beverly Burgess and its heirs, Tyler Burgess and Bonnie Jamieson; Don Loseby; Wayne Massari; Eileen Bliss; Hope Leonard; William Elliot; and Marvin Smith.

11

## 1.     Defendants' Laches Defense.

As Defendants' laches defense is most readily disposed of, the court addresses it first. "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998).

As a threshold issue, Defendants proffer no reason much less an adequate excuse for failing to raise a laches defense during the many years this case has been pending. Plaintiffs have demonstrated that to allow Defendants to do so now would be prejudicial to them and would reward Defendants for a lack of diligence. The court agrees and finds Defendants' laches defense is untimely and thereby waived. *See* Fed. R. Civ. P. 8(c)(1) (stating in the responsive pleading, "a party must affirmatively state any avoidance or affirmative defense, including . . . laches[]"); *see also Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987) (observing a Rule 8(c) affirmative defense "must be asserted in a party's responsive pleading 'at the earliest possible moment' and is a personal defense that is waived if not promptly pleaded").

Even if it were timely, a laches defense would not apply to Plaintiffs' breach of fiduciary duty claim because ERISA provides an express statute of limitations. "[L]aches is not a defense to an action filed within the applicable statute of limitations." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 260 (2d Cir. 1997) (agreeing with Eighth Circuit that "separation of powers principles dictate that federal courts not apply laches to bar a federal statutory claim that is timely filed under an express federal statute of limitations") (brackets and internal quotation marks omitted). "An express limitations period reflects a legislative value judgment striking the appropriate balance between the interests promoted by the statute and countervailing interests of repose." *Id.* (brackets and internal quotation marks omitted). Stated differently, "[l]aches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 961 (2017). For this reason, Defendants' untimely laches defense would not apply to the breach of fiduciary

duty claim asserted by Plaintiffs the Estate of Beverly Burgess, Tyler Burgess, Bonnie Jamieson, and Philip Jordan.

Although there is no express statute of limitations for an action arising under § 1132 of ERISA for a recovery of benefits, the most analogous state statute of limitations is Vermont's six-year statute of limitations for a breach of contract action. *See* 12 V.S.A. § 511 ("A civil action . . . shall be commenced within six years after the cause of action accrues and not thereafter"). Under Vermont law, "[a] cause of action accrues upon 'discovery of facts constituting the basis of the cause of action <u>or</u> the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.'" *Abajian v. TruexCullins, Inc.*, 2017 VT 74, ¶ 12, 205 Vt. 331, 335, 176 A.3d 524, 527. "At that point, the limitations period begins to run, 'and the plaintiff is ultimately chargeable with notice of all the facts that could have been obtained by the exercise of reasonable diligence in prosecuting the inquiry.'" *Id.* at ¶ 12, 205 Vt. at 336, 176 A.3d at 527-28.

Were it timely, Defendants' laches claim would apply to Plaintiffs' recovery of benefits claim. Because it is not timely, it has no impact. Even if the court were to allow a laches defense, it would be unsuccessful because Defendants have failed to establish that Plan Participants other than Plaintiffs Browe and Launderville knew of Defendants' misconduct or possessed sufficient information that would put a reasonable person on notice that further inquiry would lead to the discovery of that misconduct. Defendants did not tell Plan Participants that Defendants were using Plan benefits to pay CTC's operating expenses. They provided no formal or informal announcement of the Plan's alleged termination. Account balances were provided intermittently. Indeed, Defendants cite no Plan documents or evidence of any kind that placed these Plan Participants on actual or inquiry notice. The court therefore DENIES Defendants' request to assert an untimely laches defense with regard to Plaintiffs' recovery of benefits claim.

13

2. **Whether the Statute of Limitations Bars a Breach of Fiduciary Duty Claim by Plan Participants Wayne Massari, Eileen Bliss, and Marvin Smith.**

Defendants seek to bar a fiduciary duty claim by Plan Participants Wayne Massari, Eileen Bliss, and Marvin Smith although none of these Plan Participants have asserted such a claim. *See* 29 U.S.C. § 1132(a)(2) (identifying the classes of individuals empowered to bring such claims); *Browe*, 15 F.4th at 191 n.6 (stating fiduciary breach claims under ERISA "may not be made for individual relief, but instead are brought in a representative capacity on behalf of the plan") (quoting *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 710 F.3d 57, 65 (2d Cir. 2013)). Although the Second Circuit found "[i]t may therefore be appropriate for the district court, on remand, to dismiss Browe and Launderville as plaintiffs with respect to the breach of fiduciary duty claim[,]" *Browe*, 15 F.4th at 192 n.8, it further found the "other plaintiffs can bring that claim without running afoul of the statute of limitations[.]" *Id.* The remaining Plaintiffs, the Estate of Beverly Burgess, Tyler Burgess, Bonnie Jamieson, and Philip Jordan, have established Defendants' breach of fiduciary duty and are entitled to a judgment against Defendants on that claim.

3. **Whether the Statute of Limitations Bars Plaintiffs' and Plan Participants' Recovery of Benefits Claim.**

Defendants claim that Plaintiffs, as well as Plan Participants, are barred from a recovery of Plan benefits because their claims accrue under ERISA "upon a clear repudiation [by the Plan for a request for benefits] that is known, or should be known, to the plaintiff—regardless of whether the plaintiff has filed a formal application for benefits." *Carey v. Int'l Brotherhood of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 48 (2d Cir. 1999). In making this argument, Defendants point to no clear denial of benefits by CTC to any Plan Participant other than Plaintiff Launderville's false statements to Beverly Burgess's heirs.

The failure to follow ERISA's notice requirements generally bars a statute of limitations defense. *See Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1031 (9th Cir. 2006) (ruling that the failure to comply with ERISA's notification requirements was a

"highly significant factor . . . in determining whether a claim has accrued for benefits under ERISA[]"); *Bourgeois v. Pension Plan for Emps. of Santa Fe Int'l Corps.*, 215 F.3d 475, 482 (5th Cir. 2000) (holding that an employer's failure to provide adequate notice of a claims procedure estops the employer from claiming the employees' claim was time-barred).

While Plaintiff Launderville's misrepresentations to Tyler Burgess and Bonnie Jamieson constituted a clear repudiation of a request for benefits, Defendants point to no facts that would support a conclusion that these Plaintiffs reasonably should have known that Plaintiff Launderville's statements were false. At the time, these Plaintiffs possessed only limited documentation with regard to their mother's Plan participation, they were not provided with an account statement or the Plan itself, and they reasonably accepted Plaintiff Launderville's false assurances that there were no benefits available even when Plan benefits were at that time being paid to other Plan Participants.

When a repudiation of benefits request is accompanied by an intentional and material misstatement of fact, the applicable statute of limitations does not bar that claim unless other facts put the Estate and its heirs on inquiry notice. *See* 29 U.S.C. § 1133 (requiring accurate, adequate, and timely information to plan participants in claim denials).

Similarly, Defendants cite no evidence that would support a statute of limitations defense against Philip Jordan's claim for recovery of benefits. Defendants are thus not entitled to dismissal of his recovery of benefits claim. *See Browe*, 15 F.4th at 192 ("Put another way, it was not enough for Defendants to prove that the limitations period had run as to *some* Plaintiffs prior to the filing of this suit; rather, Defendants had to prove that *all* Plaintiffs acquired 'actual knowledge' of the breaches outside the limitations period for the defense to succeed.").

To the extent that Defendants argue that Plaintiffs as well as all other Plan Participants should be deemed to have forfeited their claims to benefits, they cite no authority that would support such a claim. Because Defendants believed the Plan was not governed by ERISA, they granted and denied benefits requests at their discretion. The

Plan was not administered with any degree of professionalism. Plan Administrators failed to create and maintain key Plan documents and account balances and to provide them to Plan Participants. They either waived or enforced Plan requirements as they saw fit. Few, if any, Plaintiffs had Plan documents or even their own account records in their possession when they filed suit.

When CTC ceased operations, Plan Participants were provided with no formal or informal notice of the alleged termination of the Plan. They were also provided with no information regarding their entitlement to Plan benefits. *See* 29 U.S.C. § 1133, *see also* 29 C.F.R. § 2560.503-1(b) (requiring a plan's procedures to include appeal process regarding adverse benefits determination). Plan Participants were then deprived of "a full and fair review by the appropriate named fiduciary of the decision denying the claim." *Id.* at § 1133(2). At best, Plan Participants were informed that CTC had been operating at a deficit for some time and could no longer be sustained on that basis. It was not until Plaintiff Launderville's side deal with Defendant Laumeister fell through and she decided to pursue legal action that other Plan Participants became aware of their potential rights to Plan benefits. Even then, many Plan Participants gleaned notice of their rights solely from this court's proceedings.

Because there was no clear repudiation of a request for Plan benefits, no forfeiture of benefits may be found. *See Brand Tarzana Surgical Inst., Inc.*, 541 F. Supp. 3d at 1037 (agreeing with other courts that "inadequate notice excuses a party from its obligations" and noting that the court "declines to fault a party for failing to act when it was not told action was required[]"). Defendants' citation of evidence that Plan Participants Don Loseby, Wayne Massari, Eileen Bliss, Hope Leonard, William Elliot, and Marvin Smith all received Plan benefits until 2007, and in Ms. Bliss's case until 2008, does not alter that conclusion. Defendants led these Plan Participants to believe it would be futile to make a claim for benefits when CTC ceased operations because CTC had no money to pay them. *See Miles v. N.Y. State Teamsters Conf. Pension & Ret. Fund Emp. Pension Benefit Plan*, 698 F.2d 593, 598 (2d Cir. 1983). These Plan Participants were also not advised in writing of the denial of any request for a continuation of those benefits.

16

"[F]ailure to comply with the regulatory obligation to disclose the existence of a cause of action to the plan participant whose benefits have been denied is the type of concealment that entitles [a] plaintiff to equitable tolling of the statute of limitations." *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 324 (2d Cir. 2004); *see also Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 246 (2d Cir. 2007) (finding that when denial of benefits claim fails to comply with § 1133's notice requirements to adequately set forth the reasons for the denial and the right to appeal, plan administers are precluded from arguing plan participants' response failed to exhaust administrative procedures).

Accordingly, other than Plaintiffs Browe and Launderville who shall be addressed separately, no other Plaintiff and no other Plan Participant has forfeited his or her claim to benefits by failing to take timely action.

### 4.   Request for Benefit Claims Asserted by Plaintiffs Browe and Launderville.

As of February 2008, Plaintiffs Browe and Launderville both knew that "CTC's cash flow was insufficient to pay its general creditors or to fund its deferred compensation accounts." (Doc. 216 at 18, ¶ 79.) Both of these Plaintiffs sought to take advantage of their insider status to secure a side deal with Defendant Laumeister that was unavailable to other Plan Participants. Because they knew that CTC would not and could not pay their Plan benefits, they approached Defendant Laumeister directly with the understanding that rather than file suit, they could extract their Plan benefits from him based upon his personal promise to make them whole.

Both Plaintiffs Browe and Launderville possessed financial expertise as well as access to CTC's financial records. In Plaintiff Launderville's case, she was a Plan Administrator and either attended or received the minutes of executive meetings. Although neither Plaintiff Browe nor Plaintiff Launderville received a benefit request denial required by ERISA, the evidence demonstrates a clear repudiation of their claims to obtain their benefits from the Plan, and to pursue their claim for Plan benefits directly from Defendant Laumeister.

"The relevant question is not the intention underlying [D]efendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Veltri*, 393 F.3d at 323. In the case of Plaintiffs Browe and Launderville, any reasonable person in their situation would have been aware of a cause of action, regardless of whether that person knew the precise legal claim to be advanced. The court therefore finds in favor of Defendants on their statute of limitations defense to Plaintiffs Browe's and Launderville's claim to recover benefits under the Plan.

## C.   Whether Plaintiffs Browe and Launderville Forfeited their Vested Plan Benefits.

The Second Circuit's mandate requires the court to formulate a remedial plan to distribute benefits under the Plan. In doing so, the Second Circuit did not exclude Plaintiffs Browe and Launderville from that distribution. Nor do Defendants cite any authority that would allow Defendants to refuse to pay vested Plan benefits when a Plan is erroneously "terminated" in a manner that does not comply with ERISA merely because a Plan Participant has either not filed suit or is barred by the applicable statute of limitations from doing so. In other words, denial of Plaintiffs Browe's and Launderville's rights to bring a claim against Defendants for recovery of benefits does not automatically forfeit their right to vested benefits pursuant to the court's remedial order.

Upon termination of an ERISA plan, 29 U.S.C. § 1344 requires the distribution of vested, "nonforfeitable" benefits first. Plaintiffs acknowledge that if this takes place, their recovery of benefits claim will be rendered moot. As Plaintiffs observe:

> If the remedial scheme now crafted by this [c]ourt complies with § 1344 and with the Second Circuit's instructions, and Plaintiffs' benefits are distributed accordingly from the Plan's recovered funds, then Plaintiffs' Count I claims will be rendered moot as an alternative form of relief. The distribution of recovered Plan assets, for Plaintiffs and nonparty participants alike, therefore does not depend on the resolution of any individual wrongful denial of benefits claims.

(Doc. 305 at 3.)

Defendants' obligation to restore Plan benefits is to the Plan and Plan assets "shall be held in trust" and "shall never inure to the benefit of any employer[.]" 29 U.S.C.

§ 1103(a), (c)(1). Plan benefits can be transferred to Defendants only if all vested and non-vested benefits have been distributed and only if "the distribution does not contravene any provision of law, and the plan provides for such a distribution in these circumstances." 29 U.S.C. §§ 1344(a), (d)(1)(B)-(C).

Here, Defendants have not demonstrated that they are entitled to retain any Plan Participant's vested benefits in a court-ordered ERISA plan termination. Distribution of Plan benefits is instead governed by § 1344 of ERISA. *See Browe*, 15 F.4th at 198 & n.14.

As Defendants concede, "ERISA is liberally construed consistent with its important remedial purposes of protecting the integrity of employee benefit plan assets and deterring fiduciary violations." (Doc. 274-1 at 1.) It requires plan fiduciaries to "make good . . . *any* losses . . . resulting from" their breach. *Browe*, 15 F.4th at 199 (quoting 29 U.S.C. § 1109(a)) (omissions in original). As a result, while Plaintiffs Browe and Launderville may be precluded from bringing a legal claim for recovery of benefits,[4] they are otherwise similarly situated to all other Plan Participants and should be treated the same, subject to Plaintiff Launderville's liability for contribution and indemnification.

## D.   Liability of Plaintiff Launderville for Contribution and Indemnification.

The court's June 7, 2022 Entry Order reflects the parties' agreement not to introduce additional evidence regarding Defendants' counterclaims for contribution and indemnification. The evidence before the court on these issues is therefore confined to the court's 2018 Findings, the Second Circuit's interpretation of this evidence, and the Second Circuit's conclusion affirming "the district court's conclusion that [Plaintiff] Launderville is liable for contribution as a co-fiduciary," and remanding "for the district court to assess . . . the extent of [Plaintiff] Launderville's liability to [Defendant] Laumeister." *Browe*, 15 F.4th at 199.

---

[4] This may impact whether these Plaintiffs can claim prevailing party status and seek attorney's fees.

### 1.   Contribution.

As the Second Circuit stated, Plaintiff Launderville engaged in "classic self dealing," and should not "escape liability entirely." *Id.* at 201. It ruled that, "Plaintiffs are entitled to seek full satisfaction of the judgment from [Defendant] Laumeister, subject to [Defendant] Laumeister's right to seek contribution from [Plaintiff] Launderville[.]" *Id.* at 200. Plaintiff Launderville's handling of the claim for benefits filed by Ms. Burgess's heirs, Ms. Jamieson and Mr. Burgess, reveals at least some intent to benefit some Plan Participants and not others.

ERISA provides "a fiduciary is vicariously liable for the acts of his co-fiduciary where, *inter alia,* 'he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.'" *Browe*, 15 F.4th at 200 (quoting 29 U.S.C. § 1105(a)(3)). In this case, Plaintiff Launderville "neither notified other participants of [Defendant] Laumeister's efforts to use Plan assets to fund CTC's operating shortfalls nor endeavored to take any steps to prevent him from doing so." *Browe*, 15 F.4th at 201. The Second Circuit found CTC's use of Plan assets:

> directly benefitted [Plaintiff] Launderville – she had a lucrative position at CTC, and it was in her interest for the company to remain afloat so that she could continue to collect her salary. Moreover, while she was furthering [Defendant] Laumeister's use of Plan assets to prop up CTC, [Plaintiff] Launderville was also working to secure her own interests, cutting a side deal with [Defendant] Laumeister to ensure that she received compensation from his estate in lieu of what she would have received through the Plan[.]

*Id.* She did all of this "while taking no steps to notify the other Plan participants . . . or otherwise to protect their interests." *Id.*

The Second Circuit further found that, "[n]ot only did [Plaintiff Launderville] take no steps to remedy [Defendant] Laumeister's breach, which is sufficient to impose co-fiduciary liability, but she also engaged in classic self dealing, affirmatively furthering that breach in violation of her own fiduciary duties so as to secure a continuing benefit for herself." *Id.*

ERISA § 404(a)(1)(A) requires all plan fiduciaries to discharge their duties solely in the interests of participants and beneficiaries, and for the exclusive purpose of

providing participants and beneficiaries with benefits. 29 U.S.C. § 1104(a)(1)(A). This "exclusive purpose" rule is reflected in ERISA's prohibitions against self-dealing. For example, § 406(b) of ERISA prohibits a fiduciary from dealing with plan assets in the fiduciary's own interest or for the fiduciary's own account. Under § 406(b), a fiduciary may not:

> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

Citing *Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16-18 (2d Cir. 1991), the Second Circuit observed that "the federal courts are authorized to develop a federal common-law under ERISA concerning the allocation of liability among co-fiduciaries with reference to traditional principles of trust law." *Browe*, 15 F.4th at 200-01.The Restatement (Second) of Trusts, in turn, provides:

> where two trustees are liable to the beneficiary for a breach of trust, each of them is entitled to contribution from the other, except that . . . if one of them is substantially more at fault than the other, he is not entitled to contribution from the other but the other is entitled to indemnity from him[.]

Restatement (Second) of Trusts § 258(1)(a). The comment to subsection (1) explains:

> Where two trustees participate in a breach of trust, ordinarily either trustee who makes good the breach of trust can compel the other to reimburse him as to one-half of what he has had to pay; and if there are more than two trustees any one of the trustees who has made good the breach of trust can compel the others to reimburse him proportionately.

*Id.* cmt. on subsection (1).

The Restatement identifies the following factors to consider in deciding whether one co-fiduciary is substantially more at fault than another:

(1) whether he fraudulently induced the other to join in the breach of trust;

(2) whether he intentionally committed a breach of trust and the other was at most guilty of negligence;

(3) whether because of his greater experience he controlled the conduct of the other, as in the case where he was an attorney and the other was a person without business experience who was accustomed to rely upon his judgment;

(4) whether he alone committed the breach of trust and the other is liable only because of an improper delegation, or failure to exercise reasonable care to prevent him from committing a breach of trust, or neglect to take proper steps to compel him to redress the breach of trust.

*Id.* at cmt. (d) (citing Restatement (Second) of Trusts § 224).

Application of the foregoing factors to the facts in this case reveals that Defendants did not fraudulently induce or otherwise compel Plaintiff Launderville to join in their breaches of trust, rather her conduct was knowing, voluntary, and intentional and not merely negligent. Although Defendant Laumeister was the primary Plan decision-maker and Plaintiff Launderville was his subordinate employee, she had considerable discretion in Plan management including proposing candidates for Plan participation and notifying at least one Plan Participant's heirs that no benefits were available. As the court previously found:

106. Ms. Launderville advised Ms. Jamieson shortly after Ms. Burgess's death on November 29, 2004 that there was nothing available to her under the Plan other than her mother's own IRA. . . .

107. Following Ms. Launderville's denial of benefits based on Ms. Burgess's participation in the 1997 Plan, neither Ms. Jamieson nor Mr. Burgess spoke with Mr. Laumeister about any possible claim that they may have had against CTC for deferred compensation payable as death benefits. Neither Ms. Jamieson nor Mr. Burgess made any other claim against the Plan until after they were contacted by Ms. Launderville in 2015 and encouraged to join in this lawsuit.

(Doc. 216 at 23-24.) At the time of her misrepresentations in 2004, CTC was paying Plan benefits to at least four Plan Participants. When Plaintiff Launderville denied the heirs' request for the Plan's death benefit, she was thus not only dishonest but she favored some Plan beneficiaries over others for no apparent reason other than personal preference.

Neither Defendant Laumeister nor Plaintiff Launderville was an attorney, and neither sought nor obtained legal counsel before using Plan assets to pay for CTC's operating expenses. Both Defendant Laumeister and Plaintiff Launderville had sufficient business experience to understand obtaining legal advice would have been prudent.

Plaintiff Launderville's breach of trust was not the result of an improper delegation or a failure to exercise reasonable care in preventing or redressing Defendants' breach. She affirmatively violated her fiduciary obligations and did not protest the misuse of Plan assets. She notified other Plan Participants and sought redress only when her side deal with Defendant Laumeister proved unsatisfactory. Until that time, she was willing to ensure that only she and Plaintiff Browe knew of Defendants' Plan violations. Plaintiff Launderville maintained few records of her own, did not appear to understand or acknowledge her fiduciary obligations, and took no steps to minimize the harm to other Plan Participants.

In contrast, Defendants Laumeister and CTC did not benefit from their fiduciary breaches. Defendant Laumeister was using substantial personal funds in addition to Plan assets to keep CTC operational. He acted based on an erroneous belief that the Plan was a "top hat" plan which he could administer as he saw fit. *See Browe*, 15 F.4th at 198 n.15 ("If the Plan had been a top hat plan, [Plan P]articipants would have had no recourse to challenge [Defendant] Laumeister's misappropriation of Plan assets under ERISA's fiduciary provisions. They would have been free, however, to pursue a remedy in contract."). Although there was gross negligence in his failure to obtain legal counsel in both the drafting and administration of the Plan, Defendants' desire to create a plan that would benefit high performing and valuable CTC employees was laudable.

Defendants' destruction of Plan records in violation of ERISA undoubtedly prejudiced Plan Participants. The court has, however, found no malicious intent in the destruction of these records.

Although Defendant Laumeister was the primary decision-maker, he acted with less self-interest than Plaintiff Launderville. Plaintiff Launderville's pursuit of a side deal bestowed no benefit on Defendant Laumeister but rather would again require him to use

his personal assets to fund Plan obligations. Her self-dealing provided an incentive to conceal Plan violations from other Plan Participants. On balance and upon reexamination of the evidence and the Second Circuit's interpretation of it, Defendant Laumeister and Plaintiff Launderville are similarly situated in terms of their breaches of trust and Defendant Laumeister is not substantially more culpable than Plaintiff Launderville. Rather, they are equally culpable on a 50/50 basis albeit for different reasons.

Comment (b) of the Restatement states that when two trustees breach their duties, the trustee who "makes good" to beneficiaries and restores what was wrongfully taken is entitled to contribution from the other trustee equal to one-half of what was paid in restitution. In that event, the Restatement provides the following illustration of the appropriate outcome:

> c. Under the circumstances stated in Comment *b*, a trustee not only is entitled to recover from his co-trustee a proportionate share of what he has actually paid in making good the breach of trust but also is entitled to compel his co-trustee to join in making good the breach of trust by paying his share.

Restatement (Second) of Trusts § 258 cmt. c. Defendants are thus entitled to contribution from Plaintiff Launderville for one half of the Restoration Award paid to Plan Participants and are entitled to compel Plaintiff Launderville to join them in paying the Restoration Award.

### 2.   Indemnification.

The "right to seek . . . indemnification is not an additional right of action; it is a procedural device, implicit in the common law of trusts, for fairly distributing costs among all culpable parties regardless of whom the plaintiff chooses to sue directly for the breach of trust." *Haddock v. Nationwide Fin. Servs., Inc.*, 570 F. Supp. 2d 355, 360 (D. Conn. 2008). Under § 258(1)(b) of the Restatement (Second) of Trusts, a claim for indemnity may be made in combination with a claim for contribution. Section 258(1)(b) provides:

> where two trustees are liable to the beneficiary for a breach of trust, each of them is entitled to contribution from the other, except that . . . **if one of them receives a benefit from the breach of trust, the other is entitled to**

> **indemnity** from him **to the extent of the benefit**; and for any further
> liability, if neither is more at fault than the other, each is entitled to
> contribution.

Restatement (Second) of Trusts § 258(1)(b) (emphasis supplied).[5]

> Defendants argue in favor of indemnification as follows:

> Launderville received a salary of about $105,000 per year during her final
> years of CTC service. But for CTC's use of Plan assets, CTC would not
> have been able to make payroll, pay its expenses, or sustain its operations.
> Launderville's benefit then was the total value of the compensation
> Launderville received from the time CTC began using Plan assets until the
> time Launderville resigned from CTC. By way of emphasis, Launderville's
> salary was not the only benefit Launderville received. CTC may have paid
> and/or provided other employee benefits, such as health insurance. To the
> extent CTC made any payments to Launderville's Plan account or any other
> tax deferred account, these payments constitute benefits resulting from the
> breach.

(Doc. 299-1 at 17.)

Although Defendants are correct that Plaintiff Launderville benefited from
Defendants' breaches of trust because she continued to receive her salary, she received no
benefit to which she was not otherwise entitled. The salary and benefits she received
during this time period were not increased and were consistent with her existing
employment relationship with CTC. To hold that she must pay back her salary and
benefits to Defendants, who are also wrongdoers, would be to effectively require her to
have worked for free. This would undoubtedly be unlawful under the existing wage and
hours laws, and it would reward Defendants for their wrongdoing.

---

[5] Comment (f) of § 258 of the Restatement (Second) of Trusts provides guidance in the form of
two Illustrations. In Illustration 7, A and B are fiduciaries for C. A and B purchase land from A
personally for $10,000, and neither intends to defraud C. The land is actually worth $8,000 and
later sells for $8,000. A and B are jointly and severally liable to C for paying $2,000 more than
the land was worth. A is not entitled to indemnity from B because A received the $2,000. B is
entitled to indemnity from A because A received the benefit of the $2,000. In Illustration 8, A
and B are trustees for C. A and B, acting in good faith, join to pay A compensation for extra
services to which A is not entitled. Although A and B are both liable to C, A is not entitled to
indemnity from B, because A received payment to which A was not entitled. B is entitled to
indemnity from A because B did not receive the benefit of the payment to A.

Because Plaintiff Launderville received no benefit from Defendants' breaches of trust other than one to which she was entitled, Defendants are not entitled to indemnification from her. The court therefore DENIES Defendants' counterclaim for indemnification.

### E.    Whether Defendants and Plan Participants are Entitled to a Set-Off.

The court agrees with Defendants that a set-off against Plaintiff Launderville's receipt of a Plan distribution is available even when not pled as an affirmative defense. *Lehr v. Perri*, 2019 WL 1556672, at *5 (E.D. Cal. Apr. 10, 2019) is instructive. There, the court held that it could order a set-off against the receipt of vested benefits to the amounts owed by a de facto fiduciary to the plan:

> [C]onsistent with ERISA, the court can set off money [the fiduciary] owes to the plan against the money owed to her by the plan. Even though defendants did not plead set off as an affirmative defense, the bankruptcy judge already ordered [the fiduciary] to pay $326,851 in damages for money she took from the company's Profit Sharing Distributions. This amount dwarfs what she claims she had in vested benefits in 2007. [The fiduciary] provides the court with no evidence that shows that her vested benefits at the time of filing this complaint exceed the amount she embezzled from the plan.

*Id.* (footnote and citation omitted). This approach is also consistent with § 257 of the Restatement (Second) of Trusts which states that if "a trustee who is also one of the beneficiaries commits a breach of trust, the other beneficiaries *are entitled to a charge upon his beneficial interest* to secure their claims against him for the breach of trust, unless the settlor manifested a different intention." *Id.* (emphasis supplied).

A set-off furthers the court's remedial plan because other Plan Participants should not suffer a delay or partial payment of their Plan benefits because Plaintiff Launderville, a wrongdoer, is also entitled to receive Plan benefits. Instead, Defendants must pay the Restoration Award to all other Plan Participants first and may then set off the amount due and owing to Plaintiff Launderville by the amount of her contribution obligation to Defendants. In this way, Plaintiff Launderville will receive what she is entitled to under

the Plan while satisfying her contribution obligation which Defendants are entitled to compel her to pay. The court therefore GRANTS Defendants' request for a set-off.

## REMEDIAL ORDER

1. Defendants CTC Corp. and Bruce Laumeister are hereby jointly and severally liable to pay the Restoration Award in the amount of $807,155 as follows:

| Participant Name | Balance Owed |
|---|---|
| Eileen Bliss | $69,219 |
| Donna Browe | $94,461 |
| Steve Brown | $49,773 |
| Bev Burgess | $94,107 |
| Bill Elliot | $7,174 |
| Sharon Fish | $33,458 |
| Ed Hojonowski | $61,477 |
| Pat DeCoff | $13,005 |
| Phil Jordan | $83,348 |
| Lucille Launderville | $189,514 |
| Hope Leonard | $16,829 |
| Wayne Massari | $22,437 |
| Garry Pleasant | $23,881 |
| Robin Second | $34,758 |
| Marvin Smith | $13,714 |

2. Defendants CTC Corp. and Bruce Laumeister are hereby entitled to contribution from Plaintiff Launderville in the amount of one half of the Restoration Award paid to all other Plan Participants. Judgment is entered in Defendants' favor and against Plaintiff Launderville on Defendants' counterclaim for contribution (the "Contribution Judgment"). Defendants' indemnification claim is hereby DISMISSED.

3. Provided Defendants CTC Corp. and Bruce Laumeister pay the Restoration Award to all other Plan Participants first, they may set off the amount due to Plaintiff Launderville under the Plan to satisfy the Contribution Judgment. If there are remaining Plan benefits due to Plaintiff Launderville after the Contribution Judgment is satisfied, Defendants shall promptly pay them to her. If there is an amount due and owing from Plaintiff Launderville for the Contribution Judgment after the remainder of the Restoration Award is paid,

Defendants may bring a civil action to obtain payment from her in an appropriate court and may seek an order compelling her to pay the remainder of the Contribution Judgment from this court.

4. Once the Restoration Award is paid in full, the Plan shall be terminated. At that point, Plaintiffs' recovery of benefits claims against Defendants shall be deemed moot.

5. Judgement is entered in favor of Plaintiffs Estate of Beverly Burgess, Tyler Burgess, Bonnie Jamieson, and Philip Jordan and against Defendants on these Plaintiffs' breach of fiduciary duty claim.

6. Plaintiffs' requests for declaratory and injunctive relief are DENIED AS MOOT.

7. Any party may request an award of attorney's fees within twenty (20) days of this Order. The court expresses no opinion at this time as to whether attorney's fees are available.

8. The court shall retain jurisdiction over this case until the Restoration Award is paid in full, however, its retention of jurisdiction shall pertain solely to its Remedial Order.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _16th_ day of December, 2022.

Christina Reiss, District Judge
United States District Court